# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE; ELIEZER JIMENEZ; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; STATE OF ARIZONA; STATE OF WEST VIRGINIA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF UTAH; and STATE OF WYOMING,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and STEVEN M. DETTELBACH as the DIRECTOR OF ATF,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of North Dakota
The Honorable District Court Judge Peter D. Welte
Case No. 3:22-cv-116

## PLAINTIFFS-APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND FOR EXPEDITED BRIEFING AND CONSIDERATION OF THIS MOTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION AND STATEMENT ...................................................... 1

ARGUMENT ........................................................................................... 8

    I.    The District Court Erred in Concluding Plaintiffs Were Unlikely to Succeed on the Merits. .......................................... 8

        A.    The District Court Erred by Finding the Final Rule to Be a "Logistical Outgrowth" of the NPRM. ...... 8

        B.    The District Court Erred by Sanctioning the Agency's Additions to the Statutory Text................... 14

            1.    The District Court Erroneously Concluded that a "Firearm" Need Not Have a "Frame of Receiver." ............................................................ 15

            2.    The District Court Permitted ATF to Reqrute the Statutory Language. ..................................... 18

            3.    The District Court Permitted ATF to Create Entirely New Statutory Requirements. ............. 20

        C.    The Court Erred by Absolving ATF of the Duty to Explain its Significant Policy Shifts. ........................... 23

    II.    Plaintiffs Are Being, and Will Continue to Be, Irreparably Harmed Without an Injunction. ....................... 25

    III.    The Balance of Equities and Public Interest Supports an Injunction. .......................................................................... 31

CONCLUSION .................................................................................. 32

CERTIFICATE OF COMPLIANCE ...................................................... 42

CERTIFICATE OF SERVICE .............................................................. 43

Appellate Case: 22-2812    Page: 2    Date Filed: 09/07/2022 Entry ID: 5195743

# TABLE OF AUTHORITIES

## CASES

*Ala. Ass'n of Realtors v. HHS,*
 141 S. Ct. 2485 (2021) .......................................................................... 31

*Allina Health Servs. v. Sebelius,*
 746 F.3d 1102 (D.C. Cir. 2014) ........................................................... 14

*Citizens Telecomm. Co. of Minnesota, LLC v. Fed. Commc'ns Comm'n,*
 901 F.3d 991 (8th Cir. 2018) ..................................................... 9, 11, 13

*CSX Transp., Inc. v. Surface Transp. Bd.,*
 584 F.3d 1076 (D.C. Cir. 2009) .................................................. 9, 12, 14

*Dep't of the Army v. Blue Fox, Inc.,*
 525 U.S. 255 (1999) ................................................................................ 26

*Gordon v. Novastar Mortg., Inc. (In re Hedrick),*
 524 F.3d 1175 (11th Cir. 2008) ........................................................... 23

*Hinz v. Neuroscience, Inc.,*
 538 F.3d 979 (8th Cir. 2008) ............................................................... 25

*Iowa Utils. Bd. v. FCC,*
 109 F.3d 418 (8th Cir. 1996) ............................................................... 26

*J. McIntyre Mach., Ltd. v. Nicastro,*
 564 U.S. 873 (2011) ................................................................................ 20

*Loughrin v. United States,*
 573 U.S. 351 (2014) ................................................................................ 19

*Mkt. Synergy Grp., Inc. v. United States Dep't of Labor,*
 885 F.3d 676 (10th Cir. 2018) ............................................................. 11

*Nken v. Holder,*
 556 U.S. 418 (2009) ................................................................................ 31

*Nw. Airlines, Inc. v. Goldschmidt,*
 645 F.2d 1309 (8th Cir. 1981) ............................................................. 11

Appellate Case: 22-2812     Page: 3     Date Filed: 09/07/2022 Entry ID: 5195743

*NYSRPA v. Bruen,*
   597 U.S. ___, 2022 U.S. LEXIS 3055 (2022)......................................29

*Org. for Black Struggle v. Ashcroft,*
   978 F.3d 603 (8th Cir. 2020) ...............................................................8

*Reprod. Health Servs. of Planned Parenthood of the St. Louis Region v.*
   *Parson,*
   1 F.4th 552 (8th Cir. 2021) ................................................................25

*Shell Oil Co. v. EPA,*
   950 F.3d 741 (D.C. Cir. 1991) ...........................................................11

*United States v. Annis,*
   446 F.3d 852 (8th Cir. 2006) ..............................................................18

*United States v. Annis,*
   6:04-cr-02032 (N.D. Ia.) ....................................................................18

*United States v. Davis,*
   139 S. Ct. 2319 (2019).......................................................................22

*Utility Air Regulatory Group v. EPA,*
   573 U.S. 302 (2014)............................................................................22

*VanDerStok, et al., v. Garland, et al.,*
   Civil Action No. 4:22-cv-00691-O (N.D. Tx.) . 4, 5, 16, 17, 18, 21, 28, 29

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ...........................................................................20

**STATUTES**

18 U.S.C. § 921(a)(3).............................................................................16

18 U.S.C. § 921(a)(3)(A).........................................................................18

18 U.S.C. § 921(a)(3)(B)....................................................................17, 19

18 U.S.C. 921(a)(3) ................................................................................2

**RULES**

Appellate Case: 22-2812     Page: 4     Date Filed: 09/07/2022 Entry ID: 5195743

FRAP 8(a)(2)(A)(ii) ...................................................................... 7

**REGULATIONS**

87 FR 24652 (Apr. 26, 2022) ............................................... 1, 10

**OTHER AUTHORITIES**

ATF, "Definition of 'Frame or Receiver' and Identification of Firearms," (Regulatory Impact Analysis and Final Regulatory Flexibility Analysis), 27 CFR Parts 447, 478, and 479 (Apr. 2022) .................... 29

H.R.377, Homemade Firearms Accountability Act of 2015, 114th Congress (2015-2016), https://www.congress.gov/bill/114th-congress/house-bill/377 ........................................................ 21

R. Winton, "What we know about the crude, homemade gun used in Shinzo Abe's assassination," *Los Angeles Times*, July 8, 2022, https://lat.ms/3KfVvwU ...................................................... 16

The Firearm Blog, https://www.thefirearmblog.com/blog/wp-content/uploads/2019/03/25zipgun.jpg ............................................... 16

# INTRODUCTION AND STATEMENT

This case involves a challenge to various regulations promulgated as part of an omnibus rulemaking issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on April 26, 2022, 2021R-05F, 87 FR 24652, and which recently took effect on August 24, 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms" ("Final Rule"). That Final Rule consists of hundreds of pages of preamble and explanation, a cornucopia of new regulatory enactments, and a lengthy economic impact analysis detailing the acknowledged harms to the Second Amendment community that are now occurring. In the days since its implementation, the Final Rule already has had widespread and deleterious effects on the firearms community, producing confusion and uncertainty about how to come into compliance with its inherently vague terms, and causing varied, significant, and irreparable harm to both the individual plaintiffs named herein and the members and supporters of the organizational plaintiffs. In addition, the Plaintiff States are suffering injury to their sovereign interests under the Final Rule, which disrupts their policy choices through federal overreach, and are suffering unrecoverable economic loss as the Final Rule's market disruptions

Appellate Case: 22-2812     Page: 6     Date Filed: 09/07/2022 Entry ID: 5195743

decrease tax revenue.

Among its numerous regulatory enactments, the Final Rule has redefined the statutory term "frame or receiver" contained in the 1968 Gun Control Act's ("GCA") definition of "firearm" (18 U.S.C. 921(a)(3)), replacing the prior regulatory definition that existed unmolested for more than five decades (27 C.F.R. 478.11). Whereas the prior regulation was a fairly simple and straightforward definition of 30 words, the Final Rule put in its place a nebulous, multi-section definition consisting of nearly 1,700 words, replete with 6 parts, 20 subparts and sub-sub parts, 19 pictures, and several unenumerated "examples" of how the definition should be applied (and, at times, should not be applied) to certain firearms.

Expanding the statutory text far beyond the limits of what Congress chose to regulate, this new definition of "frame or receiver" was designed to eliminate the budding DIY firearms market, wherein countless law-abiding gun owners purchase unfinished and incomplete firearm precursors known as "80 percent" frames and receivers and, after additional manufacturing, fitting, and finishing, acquire additional unregulated gun parts with which to lawfully construct a homemade

Appellate Case: 22-2812    Page: 7    Date Filed: 09/07/2022 Entry ID: 5195743

firearm. The Final Rule concedes that this time-honored tradition of homemade firearms is perfectly legal, but nevertheless pejoratively terms such firearms as "ghost guns," and maligns them as a threat to law enforcement and the weapons of choice of criminals and "terrorists."

In so doing, the Final Rule reverses decades of contrary and consistent guidance from the ATF, including scores of classification letters ruling that certain "partially complete or unassembled frames or receivers" (even those including parts, tools, and instructions to assist in the manufacturing process) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are *entirely unregulated* by federal law. Replacing this mountain of prior (and consistent) legal guidance, the Final Rule advances, for the first time, an entirely novel (and entirely wrong) "interpretation" of the GCA that the agency apparently has suddenly now discovered for the first time in 54 years. As a federal district court in Texas recently concluded, "[r]ather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers." *VanDerStok, et al., v. Garland, et al.*, Civil

3

Action No. 4:22-cv-00691-O (N.D. Tx.), Op. at 3.[1]

Not content with making it difficult (if not impossible) for the average, law-abiding gun owner to manufacture a homemade firearm, the Final Rule blatantly rewrote the GCA in order to regulate and control any such "privately made firearm" that slips through the regulatory cracks. Although conceding that ATF cannot outright ban the manufacture of homemade firearms, the Final Rule nevertheless regulates them in direct contravention of the statute Congress enacted. The Final Rule thus creates out of thin air a mandate that "federal firearms licensees" ("FFL") who clean, paint, repair, or accessorize a "privately made firearm" first must take that firearm into their

---

[1] This opinion by Judge O'Connor, while rejecting each of Defendants' arguments and each of the challenged promulgations within the Final Rule, questioned the showing of irreparable harm by the plaintiffs, and ultimately issued a very narrow injunction that applies only to a single corporate plaintiff that sells 80 percent products – and does not even extend to customers of that business. *Id.* at 22. In other words, while the court found the Final Rule to be wildly unlawful, its provisions are still in effect. No such question of irreparable harm exists here, as Plaintiffs (including 17 sovereign states) have explained precisely how they will be (and are being) irreparably harmed by the Final Rule. Reply at 17-21. Thus, to the extent that this Court agrees with Judge O'Connor's reasoning on the likelihood of success prong, a nationwide injunction is both necessary and appropriate here, in order to fully protect all of the members and supporters of the organizational Plaintiffs, along with the interests of the Plaintiff States.

Appellate Case: 22-2812     Page: 9     Date Filed: 09/07/2022 Entry ID: 5195743

inventory, engrave it with a government issued serial number, enter its existence into a government-mandated record system, store those records in perpetuity on behalf of the government, and eventually transmit those records to a centralized, government-controlled database of guns and gun owners. Not one of these requirements is found in the Gun Control Act.

At its core, the Final Rule represents a blatant attempt by ATF to enact many of the restrictions found on the legislative wish lists of the nation's most radical anti-Second Amendment groups – an anti-gun agenda which Congress has never seriously considered (much less enacted). Indeed, the Final Rule was designed from the ground up not to merely "interpret" the statutes Congress enacted, but instead to nakedly implement the President's political agenda that Congress has declined to pass. *See, e.g., VanDerStok* Op. at 8 ("ATF added an entirely new section expanding its jurisdiction.").

Yet regardless of how one feels about homemade firearms or the policies underlying the Final Rule, it is not within the purview of the Executive Branch – and certainly not ATF's unelected and unaccountable bureaucrats – to bypass the People's representatives in Congress, and implement the President's gun control agenda through bureaucratic fiat.

5

On July 5, 2022, the original Plaintiffs filed their Complaint for Declaratory and Injunctive Relief (ECF #1), along with 61 Exhibits, challenging many of the provisions of the Final Rule. On July 25, 2022, the original Plaintiffs filed a Motion for Preliminary and/or Permanent Injunction and accompanying Memorandum in Support. ECF #14, 14-1. On July 27, 2022, Plaintiffs filed their Amended Complaint for Declaratory and Injunctive Relief, adding seventeen States as co-Plaintiffs. ECF #22. The state Plaintiffs then filed a Notice of Joinder in the motion for injunctive relief. ECF #24.

On August 15, 2022, Defendants filed their Opposition (ECF #43) and, on August 19, 2022, Plaintiffs filed their Reply (ECF #78). On August 19, 2022, the district court held a status conference of the parties. ECF #80. On August 23, 2022, the court issued an Order Denying Motion for Preliminary Injunction finding, primarily, that Plaintiffs had failed to demonstrate a likelihood of success on the merits, but also opining that Plaintiffs had not demonstrated irreparable harm. ECF #85.

Subsequent to the district court's denial of their motion for preliminary injunction and, pursuant to FRAP 8(a), Plaintiffs filed a Motion for Injunction Pending Appeal (ECF #89, 89-1), arguing that the

6

nature of this case, which raises numerous, significant, and complex questions of federal law, supports an injunction pending appeal. Contemporaneously with that filing, both sets of Plaintiffs filed notices of appeal with this Court (Docket Nos. 22-2812 and 22-2854).

Although now having been given an opportunity under FRAP 8 to issue a stay or injunction, the district court has not ruled on Plaintiffs' motion (ECF #89), meaning that "the district court … failed to afford the relief requested...." FRAP 8(a)(2)(A)(ii). Moreover, the significant and irreparable harm to Plaintiffs that was previously prospective (prior to implementation of the Final Rule) is now in fact occurring, and will continue to occur absent immediate relief from this Court.

**Appellants thus seek this Court's review, and request relief, on an expedited basis**. To be sure, Appellants will continue to contest the validity of the entire Final Rule on appeal, and believe that the district court's opinion contains numerous errors of law requiring reversal. However, a few errors in particular stand out, should raise significant concerns about the ultimate conclusions reached by the district court, and provide this Court more than sufficient justification to grant an injunction on the Final Rule pending this Court's review.

Appellate Case: 22-2812     Page: 12     Date Filed: 09/07/2022 Entry ID: 5195743

# ARGUMENT

"In determining whether to issue a stay pending appeal, [courts] consider four factors: (1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits; (2) whether the party seeking the stay will be irreparably injured without a stay; (3) whether a stay would substantially injure other parties; and (4) the public's interest." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." *Org. for Black Struggle*, 978 F.3d at 607 (citation omitted). These factors support an injunction here.

## I. The District Court Erred in Concluding Plaintiffs Were Unlikely to Succeed on the Merits.

### A. The District Court Erred by Finding the Final Rule to Be a "Logistical Outgrowth" of the NPRM.

First, the district court rejected Appellants' claim that the Final Rule's definition of "frame or receiver" is not a logical outgrowth of the far more expansive definition originally proposed by the agency in the NPRM. Opp. at 7-8. Indeed, if Appellants could not "have anticipated that the change was possible, and thus reasonably should have filed their

8

comments on the subject during the notice-and-comment period," then the APA's notice and comment requirement would have required ATF to subject the Final Rule to a second comment period before finalizing it. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-1080 (D.C. Cir. 2009). The heart of the logical outgrowth test is the statutory requirement that the public received "fair notice" of the proposals the agency would adopt and an opportunity to comment on those particular proposals. *See Citizens Telecomm. Co. of Minnesota, LLC v. Fed. Commc'ns Comm'n*, 901 F.3d 991, 1005 n.11 (8th Cir. 2018).

As Appellants explained, the Final Rule's definition of "frame or receiver" departed significantly from the NPRM's hopelessly expansive definition, which would have turned tens of millions of unregulated gun parts into firearms. Mot. at 4-5. Apparently recognizing the absurdity of that approach, and believing the courts would not countenance such an overreach, ATF walked back the definition of "frame or receiver" in the Final Rule, agreeing with Plaintiffs' comments that each firearm should have *only one* frame or receiver. *See* Mot. at 4-7. As the Final Rule explained, "'[w]hereas the proposed rule would have considered *any* housing or structure for *any* fire control component a frame or receiver,

the final rule … provid[es] *new distinct definitions* … describing *a specific housing or structure for one specific type* of fire control component.'" Mot. at 5, quoting 87 FR at 24693 (emphasis added). However, in spite of this stark difference in methodology for defining a "frame or receiver," the district court concluded that the Final Rule was a "logical outgrowth" of the NPRM – for two reasons.

First, the district court believed the Final Rule's definition to have been foreseeable because "the NPRM expressly stated the ATF's intent to update and modernize the definition of 'frame or receiver'...." Op. at 7; *see also* at 8 ("the NPRM was sufficiently descriptive that the ATF was going to redefine 'frame or receiver'"). That conclusion is facially erroneous, because it would mean that ATF could have adopted *any* language at all designed to "modernize" the definition of "frame or receiver," so long as the NPRM merely had announced a general "intent to update" that definition.[2] That conclusion is also contrary to this

---

[2] For example, under the district court's reasoning, the EPA might issue an NPRM announcing a general "intent to update" the Endangered Species Act's list to include some rare goose found only in Alaska, but then issue a Final Rule which instead adds a snail native to Florida. On the contrary, such a hypothetical goose-to-snail revamp of the NPRM would in no way be a "logical outgrowth" thereof, as the public could not reasonably be expected to provide input about snails in response to an

10

Court's stated rule that "[t]he notice should be sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Citizens Telecomm.*, 901 F.3d at 1005 (quoting *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1319 (8th Cir. 1981)). General references to modernizing a definition are not adequate notice because "the notice must be sufficient to 'give[] interested persons an opportunity to participate in the rule making.'" *Id.* (quoting *Mkt. Synergy Grp., Inc. v. United States Dep't of Labor*, 885 F.3d 676, 681 (10th Cir. 2018)). Plaintiffs were denied "informed participation" because they were not given notice of the particular modernizing definition before it was adopted in the Final Rule. *Id.*

Instead of relying on the proposed rulemaking, the Final Rule made clear that the ultimate definition chosen by the agency *had not even been considered as a possibility* when the NPRM was promulgated, but instead was drawn directly from "language … proposed by commenter Sig Sauer" in response to the NPRM. 87 FR at 24693. Agencies "cannot bootstrap notice from a comment." *Citizens Telecomm.*, 901 F.3d at 1006 (quoting *Shell Oil Co. v. EPA*, 950 F.3d 741, 760 (D.C. Cir. 1991)). If *the agency*

_____

NPRM about geese.

Appellate Case: 22-2812     Page: 16     Date Filed: 09/07/2022 Entry ID: 5195743

*itself* had never contemplated the Final Rule's ultimate definition until after the comment period closed, it is impossible for *Plaintiffs* to have anticipated such a change and commented accordingly. The district court's reasoning would force Plaintiffs not only to have "divine[d] [the agency's] unspoken thoughts" (*CSX Transp.* 584 F.3d at 1080)," but in fact to foretell the agency's "unspoken thoughts" that had yet to occur. The APA requires no such prophesy by interested parties.

Second, the district court reasoned that the Final Rule was a "'logical outgrowth' of the NPRM" because it was narrower than the broad definition originally proposed. *See* Op. at 8 ("ATF <u>narrowed</u> its definition of 'frame and [sic] receiver'...." and "because the Final Rule narrowed the definitions at issue in the NPRM, allowing Plaintiffs a new round of

notice and comment would serve little purpose."[3]) (emphasis added).[4]  In other words, according to the district court, whereas the NPRM would have defined "frame or receiver" to include *nearly every part of a firearm*, so long as the Final Rule *chose from nearly everything*, it would suffice. Reply at 1-2.  In addition to that not being the law in any circuit, such a conclusion will merely incentivize imprecision, with agencies free to propose nothing more than broad and generalized principles that provide no specifics, and then to enact specific final rules that no one possibly could have anticipated.

On the contrary, in *Allina Health Servs. v. Sebelius*, 746 F.3d 1102,

---

[3]  The district court's conclusion, that another round of comments would "serve little purpose," is startling given ATF has already hearkened to Plaintiffs' comments once, agreed with their arguments, and made significant revisions to the Final Rule in response.  On the contrary, based on that history, there is every reason to suspect that the Final Rule could have benefitted from a further round of comments by the public and refining by the agency.  Also, this Court has stated that "[l]osing the opportunity to dissuade an agency from adopting a particular rule is prejudicial" even if  the subject matter was extensively covered in prior comments. *Citizens Telecomm.*, 901 F.3d at 1006.

[4]  The district court also claimed that "[s]imply because the ATF did not adopt the Plaintiffs' exact proposed definitions does not mean the Final Rule is not a logical outgrowth of the NPRM." Plaintiffs have never proposed any particular definition to ATF, and instead only challenged the definitions proposed by the agency. Op. at 8.

13

1108 (D.C. Cir. 2014), the D.C. Circuit rejected a less extreme argument by HHS, which had argued that its final rule was the "logical outgrowth" of a "notice [which] proposed to codify *one of only two possible interpretations* of the statute [and] [t]herefore … the hospitals should have been on notice that the Secretary might adopt either interpretation." (Emphasis added). In this case, the Final Rule's definition was not an either/or choice between two options, but instead one of countless possible permutations the agency might have chosen, any one of which would have been more "narrow[]" than the NPRM. Yet whereas Plaintiffs might have anticipated that ATF might make ***some sort of change*** in the Final Rule, there was no way for Plaintiffs or the public to have anticipated "that ***the change*** was possible." *CSX Transp.* 584 F.3d at 1079-10 (emphasis added).

## B. The District Court Erred by Sanctioning the Agency's Additions to the Statutory Text.

The district court acknowledged that, "if the Final Rule did contradict the plain language of the GCA, that would result in an agency effectively circumventing the intent of Congress." Op. at 9. Yet shortly after announcing that principle, the district court repeatedly abandoned

14

it, permitting the agency to rewrite the statute on the theory that Congress would have wanted it that way. Of course, even if that were so, then it is up to Congress – not the ATF – to make those revisions.

### 1. The District Court Erroneously Concluded that a "Firearm" Need Not Have a "Frame of Receiver."

First, the district court upheld the ATF's entirely new theory that a so-called "weapon parts kit" (defined by agency to be an assemblage of unregulated firearm parts together with an _incomplete and unfinished frame or receiver_) is somehow nevertheless a "firearm" on the grounds that the kit "may readily be converted to expel a projectile." Op. at 10. In support of its conclusion, the court opined that "Congress defined 'firearm' more broadly than simply a fully operational weapon, as the statute expressly includes _items_ that 'may readily be converted to expel a projectile.'" Op. at 10 (emphasis added). By that logic, hardware stores would need a federal firearms license, because they sell pieces of wood and metal pipe which constitute "_items_ that 'may readily be converted to expel a projectile,'" such as the homemade firearm used to kill Shinzo

15

Abe.[5]  Indeed, a crude, improvised firearm can be made in just a few minutes utilizing common household objects.[6]



Clearly, the statute requires more than merely "items" (such as those present in every homeowner's garage) which *could* be used to construct a firearm.  As the Texas court explained, "a firearm is first and foremost a *weapon*."  *VanDerStok* Op. at 7.

Indeed, the Gun Control Act does not include in its definition of "firearm" any "items" that can be *constructed into* a firearm,[7] but rather only a "weapon" or "the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).  ***Under either category, in order to be a "firearm," there must be a "frame or receiver,"*** something ATF acknowledges to be

---

[5]  R. Winton, "What we know about the crude, homemade gun used in Shinzo Abe's assassination," *Los Angeles Times*, July 8, 2022, https://lat.ms/3KfVvwU.

[6]  The Firearm Blog, https://www.thefirearmblog.com/blog/wp-content/uploads/2019/03/25zipgun.jpg

[7]  As Plaintiffs' Complaint explains, whereas Congress previously regulated all firearm parts, the Gun Control Act was designed specifically to avoid that result, instead focusing only on a single, serialized, regulated "frame or receiver" of each firearm.  Compl. ¶¶ 24-29.

every "firearm's primary structural component."   Gov. Opp. at 1 (emphasis added).   ***Yet a "weapon parts kit," by ATF's own admission, does not contain a "frame or receiver***," but merely an *unfinished* and *incomplete* part that could be constructed into a frame or receiver.   *See* Gov. Opp. at 28; *see VanDerStok* Op. at 10 (ATF may not "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is *not* a frame or receiver….").   As Plaintiffs argued below, if a given item is determined by ATF to *not yet constitute* a "frame or receiver," then that item (even with additional unregulated parts) cannot be a "weapon" – because, again, by definition, a "weapon" *must* have a "frame or receiver."   Reply at 15; *see. VanDerStock* Op. at 8 ("[t]hat which *may become* a receiver is not itself a receiver.") (Emphasis in original).

The district court acknowledged Plaintiffs' argument (see Compl. ¶¶ 256-259), conceding that "a 'frame or receiver' may be considered a firearm much sooner in the process than a 'weapon,'"[8] but glosses over the point, opining that "Plaintiffs have pointed to no provision of federal

---

[8] If a "weapon parts kit" *did* include a finished "frame or receiver," then that item would already be a "firearm" under Section 921(a)(3)(B) without respect to the other "parts" in a "kit."

law foreclosing th[e] possibility" that a "weapon parts kit" can be considered a weapon even without having a "frame or receiver." Opp. at 11-12. On the contrary, the statutory language itself forecloses the claim by the Final Rule – and the clearly erroneous conclusion by the district court – that there is such thing as a "firearm" with no "frame or receiver."[9]

### 2. The District Court Permitted ATF to Rewrite the Statutory Language.

Second, the district court approved of ATF's reappropriation of the statutory term "readily" found in 18 U.S.C. Section 921(a)(3)(A), as applied to what constitutes the "frame or receiver" and thus a firearm

---

[9] The district court relied on this Court's decision in *United States v. Annis*, 446 F.3d 852 (8th Cir. 2006), as authority for its conclusion that a "firearm" need not have a "frame or receiver." Op. at 10. But the district court makes the same mistake as Defendants (*see* Reply at 4), pointing to a case that involved "a sawed-off rifle" that was "was missing both the clip and the bolt," but which otherwise could be made "operational in just a few seconds by putting the bolt in" – meaning the firearm contained a "frame or receiver." *Annis,* 446 F.3d at 856-57. Indeed, the indictment in that case alleged that the defendant possessed "a weapon made from a .22 Mossberg rifle" which quite obviously has a complete "frame or eceiver." *United States v. Annis*, 6:04-cr-02032 (N.D. Ia.), First Superseding Indictment, ECF #22 at 2. *See VanDerStok* Op. at 14-15 (rejecting the government's use of *Annis*). To Plaintiffs' knowledge, neither this Court – nor any federal court but the district court – has found that an item can constitute a "firearm" without having a "frame or receiver."

18

under Section 921(a)(3)(B).  Op. at 11-12.  According to the district court, "certain frame or receiver kits ... are ... a frame or receiver of a weapon because they can be 'readily' converted to be a frame or receiver...."  *Id.* at 11.  Yet in reaching that conclusion, the district court conflates the statutory text, importing the word "readily" which is *found only* in 18 U.S.C. § 921(a)(3)(A)'s definition of what constitutes a "weapon," into § 921(a)(3)(B)'s definition of what constitutes a "frame or receiver," where the "readily" language *does not appear.  Id.*; *see* Reply at 5-6.

Indeed, "when 'Congress includes particular language in one section of a statute but omits it in another'—*let alone in the very next provision*—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (emphasis added).  According to the district court, however, the statute need not be interpreted precisely and according to its text, since "Plaintiffs have pointed to no provision of federal law foreclosing th[e] possibility" that the concept of "readily" could be applied in places it does not appear. Op. at 11.  If that is the law — that statutes must affirmatively preempt their own misinterpretation by explicitly foreclosing the importation of additional language and concepts — then a whole host of regulatory

19

abuses will follow.[10]

### 3. The District Court Permitted ATF to Create Entirely New Statutory Requirements.

Third, sanctioning the Final Rule's creation of a new definition for a "privately made firearm" ("PMF"), the district court explained that the Final Rule "requires a PMF entering commerce through an FFL[11] to be given a serial number." Op. at 14. Of course, no provision of the Gun Control Act contains such a requirement. Nevertheless, the district court permitted ATF to create such a requirement out of whole cloth, justified by nothing more than the policy argument that, "[w]ithout a serial

---

[10] The district court repeated this error when it concluded that "a firearm muffler or firearm silencer must have a frame or receiver" (Op. at 15), rejecting Plaintiffs' argument that the phrase "the frame or receiver *of any such weapon*" in Section 921(a)(3)(B) refers back to subsection (A)'s "*any weapon*," and does not relate forward to subsection (C)'s "any firearm muffler or firearm silencer." (Emphasis added). *See* Reply at 9. Indeed, ATF previously held the position that "there is no specific frame/receiver to a silencer," a fact overlooked by the district court. *See* Compl. ¶ 501 and Exhibit 25.

[11] There is obviously some question whether a firearm taken to a local gun shop for a paint job has entered into "the stream of commerce," a concept that generally "refers to the movement of goods from manufacturers through distributors to consumers…." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 306 (1980).

number, PMFs become untraceable firearms — *an outcome the ATF is well within its regulatory authority to prevent*."  Op. at 14 (emphasis added).

On the contrary, this Court must reject on its face the district court's startling claim that ATF has broad regulatory flexibility to "prevent … outcome[s]." *Cf. VanDerStok* Op. at 13-14 ("Congress could have … Congress could have … Congress could have … Congress could have … But Congress did not….").  Instead, ATF is tasked with enforcing the laws that Congress enacts,[12] regardless of whether the agency – or even federal judges – believe different policies would better serve Congress's purported intent or perceived purpose.[13]  *See* Reply 6-7; Compl. ¶ 222.  Nor may an agency "rewrite … unambiguous statutory terms" to suit "bureaucratic policy goals."  *Utility Air Regulatory Group*

---

[12] In fact, Congress has considered, *but failed to enact*, legislation that would require PMFs to be serialized.  *See* H.R.377, Homemade Firearms Accountability Act of 2015, 114th Congress (2015-2016), https://www.congress.gov/bill/114th-congress/house-bill/377.

[13] In opining that ATF should have the power to require serial numbers on all firearms including privately made firearms, the district court echoed the ATF's false claims that "the GCA … required *all firearms* to be marked under federal law" and that "PMFs, like commercially produced firearms, *must* be able to be traced."  *See* Compl. ¶ 356 (emphasis added).

*v. EPA*, 573 U.S. 302, 325-26 (2014).  Rather, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

In order to facilitate the serialization of homemade firearms that Congress never required to be serialized, the district court next permitted ATF to blatantly add to the statute with respect to *who* must serialize firearms.  Although expressly recognizing that "the Gun Control Act ... requires [only] licensed <u>*importers*</u> and <u>*manufacturers*</u> to identify firearms by serial number" (Op. at 4), the district court nevertheless opined that "[r]equiring licensed <u>*dealers*</u>—like licensed manufacturers and importers—to mark these firearms as they enter commerce *is necessary* to fulfill Congress's *intent* to allow for tracing of commercially sold firearms."  Op. at 23 (emphasis added).

In other words, the district court first "sa[id] what the law is," but then decided as a matter of policy what the law should be, permitting allegedly "necessary" modifications to the statute to fulfill perceived "Congress[ional] intent."  Of course, courts "interpret and apply statutes, not congressional purposes," and judges cannot:

> "interpret a statute contrary to the plain meaning of its words
> if doing so would, in the court's view, better further the

22

purpose it thinks Congress had in mind.... As the Supreme Court recently reminded us, 'law depends on respect for language.' ...('[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.') ... '[t]he best evidence of that [legislative] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.'" (*Gordon v. Novastar Mortg., Inc. (In re Hedrick)*, 524 F.3d 1175, 1187-1188 (11th Cir. 2008)). (citations omitted.)

## C. The Court Erred by Absolving ATF of the Duty to Explain its Significant Policy Shifts.

Several of Plaintiffs' challenges to the Final Rule center around the fact that ATF has engaged in seismic policy shifts in numerous areas of firearms law, while failing even to acknowledge – much less to explain, rationalize, or in any way justify – those changed policies. *See* Mot. at 16-20. One-by-one, the district court rejected each of these challenges. Op. at 20-22. However, although announcing the appropriate standard (that an agency must "display awareness that it is changing position" and explain "that the agency believes [the new policy] to be better" than the old one) (Op. at 21), the district court did not actually apply that standard. Rather, the district court merely examined the agency's proffered justifications contained in the Final Rule, and opined that they were sufficient. Op. at 21-22.

23

For example, Plaintiffs contrasted the Final Rule's approach to so-called "multi-piece frames or receivers" (requiring *multiple* serial numbers) with how the agency has treated nearly identical items in the past (requiring only *one* serial number).  Compl. ¶ 145-46; Mot. at 16. Falling far short of demanding the agency explain its change in approach, the district court merely opined that "because the policy … requiring multiple … serial numbers … is necessary if the ATF wishes to track the subparts … [a]s the Court sees it, this adequately explains the unique serialization requirement of multi-piece frames or receivers."  Op. at 21.

Likewise, with respect to Plaintiffs' point that the Final Rule's "use and definition of the term 'readily' as it applies to unfinished 80% frames and receivers [is] a significant shift in policy," the district court acknowledged that "the parties each go deep into detail regarding the alleged policy shift," but claimed that any such analysis of such policy shift "is unnecessary."  Op. at 21.  Indeed, whereas Plaintiffs had explained that ATF has *never* until the Final Rule applied the concept of "readily" (from Section 921(a)(3)(A)) to 80 percent frames and receivers (in Section 921(a)(3)(B)) (*see* Compl. ¶¶ 230-250), *Defendants were adamant that that no policy change has occurred.*  Govt. Opp. at 23

24

("Plaintiffs err in contending that ATF has changed its position…."). Glossing over the agency's failure to acknowledge (even during briefing) its policy change, the district court nevertheless reasoned that "the Final Rule adequately explains the policy shift … the goal of serializing … fully explains any changes." Op. at 21. It was plainly erroneous for the district court to find that the agency has "adequately explain[ed]" a "policy shift" that the agency is adamant never occurred.

## II. Plaintiffs Are Being, and Will Continue to Be, Irreparably Harmed Without an Injunction.

"The irreparable harm analysis turns on the nature of the injury likely to result from the challenged action, not the number of people who would be injured … an irreparable injury [is] an injury 'of such a nature that money damages alone do not provide adequate relief.'" *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region v. Parson*, 1 F.4th 552, 562 (8th Cir. 2021) (quoting *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 986 (8th Cir. 2008)).

The district court opined that Plaintiffs would not suffer irreparable harm, concluding that their allegations "largely consist[] of arguments that the Final Rule is vague, will cause uncertainty, [] will result in

25

businesses needing to 'revamp business practices' and stop selling certain products," and "much of the alleged harm is entirely speculative…." Op. at 25. But the district court's own findings undermine its conclusions.

First, a business being forced to "stop selling certain products" due to new serialization and recordkeeping requirements (*See* Compl. Ex. 27 ¶¶ 5, 9), revocation of ATF determination letters that such products are lawful to sell as unregulated components (*See* Compl. ¶¶ 9.a, 288, 509, 519, Ex. 61 ¶¶ 31-32), or changed legalities of various items requiring federal licensure (*See* Compl. Ex. 61 ¶¶ 33-40, 207, 250, 337), unquestionably constitutes irreparable harm, as this Circuit has concluded that "[t]he threat of unrecoverable economic loss … does qualify as irreparable harm." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). Because "money damages" are not available under the APA (*Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)), Plaintiffs' economic losses are unrecoverable against Defendants, which qualifies their losses as "irreparable" under this Circuit's precedent.

Indeed, just one industry member represented herein by the organizational Plaintiffs already has reported lost sales totaling hundreds of thousands of dollars, and is nearing the point where layoffs

Appellate Case: 22-2812     Page: 31     Date Filed: 09/07/2022 Entry ID: 5195743

will be unavoidable due lost revenue streams. Many companies are in similar situations.

Another supporter of the organizational Plaintiffs which, prior to the Final Rule sold 80 percent products, reports that the Final Rule caused an immediate loss in business between 75 and 90 percent of gross revenue, that it has been forced to lay off all employees, and that it is on the verge of closing its doors and going out of business entirely.

Another industry member represented by Plaintiffs is now faced with determining whether and how to serialize thousands of unsold 80 percent frames and receivers which remain in inventory and which, prior to the Final Rule, did not require any serial number. The Final Rule mandates that such serialization occur within 60 days of implementation. 87 FR at 24,743. This serialization process will constitute an enormous expense and, depending on the cost, might become cost-prohibitive, in which case hundreds of thousands of dollars of inventory will need to be destroyed in order to comply with the Final Rule. This predicament will cause irreparable harm not only to businesses in this situation, but also to the Plaintiff States who will not benefit from the tax dollars that would otherwise flow from the sale of these products that must now be

27

destroyed.

Second, "needing to 'revamp business practices'" (Op. at 25) in order to survive the Final Rule's onerous regulation is likewise an irreparable harm. To be sure, some of the many entities represented by the organizational plaintiffs may be able to navigate the Final Rule's unlawful demands by obtaining (or utilizing) a federal firearms license, serializing previously unregulated parts, conducting background checks and recordkeeping prior to sales that federal law does not require, serializing and keeping records on privately made firearms (*See* Compl. Ex. 61 ¶¶ 28), and storing such records forever (Compl. ¶ 5). But survival does not mean that the effects caused by unlawful regulation are not irreparable. As the *VanDerStok* court explained, "it is no answer to say that [a plaintiff] may avoid the harm by complying with an unlawful agency rule … [t]o the extent the Final Rule would impose additional compliance costs, Defendants admit that such costs are nonrecoverable. And nonrecoverable means irreparable." *VanDerStok* Op. at 18-19.[14]

---

[14] The district court cited cases from other circuits for the proposition that "uncertainty because of a new federal regulation certainly does not constitute irreparable harm, and 'ordinary compliance costs are typically insufficient to constitute irreparable harm.'" Op. at 25 (citation omitted). However, another district court in this Circuit has held that irreparable

Third, the harms caused by the Final Rule are in no way "entirely speculative." Op. at 25. Indeed, the agency itself *predicted that these specific harms to the industry would occur*, including that "employees will lose their jobs," that many "non-FFLs may choose to stay unregulated and therefore cease operations," and that significant compliance costs would result. *See* ATF, "Definition of 'Frame or Receiver' and Identification of Firearms," [Regulatory Impact Analysis and Final Regulatory Flexibility Analysis), 27 CFR Parts 447, 478, and 479](#) (Apr. 2022) at 42, and generally at 27-49; *see also VanDerStok* Op. at 16 (citing to the RIA when finding irreparable harm).

Fourth, the district court failed to address the harms that law-abiding gun owners are now suffering, as the Final Rule has caused countless such persons to be unable to obtain the unregulated parts to lawfully manufacture their own homemade firearms. *See* Compl. ¶ 267, 379, 403. In addition to the resulting constitutional infringements[15]

_____

harm can stem from "incur[ring] the business and financial effects of a lost or suspended employee, as well as nonrecoverable compliance and monitoring costs." *Missouri v. Biden*, 576 F. Supp. 3d 622, 634 (E.D. Mo. 2021).

[15] The Final Rule violates the Second Amendment and the Supreme Court's teachings in *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022). The

Appellate Case: 22-2812     Page: 34     Date Filed: 09/07/2022 Entry ID: 5195743

(representing clear irreparable harm), the Final Rule's requirements that firearm parts now be serialized and sold only after a background check and recordkeeping necessarily adds not only additional cost to the end product (such as a typical $25 transfer fee charged by an FFL, not to mention the federal excise tax that must be paid on finished firearms), but associated burden (such as having to drive to a gun store rather than ordering parts through the mail). None of these harms is recoverable against Defendants if Plaintiffs prevail and, by definition, is thus irreparable.

Finally, the district court entirely failed to consider other irreparable harms, such as those now being suffered by the Plaintiffs States, including both sovereign injury and loss of tax revenue. In addition, the district court entirely ignored the credible threat of criminal prosecution now faced by those law-abiding gun owners who attempt to legally construct silencers using solvent traps, pursuant to the National Firearms Act, something that ATF – prior to the Final Rule – told them was a perfectly lawful thing to do. *See* Am. Compl. ¶¶ 11-11.5 (states'

district court misstates *Bruen*'s holding to only bar arbitrary infringement by states and then misreads the Final Rule stating that it only "concerns the <u>commercial sale of firearms</u>." Op. at 17.

harms) 450, 469, 473, 476 (solvent traps) 429, and 439 (risk of charges for possession of household items); Ex. 61 ¶¶ 44-51.

## III. The Balance of Equities and Public Interest Supports an Injunction.

When the "government is the opposing party," the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has recently affirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends. …. even the Government's belief that its action 'was necessary to avert a national catastrophe' could not overcome a lack of congressional authorization." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021). The district court's opinion does not substantively address this prong of the preliminary injunction test, focusing instead on "the likelihood of success on the merits" and alleged "speculative risk of harm…" Op. at 25. Nevertheless, as Plaintiffs explained below, deferring implementation of the Final Rule's substantial and radical changes, until the Court can properly consider the merits, will cause little risk to the public or to the agency and, indeed, Defendants have engaged

31

in great delay in promulgating this alleged "public safety" rule. *See* Mot at n.16.

## CONCLUSION

The sheer size and complexity of the Final Rule alone (the rule and its regulatory impact analysis total 505 pages of double-spaced, 12-point type, more than a full ream of paper) should give this Court pause with respect to allowing its continued wholesale implementation prior to consideration of Appellants' appeal by this Court. Moreover, in purporting to "interpret" provisions of the Gun Control Act that have existed since 1968, ATF suddenly now advances newly discovered "interpretations," understandings, and applications of the statutory text that the agency apparently never new existed until now, more than a half century later.

Indeed, the district court's opinion below was issued only four days after briefing concluded. Moreover, in its opinion, the district court seems to indicate that it is not entirely confident that it has got everything right. *See* Op. at 10 ("while highly technical, the Final Rule[] appears to be consistent with the GCA") and at 19 ("while undoubtedly technical, as the Court reads the Final Rule" and "[w]hile again highly

32

technical, as the Court reads the Final Rule").  Moreover, in spite of the omnibus nature of the Final Rule and its widespread impacts on the firearms community, the district court below represents only one of two federal courts to have considered the merits of the ATF's regulatory changes – and, as noted, the Texas court found the Final Rule to be wildly unlawful, and far in excess of ATF's authority.

Appellants submit that this case raises important questions regarding the proper construction and interpretation of federal law, including significant concerns with respect to the lawfulness of the Final Rule's numerous regulatory enactments.  In addition, the district court's opinion, at times, appears unsure of its own conclusions.  Each of these factors weighs in favor of this Court issuing an immediate injunction of the Final Rule until such time as Appellants' appeal can be considered by the Court.

Respectfully submitted,

Date: September 7, 2022

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

Robert B. Stock (ND # 05919)
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
701-237-6983 (T)
701-237-0847 (F)
rstock@vogellaw.com
For service: rbslitgroup@vogellaw.com
*Counsel for Morehouse Enterprises, LLC d/b/a Bridge City Ordnance,
Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners
Foundation*


MARK BRNOVICH
Attorney General of Arizona

MICHAEL CATLETT*
 *Deputy Solicitor General*
ANTHONY NAPOLITANO*
 *Assistant Attorney General*

Appellate Case: 22-2812    Page: 39    Date Filed: 09/07/2022 Entry ID: 5195743

ARIZONA ATTORNEY GENERAL'S OFFICE
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-8860
Michael.Catlett@azag.gov
Anthony.Napolitano@azag.gov
*Counsel for Plaintiff State of Arizona*


PATRICK MORRISEY
Attorney General of West Virginia

LINDSAY SEE*
   *Solicitor General*
MICHAEL R. WILLIAMS*
   *Senior Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov
*Counsel for Plaintiff State of West Virginia*


TREG R. TAYLOR
Attorney General of Alaska

AARON C. PETERSON*
   *Senior Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Avenue #200
Anchorage, AK 99501
Aaron.peterson@alaska.gov
(907) 269-5165
*Counsel for Plaintiff State of Alaska*

Appellate Case: 22-2812     Page: 40     Date Filed: 09/07/2022 Entry ID: 5195743

LESLIE RUTLEDGE
Arkansas Attorney General

NICHOLAS J. BRONNI
  *Arkansas Solicitor General*
DYLAN L. JACOBS
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov
*Counsel for Plaintiff State of Arkansas*


LAWRENCE G. WASDEN
Attorney General of Idaho

DAYTON REED*
  *Deputy Attorney General*
OFFICE OF THE IDAHO ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
dayton.reed@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*


THEODORE E. ROKITA
Indiana Attorney General

BETSY M. DENARDI*
  *Director of Complex Litigation*
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6201

Appellate Case: 22-2812    Page: 41    Date Filed: 09/07/2022 Entry ID: 5195743

Betsy.DeNardi@atg.in.gov
*Counsel for Plaintiff State of Indiana*


DEREK SCHMIDT
Attorney General of Kansas

BRANT M. LAUE
  *Solicitor General*
OFFICE OF KANSAS ATTORNEY GENERAL
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
(785) 368-8435 Phone
Brant.Laue@ag.ks.gov


DANIEL CAMERON
Attorney General of Kentucky

MATTHEW KUHN
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Matt.Kuhn@ky.gov
*Counsel for Plaintiff Commonwealth of Kentucky*


JEFF LANDRY
Attorney General of Louisiana

ELIZABETH B. MURRILL*
  *Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766

37

murrille@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*


ERIC S. SCHMITT
Attorney General of Missouri

D. JOHN SAUER
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF MISSOURI
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for Plaintiff State of Missouri*


AUSTIN KNUDSEN
Attorney General of Montana

DAVID M.S. DEWHIRST*
  *Solicitor General*
KATHLEEN L. SMITHGALL*
  *Assistant Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
david.dewhirst@mt.gov
kathleen.smithgall@mt.gov
*Counsel for Plaintiff State of Montana*


DOUGLAS J. PETERSON
Attorney General of Nebraska

38

JAMES A. CAMPBELL
  *Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
[jim.campbell@nebraska.gov](mailto:jim.campbell@nebraska.gov)
*Counsel for Plaintiff State of Nebraska*


JOHN M. O'CONNOR
Attorney General of Oklahoma

BRYAN CLEVELAND
  *Deputy Solicitor General*
OKLAHOMA ATTORNEY GENERAL'S OFFICE
313 NE 21st St.
Oklahoma City, OK 73105
(405) 522-1961
[Bryan.cleveland@oag.ok.gov](mailto:Bryan.cleveland@oag.ok.gov)
*Counsel for Plaintiff State of Oklahoma*


ALAN WILSON
Attorney General of South Carolina

J. EMORY SMITH, JR.*
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
Email: [ESmith@scag.gov](mailto:ESmith@scag.gov)
*Attorneys for Plaintiff State of South Carolina*


KEN PAXTON
Attorney General of Texas

Appellate Case: 22-2812     Page: 44     Date Filed: 09/07/2022 Entry ID: 5195743

AARON F. REITZ*
  *Deputy Attorney General for Legal Strategy*
CHARLIE ELDRED*
  *Special Counsel for Legal Strategy*
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Charles.Eldred@oag.texas.gov
*Counsel for Plaintiff State of Texas*


SEAN D. REYES
Attorney General of Utah

MELISSA A. HOLYOAK*
  *Solicitor General*
OFFICE OF THE UTAH ATTORNEY GENERAL
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 366-0260
Email: melissaholyoak@agutah.gov
*Counsel for Plaintiff State of Utah*


BRIDGET HILL
Attorney General of Wyoming

RYAN SCHELHAAS*
  *Chief Deputy Attorney General*
OFFICE OF THE WYOMING ATTORNEY GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov
*Counsel for Plaintiff State of Wyoming*

Appellate Case: 22-2812     Page: 45     Date Filed: 09/07/2022 Entry ID: 5195743

*Application for Admission Forthcoming*

## CERTIFICATE OF COMPLIANCE

This motion is in excess of the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains <u>6,889</u> words as determined by the word-counting feature of Microsoft Word 365.   Plaintiffs-Appellants contemporaneously filed a Motion to Exceed Word Limits on September 7, 2022, Entry ID: 5195719.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Century Schoolbook font.

And this motion complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Kaspersky Internet Security and no virus was detected.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

Appellate Case: 22-2812     Page: 47     Date Filed: 09/07/2022 Entry ID: 5195743

## CERTIFICATE OF SERVICE

I certify that on September 7, 2022, I electronically filed the fore-going motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

Appellate Case: 22-2812    Page: 48    Date Filed: 09/07/2022 Entry ID: 5195743