Nos. 22-2812, 22-2854

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

———————————

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE, *et al.*,
*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the District of North Dakota

———————————

## RESPONSE TO EMERGENCY MOTION
## FOR AN INJUNCTION PENDING APPEAL

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JENNIFER KLEMETSRUD PUHL
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
  *Attorneys, Appellate Staff
  Civil Division, Room 7260
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-3388*

# INTRODUCTION

Federal licensing, background check, and recordkeeping requirements ensure that law enforcement may trace firearms used in crimes and that firearms are not sold to those, such as felons, who cannot lawfully possess them. In delimiting these requirements, Congress defined "firearm" to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and the "frame or receiver" of any such weapon. 18 U.S.C. § 921(a)(3). These expansive definitions reflect Congress's understanding that limiting the statute to operational weapons would allow persons to circumvent the statute by selling or purchasing nearly complete firearms without obtaining a license, keeping records, or running a background check.

Responding to technological advances that have led to an increasing variety of frames and receivers and the proliferation of weapon kits and parts that permit an individual to easily self-assemble a firearm, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) promulgated the rule at issue in this case. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022). At a high level, the Rule updates the definition of "frame or receiver" to reflect modern firearms and clarifies that kits or aggregations of parts that enable a purchaser to readily assemble an operational weapon (or a functional frame or receiver) fall within the statutory definition of "firearm." And the Rule requires that

licensed dealers mark with serial numbers unserialized firearms that they take into inventory.

Plaintiffs brought a challenge to the Rule, seeking an injunction against its enforcement. As the district court correctly concluded, plaintiffs failed to meet any of the factors required to justify such relief. Plaintiffs similarly cannot satisfy the requirements for an injunction pending appeal. Because the Rule accords with the statute and the rulemaking satisfied the APA's strictures, plaintiffs can demonstrate no likelihood that they will succeed on appeal. And plaintiffs also fail to demonstrate any irreparable harm or to show that their asserted harms outweigh the significant law enforcement and public safety interests furthered by the Rule.

## STATEMENT

**1.** Through the Gun Control Act of 1968, *codified as amended*, 18 U.S.C. § 921 *et seq.*, Congress has enacted requirements for persons who import, manufacture, or deal in "firearms." *Id.* §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain certain records of firearm acquisition and transfer, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). In addition, Congress has required importers and manufacturers to identify each firearm they import or manufacture with a serial number on the receiver or frame. *Id.* § 923(i).

The statutory scheme hinges on the definition of a "firearm." Congress defined that term to include "any weapon" that "will or is designed to or may readily be

2

converted to expel a projectile by the action of an explosive" as well as "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Because Congress did not define the terms "frame" or "receiver," in 1968, ATF defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation provided direction as to which portion of a weapon constituted the frame or receiver for licensing, serialization, and recordkeeping purposes and ensured that a component necessary for the weapon's functioning could be traced if the weapon were used in a crime. *See* 87 Fed. Reg. at 24,652.

**2.** In the last half-century, advances in weapon design have rendered ATF's regulatory definition incomplete. Today, most weapons have a split or multi-piece receiver, or they incorporate a striker rather than a hammer to fire the weapon. *See* 87 Fed. Reg. at 24,652. As a result, as many as 90% of all firearms do not have a single component that houses a hammer, a bolt or breechblock, and a firing mechanism; under a strict application of the 1968 regulation, those firearms would have no frame or receiver. *Id.*

In addition, technological advances have made it easier to create and sell firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers. Although these items meet the statutory definition of "firearm," some entities have been selling these items to unlicensed buyers without complying with the

3

GCA. 87 Fed. Reg. at 24,652. Such sales permit unlicensed persons, who have not completed a background check, to assemble firearms quickly and easily. And because these privately made firearms usually lack serial numbers, it is difficult for law enforcement to trace them when they are used in crimes. *Id.* at 24,652, 24,659.

**3.** ATF promulgated the Rule at issue in this case in April 2022. *See* 87 Fed. Reg. 24,652. As relevant here, the Rule amends certain regulatory definitions to ensure those definitions reflect the modern realities of firearm design and sales.

First, the Rule amends the regulatory definition of "firearm." As explained, the statutory definition includes inoperable weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Weapon parts kits—some of which contain all components necessary to easily assemble a functional weapon and even the templates and tools to allow such ready assembly—have increasingly been sold without compliance with the GCA's licensing, recordkeeping, and background check requirements. 87 Fed. Reg. at 24,662. The Rule amends the regulatory definition of "firearm" to clarify that the term includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,662, 24,727, 24,735.

Second, the Rule amends the definitions of "frame" and "receiver." The Rule defines the "frame" of a handgun as the housing or structure for the component designed to hold back the hammer, striker, bolt, or similar primary energized

Appellate Case: 22-2812    Page: 5    Date Filed: 09/26/2022 Entry ID: 5201993

component before initiating the firing sequence. The Rule defines the "receiver" of long guns and other projectile weapons as the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *See* 87 Fed. Reg. at 24,727, 24,735. These updated definitions are intended to identify as the "frame" or "receiver" one component for each firearm. In addition, the Rule clarifies that frames and receivers that are partially complete, disassembled, or nonfunctional (such as a frame or receiver parts kit) constitute frames or receivers subject to regulation if they are designed to, or may readily be converted to, function as a frame or receiver. *Id.* at 24,663, 24,727-28, 24,739.

Third, the Rule makes clear that the GCA's definition of a "firearm" includes a "privately made firearm"—that is, one produced or assembled by a person other than a licensed manufacturer and that does not contain a serial number placed by a licensed manufacturer at the time of production. 87 Fed. Reg. at 24,735. Consistent with the GCA's regulatory focus on importers, manufacturers, and dealers, the Rule does not regulate the private making of firearms by non-licensees who wish to possess the firearms for personal use; however, the Rule requires that any such firearms must be serialized and recorded if they are taken into the inventory of a federally licensed dealer. *Id.* at 24,653, 24,742, 24,744.

**4.** Plaintiffs—one firearms owner, one licensee, two firearms-related organizations, and 17 States—brought this suit challenging the Rule and seeking a preliminary injunction. The district court denied preliminary relief. First, the court

Appellate Case: 22-2812     Page: 6     Date Filed: 09/26/2022 Entry ID: 5201993

held that plaintiffs were unlikely to succeed on the merits of their claims. Op. 7-24. Second, the court held that plaintiffs had failed to demonstrate irreparable harm. Op. 24-25. Finally, the court held that the balance of the equities and the public interest weighed against preliminary relief. Op. 25.

Plaintiffs appealed the denial of the preliminary injunction and moved for an injunction pending appeal in district court. Before the district court ruled on that motion, plaintiffs filed the present motion.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify an injunction pending appeal, a movant must show that it is "likely to succeed on the merits" of its appeal, that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20; *see also Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998) (equating requirements for an injunction pending appeal to requirements for a preliminary injunction). Plaintiffs have failed to carry that burden.

## I.    Plaintiffs Have Not Shown They Are Likely to Succeed on the Merits.

In arguing for a nationwide injunction pending appeal, plaintiffs advance three grounds upon which they claim discrete portions of the Rule are invalid. First, they erroneously contend that the definitions of "frame" and "receiver" are not a logical outgrowth of the definitions proposed in the NPRM. Next, they claim that the Rule's

6

provisions concerning parts kits and marking requirements are contrary to the GCA. And finally, they assert that ATF did not provide sufficient explanation for two provisions. As the district court correctly held in rejecting each of these challenges (along with many others), plaintiffs are incorrect on every score.

## A. The Rule's Definitions of "Frame" and "Receiver" Are a Logical Outgrowth of the NPRM

As the district court held, the Rule's definitions of "frame" and "receiver" are a logical outgrowth of the NPRM. The NPRM announced ATF's intent to update the definition of "frame or receiver" to address the problem of most modern firearms not having "a specific part that expressly falls within the" old definition and specifically proposed defining the term to include any part "that provides housing or a structure designed to hold or integrate any fire control component." 86 Fed. Reg. 27,720, 27,727 (May 21, 2021).

ATF received 290,000 comments from interested parties. Some of those comments, including from some plaintiffs, explained that the proposed definition would create confusion because a weapon might have multiple frames or receivers subject to regulation. *See, e.g.*, 87 Fed. Reg. at 24,692. Heeding those comments, the Rule narrowed the proposed definition to specify that a "frame" (for handguns) or "receiver" (for long guns) is the part that houses a specific fire control component (for handguns, the "sear"; for long guns, the "bolt" or "breechblock"), rather than any part that houses any fire control component. *See id.* at 24,735; *see also* Mot. 9 (stating

7

that ATF "agree[d] with Plaintiffs' comments that each firearm should have only one frame or receiver").

Rather than identify any specific way in which a lack of notice prevented them from "offer[ing] informed criticism and comments," *Citizens Telecomm. Co. v. FCC*, 901 F.3d 991, 1001 (8th Cir. 2018) (quotation omitted), plaintiffs instead complain (at 8-12) that the NPRM was "hopelessly expansive" and provided only "[g]eneral references" to ATF's intent to modernize the definition. That contention cannot be squared with the text of the NPRM.

The NPRM proposed a definition that included the housing of any fire control component (a definition that is hardly hopelessly expansive) and "described in significant detail the factors"—including feasibility, flexibility to encompass technology changes, and ensuring each firearm has a frame or receiver—"that would animate" the new definition, *Citizens Telecomm. Co.*, 901 F.3d at 1003 (quotation omitted). That description provided sufficient notice to permit parties to offer informed comments, and the Rule applied the same factors listed in the NPRM when considering comments, including from plaintiffs. Contrary to plaintiffs' claim (at 12-13), the government does not argue that adopting a narrower regulation than proposed must always be a logical outgrowth. But here, the "possibility" that ATF might narrow the proposed definition for feasibility or other reasons was "reasonably foreseeable" and so the Rule is a "logical outgrowth of the" NPRM. *Long Island Care at Home v. Coke*, 551 U.S. 158, 174-75 (2007) (quotation omitted).

8

In any event, plaintiffs have failed to show how any error on this score harmed them. Where an agency has conducted notice and comment, plaintiffs claiming that notice was inadequate must show that "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the [agency's] rationale." *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003). Plaintiffs here have failed to identify any additional comments that they would have submitted had the NPRM set forth the definitions that the Rule adopted.

## B.     The Rule Is Not Contrary to Law

Plaintiffs next contend (at 15-23) that three aspects of the Rule are contrary to law: the Rule's definition of a "firearm" to include certain kits of weapon parts that do not already contain a functional frame or receiver; the Rule's definition of a "frame" or "receiver" as including a kit containing parts that may "readily" be converted into a functional frame or receiver; and the Rule's requirement that federal firearms licensees mark with a serial number any privately made, unserialized firearms that they take into inventory. As the district court concluded, *see* Op. 10-14, none of the challenged regulations conflicts with the statute.

**1.** Plaintiffs unpersuasively argue (at 15-18) that the Rule is contrary to the GCA because it defines a "firearm" to include certain weapon parts kits that may readily be assembled into an operational firearm, even if the kit does not include a completed frame or receiver. But nowhere does the GCA require that a weapon be operational, or contain a completed frame or receiver, to constitute a firearm; to the

Appellate Case: 22-2812     Page: 10     Date Filed: 09/26/2022 Entry ID: 5201993

contrary, Congress defined a firearm to include any weapon that "is designed to or may readily be converted to expel a projectile," 18 U.S.C. § 921(a)(3)(A). That definition makes clear Congress's intent to include unassembled, incomplete, or nonoperational weapons. And indeed, courts have long recognized that such weapons are GCA "firearms." *See, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006). Thus, as the district court held, the Rule's provision making clear that certain weapon part kits are firearms "fit[s] squarely within the GCA's 'firearm' definition because after delivery, the kits are easily converted from mere parts into a weapon that expels a projectile." Op. 10.

In urging otherwise, plaintiffs primarily argue (at 16-17) that the GCA defines a "firearm" to include only "weapon[s]" and that, "by definition, a 'weapon' must have a 'frame or receiver.'" As an initial matter, kits that meet the regulatory definition of "firearm" do contain a frame or receiver because, as the Rule elsewhere clarifies, a nonfunctional frame or receiver that may readily be converted into a functional one is itself a "frame or receiver" under the GCA. *See infra* pp.11-12.

In any event, plaintiffs are incorrect that a "weapon" must include a completed frame or receiver. As the Rule explains, dictionaries define a "weapon" simply as an "instrument of offensive or defensive combat." 87 Fed. Reg. at 24,684 (quotation omitted). Nowhere does the GCA or that commonsense definition of "weapon" suggest any requirement that a weapon must include a frame or receiver—much less

Appellate Case: 22-2812      Page: 11      Date Filed: 09/26/2022 Entry ID: 5201993

that it must include an operational one. And reading such a requirement into the statute would undermine Congress's intent to capture within the definition non-operational, but readily convertible, weapons.

Plaintiffs' suggestion (at 15-16) that ATF's definition could require hardware stores to obtain a federal firearms license likewise does not advance their claim. Unlike a weapon part kit regulated by the Rule, the collection of wood and metal pipes sold by a hardware store is not an "aggregation of parts" that "is clearly identifiable as an instrument to expel live ammunition." 87 Fed. Reg. at 24,684.

**2.** Plaintiffs are similarly wrong to argue (at 18-20) that the Rule contradicts the GCA by defining a "frame" or "receiver" to include a kit containing parts that may "readily" be converted into a functional frame or receiver. In making that argument, plaintiffs rely almost entirely on the assertion that the word "readily" "does not appear" in "§ 921(a)(3)(B)'s definition of what constitutes a 'frame or receiver.'" Mot. 19. But that argument proceeds from the incorrect premise that § 921(a)(3)(B) contains a "definition" of "frame or receiver." To the contrary, that provision states only that the term "firearm" includes "the frame or receiver" of a weapon. Indeed, the GCA does not go on to define the terms "frame" and "receiver"; instead, Congress left it to ATF to interpret those terms.

In interpreting those terms to include a collection of parts that may "readily" be converted to a functional frame or receiver, ATF acted in accordance with the statute. When defining particular weapons, Congress has repeatedly included a clause making

Appellate Case: 22-2812    Page: 12    Date Filed: 09/26/2022 Entry ID: 5201993

clear that non-operational weapons that are "designed to" or may "readily" be converted to operational weapons are included. *See, e.g.*, 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b) (defining "machinegun" to include a weapon that "can be readily restored to shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger"). These provisions reflect the reality that any other approach would permit persons to circumvent statutory requirements by producing or purchasing nearly-complete weapons that are readily converted into operational weapons. In including a similar provision in the regulatory definitions of "frame" and "receiver," ATF acted in conformity with those congressional determinations and with the relevant statutory scheme.

**3.** Plaintiffs miss the mark in asserting (at 20-23) that the Rule's requirement that a federal firearms licensee mark privately made firearms with a serial number when they come into the licensee's inventory exceeds ATF's authority under the GCA.

As the district court explained, the GCA grants ATF both general "authority to take actions 'necessary to carry out the provisions'" of the statute and also specific authority to "regulate [a licensee's] 'records of importation, production, shipment, receipt, sale or other disposition of firearms.'" Op. 14 (first quoting 18 U.S.C. § 926(a); then quoting *id.* § 923(g)(1)). Under longstanding ATF regulations implementing those provisions, dealers are required to "enter into a record each receipt and disposition of firearms" and to include within the record, among other

12

information, the firearm's "serial number." *See* 27 C.F.R. 478.125 (2021). To enable those recordkeeping requirements to serve their intended purpose—ensuring that law enforcement may trace firearms that are used in crimes—a licensed dealer must be able to record a serial number for each firearm that it receives or disposes of. And for privately made firearms that contain no serial number at the time of receipt, the dealer thus must mark the firearm upon taking it into inventory. *See* 87 Fed. Reg. at 24,669-70. In short, although no provision of the GCA expressly requires dealers to mark unserialized firearms upon acceptance, the Rule's requirement fits well within the statute's express delegation of authority to ATF to enact regulatory recordkeeping requirements that depend on firearms' serial numbers.

### C. The Rule Is Not Arbitrary and Capricious

Having failed to demonstrate any conflict with the statute, plaintiffs next argue (at 24-25) that the Rule is arbitrary and capricious. Review under that "standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, ATF reviewed over 290,000 comments, examined the relevant data, and articulated an explanation for its decisionmaking in detail. In short, the agency "reasonably considered the relevant issues and reasonably explained the decision." *Id.* That is all the APA requires.

In contending otherwise, plaintiffs identify only two alleged deficiencies: first, they argue (at 24) that ATF failed to adequately explain its requirement that each

13

component of a multi-piece frame or receiver be serialized; second, they argue (at 24-25) that ATF failed to grapple with a claimed change in policy regarding when an unfinished frame or receiver may constitute a firearm. Neither contention has merit.

As an initial matter, plaintiffs do not develop either argument. Their motion includes only conclusory statements that fail to provide any detail regarding the specific deficiencies plaintiffs perceive in ATF's lengthy explanation of the Rule's requirements. Nor do plaintiffs identify any previous ATF regulations or classifications that assertedly conflict with the Rule's approach. Because plaintiffs "do[] not develop th[ese] argument[s]," they have been forfeited. *United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018).

Plaintiffs' arguments are, in any event, unavailing. First, the Rule requires that if a multi-piece frame or receiver is being sold together and "more than one modular subpart" is "similarly designed to house, hold, or contain" the primary fire control component "(*e.g.*, left and right halves), each of those subparts must be identified with the same serial number." 87 Fed. Reg. at 24,671. And if "a modular subpart" is being "sold separately," then the subpart must "be identified with an individual serial number." *Id.* at 24,672. The Rule explains that these requirements are necessary to enable effective tracing of firearms—that is, to allow the statute to function as designed—because "otherwise, multi-piece frames or receivers could be sold or distributed piecemeal in individual subparts and replaced by the end user without any

14

traceable marks of identification." *Id.* As the district court held, *see* Op. 21, that justification more than suffices to carry ATF's burden of reasonable explanation.

Second, with respect to the alleged policy shift regarding unfinished frames and receivers, plaintiffs appear to contend that ATF had never previously used the specific term "readily" (as in "readily converted") to describe when an unfinished frame or receiver falls within the statutory definition of "firearm." That ATF has never used the term in this context is of no moment. As ATF explained in the Rule, although ATF had previously classified unfinished frames and receivers based on the extent to which converting the unfinished item into a functional one would require certain difficult machining operations, that analysis largely parallels the "readily" convertible test adopted in the Rule. *See* 87 Fed. Reg. at 24,668 ("Rather than a new or different test, how quickly and easily [*i.e.*, readily] an item could be made functional is largely determined by which machining operations still needed to be performed."). And ATF reasonably explained that adopting the term "readily" allowed ATF to incorporate definitions and factors based on preexisting case law interpreting the term in other firearms statutes and thereby "provide manufacturers with fair warning on how the factors in that definition are evaluated." *Id.* at 24,663, 24,668.

ATF also acknowledged that it previously "did not examine templates, jigs, or other items and materials" included in frame and receiver kits but that, having done so, it now recognized that "aggregation of a template or jig with a partially complete frame or receiver" can enable a purchaser to construct a functional frame or receiver

"efficiently, quickly, and easily (*i.e.*, 'readily')." 87 Fed. Reg. at 24,668. Thus, insofar as some of ATF's previous classifications are not consistent with the approach required by the Rule, ATF acknowledged that fact. *Id.* ATF therefore demonstrated awareness of any "policy change" in the Rule and provided ample justification for any such change. *See Northporth Health Servs. v. U.S. Dep't of Health & Human Servs.*, 14 F.4th 856, 875 (8th Cir. 2021).

## II.  Even If They Could Demonstrate a Likelihood of Success on the Merits, Plaintiffs Would Not Be Entitled to the Injunction They Seek.

Plaintiffs have failed to justify the nationwide preliminary injunction that they request. They have not demonstrated irreparable harm. Even if they had, their minimal asserted harms could not outweigh the ATF's, and the public's, countervailing law-enforcement interests. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that the balance of the equities and public interest "merge" when the government is a party). And even if plaintiffs could justify some relief, that relief must be confined to remedying their injuries.

**1.** Plaintiffs have failed to demonstrate that the Rule will cause irreparable harm. As explained, the Rule does not forbid the sale (or purchase) of any firearm, weapon kit, or other item; instead, the Rule clarifies that certain items, like ready-to-assemble kits, meet the statutory definition of "firearm" (or of "frame" or "receiver") and so must be sold in accordance with the GCA's licensing, recordkeeping, and background check requirements. Thus, plaintiffs who wish to purchase or sell the

Appellate Case: 22-2812     Page: 17     Date Filed: 09/26/2022 Entry ID: 5201993

regulated products may continue to do so if they comply with the GCA. And these requirements are not especially onerous: a federal firearms license costs $200 for the first three years (and $90 to renew for further three-year terms), *see* 27 C.F.R. § 478.42(c)(2), and there are tens of thousands of federally licensed firearms dealers around the country, all of whom bear the costs of background checks and recordkeeping. These sorts of "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). In addition, although the Rule was promulgated in April, plaintiffs waited until July—a month before the Rule's effective date—to move for a preliminary injunction. That "delay in seeking relief vitiates much of the force" of plaintiffs' "allegations of irreparable harm." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013) (quotation omitted).

In response, plaintiffs generally take two tacks. First, they suggest (at 26) that the ordinary compliance costs may constitute irreparable harm in a suit against the United States, where monetary damages are not available. But the single court of appeals case that plaintiffs cite for that proposition refutes it: as that case explains, for harm to be irreparable, it must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Although economic harms that sovereign immunity renders unrecoverable may meet that standard, *see id.* at 426, the ordinary compliance costs at issue in this case are a far cry from the sort of great costs that would demonstrate a

Appellate Case: 22-2812     Page: 18     Date Filed: 09/26/2022 Entry ID: 5201993

clear and present need for immediate relief. Indeed, were the rule otherwise, plaintiffs could justify a preliminary injunction against the United States based on a single dollar of harm—a result that would uniquely disadvantage the federal government and that is otherwise incompatible with the Supreme Court's admonition that such relief is "extraordinary." *Winter*, 555 U.S. at 24.

Second, plaintiffs lob a scattershot of speculative and underdeveloped harms. For example, they assert (at 26-27) that some industry members have reported large losses in business and (at 30-31) that some States will suffer lost tax revenue from the Rule—but they point to no evidence in the record to substantiate those assertions. Similarly, although plaintiffs gesture at supposed irreparable harms from Second Amendment violations (at 29 & n.15) and "sovereign injury" (at 30), plaintiffs have developed no argument on the merits that the Rule invades those interests. And although plaintiffs cite (at 29) ATF's Regulatory Impact Analysis, which stated that some non-licensed dealers may choose to go out of business rather than obtain a license, such self-inflicted harm is not irreparable. *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).

**2.** Even if plaintiffs could demonstrate some irreparable harm from, for example, the ordinary compliance costs the Rule may cause them to bear, plaintiffs would not be entitled to an injunction pending appeal because they cannot demonstrate that the balance of the equities, and the public interest, weigh in favor of that relief.

The public has a strong interest in enforcement of the Rule pending appeal. As the Rule explained, unserialized firearms have proliferated in recent years; in 2021, nearly 20,000 such firearms were reported to ATF as having been recovered by law enforcement from potential crime scenes, and the United States has recently brought many criminal cases "to counter the illegal trafficking of unserialized privately completed and assembled weapons, the possession of such weapons by prohibited persons, and other related Federal crimes." 87 Fed. Reg. at 24,656-57. This "proliferation of untraceable firearms severely undermines" law enforcement's ability to engage in the "integral" process of "determin[ing] where, by whom, or when" a firearm used in a crime was manufactured, and "to whom [it was] sold or otherwise disposed." *Id.* at 24,656, 24,659. There is thus a strong public interest in enforcement of the Rule, which will "increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime." *Id.* at 24,654.

Plaintiffs have no answer to the substantial law enforcement and public safety interests advanced by the Rule, instead resting primarily on the unexplained assertion that an injunction "will cause little risk to the public or to the agency." Mot. 31. That assertion is, as ATF explained in the Rule, incorrect. And although plaintiffs briefly suggest (at 31) that the government's interests in the Rule should be discounted because (in their view) the Rule is illegal, that argument disregards the injunction pending appeal framework. To succeed, plaintiffs must demonstrate not only that they

are "likely to succeed on the merits," but *also* that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

In short, plaintiffs have demonstrated that the Rule will cause, at most, modest financial burdens on some persons who wish to sell or purchase products regulated by the Rule, who may (for example) spend $200 to obtain a federal firearms license or "drive to a gun store rather than ordering parts through the mail." Mot. 30. Those modest burdens do not outweigh the substantial countervailing safety interests that the government, and the public, have in implementation of the Rule.

**3.** In any event, even if plaintiffs could demonstrate some entitlement to injunctive relief, they could not justify the sweeping nationwide injunction against the Rule that they seek. To the contrary, any injunction "must be narrowly tailored to remedy only the specific harms shown by the plaintiffs." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (quotation and alteration omitted). That principle requires the Court to limit any injunction here in two ways. First, an injunction should be limited to any specific provisions of the Rule that the Court finds plaintiffs are likely to succeed in challenging. *Cf.* 87 Fed. Reg. at 24,730 (severability clause in the Rule). Second, any injunction must run only to the specific plaintiffs who the Court finds have demonstrated some harm from the Rule. This does not include the plaintiff States, whose assertions of harm are no more than speculative claims regarding unspecified "sovereign injury and loss of tax revenue," Mot. 30. Similarly, although plaintiffs briefly suggest that "a nationwide injunction is both necessary and

20

appropriate here," Mot. 4 n.1, they nowhere attempt to justify the need for relief extending beyond the specific plaintiffs who can demonstrate harm.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JENNIFER KLEMETSRUD PUHL
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

/s/ *Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

SEPTEMBER 2022

21

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response to a motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,198 words. It also complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because this response has been prepared in a proportionally spaced typeface using Word 14-point Garamond typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the response has been scanned for viruses, and it is virus free.

*/s/ Sean R. Janda*
SEAN R. JANDA

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2022, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda