# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE; ELIEZER JIMENEZ; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION,
*Plaintiffs-Appellants*

STATE OF ARIZONA; STATE OF WEST VIRGINIA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF UTAH; and STATE OF WYOMING,
*Plaintiffs*
v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and STEVEN M. DETTELBACH as the DIRECTOR OF ATF,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of North Dakota
The Honorable District Court Judge Peter D. Welte
Case No. 3:22-cv-116

## PRIVATE PLAINTIFFS-APPELLANTS' ADDENDUM

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us

*Counsel for Morehouse Enterprises, LLC d/b/a Bridge City Ordnance, Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners Foundation*

# TABLE OF CONTENTS

Order Denying Motion for Preliminary Injunction…………………………..ADD-1

Order Denying Injunction Pending Appeal…………………………………..ADD-28

U.S. Const. amend. II………………………………………………..………ADD-32

18 U.S.C. § 921……………………………………………………………ADD-33

18 U.S.C. § 923……………………………………………………………ADD-39

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Morehouse Enterprises, LLC, d/b/a/ Bridge City Ordnance, et al., ) | |
| ) | **ORDER DENYING MOTION FOR** |
| Plaintiffs, ) | **PRELIMINARY INJUNCTION** |
| ) | |
| vs. ) | Case No. 3:22-cv-116 |
| ) | |
| Bureau of Alcohol, Tobacco, Firearms and ) | |
| Explosives, et al., ) | |
| ) | |
| Defendants. ) | |

On April 26, 2022, in response to evolving technical advances in firearms technology, the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") promulgated a final rule updating decades-old definitions within its longstanding regulations of federal firearms laws. See Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, and 479) (the "Final Rule"). At bottom, the Final Rule amends the definitions of certain terms with the ATF's regulations, such as "frame or receiver," and amends related ATF regulations on firearm markings and recordkeeping. Id. The Final Rule takes effect on August 24, 2022. Id.

Asserting a theme of unlawful and extreme federal agency overreach, Plaintiffs Morehouse Enterprises, LLC, d/b/a Bridge City Ordnance, Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners Foundation seek to enjoin the Final Rule from taking effect as scheduled and filed a motion for preliminary and/or permanent injunction, along with a motion for oral

**ADD-1**

argument.[1] Doc. Nos. 14, 19; Doc. No. 25. Defendants the ATF, the United States Department of Justice, and ATF Director Steven M. Dettelbach (together, the "Defendants") oppose the motion.[2] Doc. No. 43.  As explained below, the motion for injunctive relief is denied, and the motion for oral argument is now moot.

## I.   <u>BACKGROUND</u>

The Plaintiffs are one individual, one business entity, two organizations, and seventeen states. Doc. No. 22, ¶¶ 4-6, 11. Eliezer Jimenez ("Jimenez") is a firearms owner residing in Grand Forks, North Dakota. <u>Id.</u> ¶ 4. Jimenez buys parts, "including unfinished frames or receivers, tools, jigs, and other items to assist him in making firearms" from online retailers. <u>Id.</u>  Morehouse Enterprise, LLC, d/b/a Bridge City Ordnance ("Bridge City") is located in Valley City, North Dakota, and holds an active federal firearms license, deals in firearms, and its otherwise an entity regulated by ATF. <u>Id.</u>

Gun Owners of America ("GOA") is a California non-stock corporation with its principal place of business in Springfield, Virginia. <u>Id.</u> ¶ 5. "GOA was formed in 1976, to preserve and defend the Second Amendment rights of gun owners." <u>Id.</u> GOA has more than 2 million members and supporters across the country, including residents of this District. <u>Id.</u>  Gun Owners Foundation

---

[1] Plaintiff States Arizona, Alaska, Arkansas, West Virginia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and Wyoming (collectively, the "Plaintiff States") joined the action via an amended complaint and also join the motion for preliminary injunction. Doc. No. 22. The Original Plaintiffs and Plaintiff States are collectively referred to as the "Plaintiffs."

[2] Four amici curiae parties submitted briefs joining the Defendants opposition to the motion – (1) Jonathan Gold, Gun Owners for Safety, Jason Perry, and Scott Spreier (Doc. No. 52); (2) District of Columbia, and States California, Colorado, New Jersey, Pennsylvania, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New York, North Carolina, Oregon, Rhode Island, Washington, and Wisconsin (Doc. No. 65); (3) Gun Violence Prevention Groups (Doc. No. 66); and (4) Major Cities and Prosecutors Against Gun Violence (Doc. No. 84).

**ADD-2**

("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia. Id. ¶ 6. As alleged, "GOF was formed in 1983, and is organized and operated as a nonprofit legal defense and educational foundation[.]" Id.

Finally, seventeen states joined the action as Plaintiffs, including Arizona, Alaska, Arkansas, West Virginia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and Wyoming. Id. ¶ 11a-11q. Each Plaintiff State is a sovereign state of the United States of America and alleges that it is suing "to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, businesses, and tax revenue." Id.

For the Defendants, the United States Department of Justice (the "DOJ") is an executive agency within the federal government of the United States. Id. ¶ 12. The DOJ is headquartered in Washington, D.C. and is the agency responsible for enforcing federal firearms laws. Id. The ATF, a component of the DOJ, is headquartered in Washington, D.C. and is delegated authority to enforce federal firearms laws. Id. ¶ 13. Lastly, Defendant Steven M. Dettelbach is the Director of ATF and is responsible for overseeing the agency's promulgation and enforcement of the challenged regulations. Id. ¶ 14.

A.   The Statutory Framework

Congress passed the Gun Control Act of 1968 (the "GCA") to address concerns of firearms moving in interstate commerce.  18 U.S.C. §§ 921 et seq.  The GCA defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." Id. § 921(a)(3).  In the GCA, Congress did not define the terms "frame" or "receiver." Among other things, Congress also requires individuals and entities that import, manufacture, or deal in firearms to have a federal

firearms license (id. § 923(a)), to keep records of firearm acquisitions or transfers (id. § 923(g)(1)(A)), and to conduct background checks before transferring firearms to a non-licensee (id. § 922(t)).  It also requires licensed importers and manufacturers to identify firearms by serial number on the frame or receiver of the weapon.  Id. § 923(j).  As is typical and expected with federal statutes, Congress delegated the responsibility for administering and enforcing the GCA to the United States Attorney General, and Congress and the Attorney General, in turn, delegated to the ATF the authority to promulgate regulations "necessary to carry out the provisions of the GCA."  Id. § 926(a). Along these same lines, the responsibility for enforcement of the National Firearms Act of 1934 ("NFA") has been delegated to the Director of the ATF as well. See 26 U.S.C. § 7805.

Consistent with that delegation of authority, the ATF promulgated regulations as to the GCA.  One such regulation defined the statutory term "frame or receiver" to "provide guidance as to which portion of a firearm was the frame or receiver for purposes of licensing, serialization, and recordkeeping[.]"[3] 86 Fed. Reg. 27721 (May 21, 2022). The licensing, serialization, and record keeping "ensur[ed] that a necessary component of the weapon could be traced if later involved in a crime." Id. That definition, however, was promulgated 50 years ago. Id. Since that time, and unsurprisingly, there have been continued technological advancements in firearms manufacturing. Id.

---

[3] The former definition of "frame or receiver" was "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at is forward positions." Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg. 18555, 18558 (Dec. 14, 1968) (codified at 27 C.F.R. § 478.11).

4   **ADD-4**

**B.      The NPRM and the Final Rule**

In 2021, in an effort to update these decades-old definitions and account for the advancements in firearms technology, the ATF began the administrative rulemaking process.  To start, the ATF published a notice of proposed rulemaking (the "NPRM") on May 21, 2021. Id. at 27720. As required, the NPRM contained the regulatory text of the proposed rule. Id. at 27741-53. It explained the ATF sought to "amend[] [its] regulations to clarify the definition of 'firearm' and to provide a more comprehensive definition of 'frame or receiver' so that those definitions more accurately reflect firearm configurations not explicitly captured under the existing definitions[.]" Id. at 27725. The NPRM also "propose[d] new terms and definitions to take into account technological developments and modern terminology in the firearms industry, as well as amendments to the marking and recordkeeping requirements that would be necessary to implement these definitions." Id. Interested parties could submit comments on the proposed rule until August 19, 2021. Id. at 27720. In response to the NPRM, the ATF received over 290,000 public comments.

After considering the public comments, the ATF promulgated the Final Rule on April 26, 2022.  The summary of the Final Rule states, in part:

> The [DOJ] is amending [ATF] regulations to remove and replace the regulatory definitions of "firearm frame or receiver" and "frame or receiver" because the current regulations fail to capture the full meaning of those terms. The [DOJ] is also amending ATF's definitions of "firearms" and "gunsmith" to clarify the meaning of those terms and to provide definitions of terms such as "complete weapon," "complete muffler or silencer device," "multi-piece frame or receiver," "privately made firearm," and "readily" for purposes of clarity given advancements in firearms technology. Further, the Department is amending ATF's regulations on marking and recordkeeping that are necessary to implement these new or amended definitions.

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, and 479). The Final Rule also includes an analysis

of the comments received on the NPRM and the ATF's responses. Id. at 24667-24727. As noted, the Final Rule is effective August 24, 2022. Id. at 24652.

### C.     Procedural History

On July 5, 2022, the Plaintiffs initiated this action against the Defendants, alleging ten causes of action, including various violations of the Administrative Procedure Act ("APA") and several constitutional claims. At its heart though, the Plaintiffs allege the ATF exceeded its statutory authority, violated the rulemaking process, created new federal law, and violated certain constitutional rights in proceeding with the Final Rule, and they seek a preliminary injunction to stop the Final Rule from taking effect on August 24, 2022.

## II.   LAW AND ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). When considering a motion for preliminary injunction, the Court weighs the four factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc): "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 114. The balance of harms and public interest factors merge when the government is the opposing party (see Nken v. Holder, 556 U.S. 418, 435 (2009)), and likelihood of success on the merits is the most important factor. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). The burden to demonstrate the necessity of a preliminary injunction rests with the movant. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

### A.   Likelihood of Success on the Merits

Beginning with the first factor, the Plaintiffs assert they are likely to succeed on the merits because (1) the Final Rule violates the APA's notice and comment requirement; (2) the Final Rule is not in accordance with the law and conflicts with federal law; and, (3) the Final Rule is arbitrary and capricious. The Defendants argue the Plaintiffs have not demonstrated likelihood of success on the merits, and on the facts of this case, the Court agrees with the Defendants.

### 1.   Notice and Comment Requirement

To start, the Plaintiffs claim that the Final Rule should be enjoined because a proper notice and comment period did not take place.  More specifically, the Plaintiffs posit that the Final Rule is not a "logical outgrowth" of the ATF's NPRM.

It is a fundamental principle of administrative law that the rulemaking process must go through the "notice and comment" process detailed in 5 U.S.C. § 553. "To satisfy the APA's notice requirement, the NPRM and the final rule need not be identical[;]" however, a final rule must be "a 'logical outgrowth' of its notice." CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1079 (D.C. Cir. 2009). A final rule is a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." Id. at 1079-80.

Here, the NPRM expressly stated the ATF's intent to update and modernize the definition of "frame or receiver" because "most firearms currently in circulation in the United States do not have a specific part that expressly falls within the current 'frame or receiver' regulatory definitions." 86 Fed. Reg. at 27727.  So, in the NPRM, the ATF started with a broad definition of "frame or receiver."  Then the ATF allowed a period of public comment beginning on May 21,

7   **ADD-7**

2021. And after reviewing and considering the over 290,000 comments offered by the public, including those comments from the Plaintiffs, the ATF narrowed its definition of "frame and receiver." It is difficult to conclude, under these facts, that the Final Rule is not a "logical outgrowth" of the NPRM.  Indeed, this appears to present a rather textbook example of how the administrative rulemaking process must proceed under the APA.

Effectively, the Plaintiffs argue they should have received a second opportunity at the proposed rulemaking process because they could not have anticipated the Final Rule's definition of "frame or receiver" and that there should have been a second comment period after the ATF narrowed the definitions.  But the law does not support such a claim.  "[I]n most cases, if the agency . . . alters its course in response to the comments it receives, little purpose would be served by a second round of comment." American Water Works Ass'n v. EPA, 40 F.3d 1266, 1274 (D.C. Cir. 1994). Importantly, the "logical outgrowth" test applies to consider "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." Id. (emphasis added).  Here, the Plaintiffs had an opportunity to offer comments on the proposed definitions.  Moreover, because the Final Rule narrowed the definitions at issue in the NPRM, allowing Plaintiffs a new round of notice and comment would serve little purpose. Without question, the NPRM was sufficiently descriptive that the ATF was going to redefine "frame or receiver," and it allowed interested parties to offer informed criticism and comment.  Simply because the ATF did not adopt the Plaintiffs' exact proposed definitions does not mean the Final Rule is not a logical outgrowth of the NPRM or that the ATF violated the APA's notice and comment requirement.  As such, the Plaintiffs have failed to demonstrate likelihood of success on the merits of this claim.

**ADD-8**

8

### 2.    Accordance with the Law

Next, Plaintiffs argue the Final Rule is inconsistent with the statutory language of the GCA, which means the ATF exceeded the scope of its delegated authority. In response, the Defendants assert that the Final Rule falls well-within the ATF's agency rulemaking authority as delegated by Congress. The Court agrees with the Defendants.

As discussed above, the Attorney General is generally responsible for enforcing the GCA, and Congress expressly delegated the responsibility for administration of the GCA to the Director of the ATF. See 18 U.S.C. 926(a); see Nat'l Rifle Ass'n v. Brady, 914 F.2d 475, 479 (4th Cir. 1990). And to be sure, no one disputes the ATF's authority to develop rules to interpret and enforce the GCA. Rather, the question is whether the Final Rule is inconsistent with and contradicts the plain language of the GCA itself. Of course, if the Final Rule did contradict the plain language of the GCA, that would result in an agency effectively circumventing the intent of Congress.

#### a.    Definition of Firearm and "The" Frame or Receiver

According to the Plaintiffs, the Final Rule conflicts with the plain language of the GCA in several ways. For instance, 18 U.S.C. § 921(a)(3) defines "firearm" as the part that is "the frame or receiver of any such weapon[.]" (Emphasis added). The use of the word "the," per the Plaintiffs, suggests a singular object, where each "firearm" contains only ("the") one "frame" or one "receiver." The Plaintiffs say, however, that the Final Rule results in a regulatory scheme where firearms could have multiple frames or receivers. However, after carefully reading the Final Rule itself, the Court disagrees.

While the NPRM contemplated that a firearm may have multiple components constituting a "frame or receiver," the Final Rule explicitly addresses this concern and states multiple times that only a single component for each weapon will constitute the frame or receiver. 87 Fed. Reg.

**ADD-9**

at 24683, 24688.  Indeed, the Final Rule states: "The [ATF] agrees with numerous commenters that the context of the singular terms 'frame' and 'receiver' in these provisions suggests that a firearm only has one frame or receiver." Id. at 24683. And, the Final Rule recognizes that the subparts of a multi-piece frame or receiver should be considered a single frame or receiver and requires such components to be marked with a serial number (and if sold together, with the same serial number). Id. at 24739.  Accordingly, while highly technical, the Final Rules appears to be consistent with the GCA in recognizing a single frame or receiver.

b.   <u>Definition of Firearm and Weapon Parts Kits</u>

The Plaintiffs next argue that the Final Rule's amended definition of "firearm" is inconsistent with the GCA because it includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." Doc. No. 14 at 9-10. Notably though, the GCA itself defines "firearm" as "any weapon (including a starter gun) which will or is designed to <u>or may readily be converted to expel a projectile</u> by the action of an explosive[.]" 18 U.S.C. § 921(a)(3)(A) (emphasis added).

A plain reading of the GCA confirms that Congress defined "firearm" more broadly than simply a fully operational weapon, as the statute expressly includes items that "may readily be converted to expel a projectile." The language from the Final Rule—"completed, assembled, restored, or otherwise converted," as well as the weapon kits at issue—fit squarely within the GCA's "firearm" definition because after delivery, the kits are easily converted from mere parts into a weapon that expels a projectile. This interpretation mirrors existing Eighth Circuit Court of Appeals case law, which suggests a non-operational weapon, that can be made operational, qualifies as a firearm. See <u>United States v. Annis</u>, 446 F.3d 852, 857 (8th Cir. 2006). Accordingly,

10   **ADD-10**

the ATF did not act inconsistently with the GCA in considering weapon kits as firearms under federal law.

### c.   Definition of Frame or Receiver and "Readily"

The Plaintiffs further argue that the Final Rule's definition of "frame or receiver" is contrary to the GCA because it improperly uses the term "readily" from the statutory definition of "firearm." Doc. No. 14 at 9.   Critically though, the GCA does not define the term "frame or receiver," which leaves the regulation of what constitutes a frame or receiver to the discretion of the ATF.   In turn, the ATF's update of the definition of "frame or receiver" includes items that "may readily be completed, assembled, restored, or otherwise converted." From the Plaintiffs' perspective, this creates a "regulatory glob" that conflates the statutory definition of "firearm" with the regulatory definition of "frame or receiver."

Again, after reading the Final Rule, the Plaintiffs' argument misses the mark.   As an initial matter, the Final Rule does not improperly use the statutory term "readily."   To the contrary, and as noted above, adopting Plaintiffs' position would appear to contradict the plain language of the GCA, which clearly defined "firearms" more broadly than a fully operational weapon. Additionally, the relevant text of the Final Rule makes it clear that certain weapon parts kits (which are considered a weapon under 18 U.S.C. § 921(a)(3)(A)) and certain frame or receiver kits (which are considered a frame or receiver of a weapon because they can be "readily" converted to be a frame or receiver of a weapon under 18 U.S.C. § 921(a)(3)(B)), are considered firearms for different reasons. As the Plaintiffs point out, under the final rule, it is possible that a "frame or receiver" may be considered a firearm much sooner in the process than a "weapon."   But critically, the Plaintiffs have pointed to no provision of federal law foreclosing this possibility, and this

11

**ADD-11**

distinction cuts against the assertion that ATF has conflated the statutory definition of firearm with the Final Rule's definition of "frame or receiver."

d.    Creation of New Federal Crimes

Next, the Plaintiffs claim the ATF exceeded its statutory authority because the Final Rule creates new crimes of "conspiracy" and "structuring transactions." Doc. No. 14. at 10. Curiously, however, nothing in the text of the Final Rule creates any new federal crimes.  As correctly noted by the Defendants, "conspiracy to violate" and "aiding and abetting" a violation of any underlying criminal offense have long been considered statutory violations. See 18 U.S.C. §§ 2, 371. Further, federal courts have already recognized crimes of conspiracy and aiding and abetting as violations of federal firearms laws. See United States v. Evans, 928 F.2d 858 (9th Cir. 1991); United States v. Moore, 109 F.3d 1456, 1464 (9th Cir. 1997); United States v. Garcia-Pena, 743 F.2d 1462, 1464 (11th Cir. 1984); Armament Servs. Int'l Inc. v. Att'y Gen. United States, 760 F. App'x 114, 120 (3d Cir. 2019). The Court further disagrees that the Final Rule creates a new crime of "structuring," as the Final Rule only provides that one cannot conceal their transfer of a disassembled firearm in more than one box or shipment, which is consistent with the intent of the GCA and within the scope of the ATF to regulate.

e.    Creation of "Privately Made Firearm"

The Plaintiffs' next argument is that the Final Rule conflicts with the GCA because it creates the term "privately made firearm" ("PMF"), which is not mentioned in either the GCA or any existing regulations.  More to the point, the Plaintiffs assert that the ATF has improperly conjured up the term PMF to violate the rights of privately made firearm owners.  They argue the PMF definition conflicts with the GCA because "there is no federal prohibition on an individual

**ADD-12**

manufacturing his own firearm for personal use," and the GCA does not require PMFs be marked with serial numbers, as the Final Rule now requires. Doc. No. 14 at 10-11.

Again, the Plaintiffs' argument is based on an inaccurate and imprecise view and description of the Final Rule. In reality, the Final Rule does not prohibit any individual from manufacturing a firearm for personal use. PMFs are only implicated by the Final Rule to the extent it requires federal firearms licensees ("FFLs") to "legibly and conspicuously identify each" PMF that is taken into inventory within seven days of receipt or acquisition. 87 Fed. Reg. at 24742. Essentially, the Final Rule only requires FFLs[4] to serialize any unserialized PMF when it reaches the stream of commerce. Id. at 24746. Any suggestion the Final Rule prohibits manufacture or ownership of PMFs is misleading at best.  Relatedly, the Plaintiffs argue the PMF serialization requirement for FFLs creates a new federal crime of obliteration of a PMF serial number. However, the obliteration of a PMF serial number would be treated the same as obliteration of any firearm's serial number, which has long been a crime under federal law. See 18 U.S.C. § 922(k); 26 U.S.C. § 5861(h).

Further, while PMF is not a term included in the GCA or prior regulations, the Court fails to see any logic or authority for the proposition that the ATF cannot define a new term as necessary to enforce the GCA through regulation.  There is nothing in the GCA prohibiting the ATF from delineating between different categories of firearms to accomplish the goal of interpreting and enforcing the GCA.

---

[4] The Plaintiffs argue the Final Rule creates a new category of licensing of "dealer-gunsmiths" to "solely provide PMF marking services." However, the Court's reading indicates the Final Rule applies to all FFLs and requires these licensees to add the serial number prior to the PMF entering commerce.

In reality, the relevant distinction between a PMF and any other firearm is the lack of a serial number. The Final Rule does not require that all PMFs receive a serial number—it only requires a PMF entering commerce through an FFL to be given a serial number. While the Plaintiffs argue otherwise, the ATF's requirement to serialize PMFs entering the stream of commerce is consistent with its authority to take actions "necessary to carry out the provisions" of the GCA, as well as the narrower delegation of authority to regulate an FFL's "records of importation, production, shipment, receipt, sale, or other disposition of firearms" under § 923(g)(1). Without a serial number, PMFs become untraceable firearms—an outcome the ATF is well within its regulatory authority to prevent.

f.   <u>Complete Muffler or Silencer Device</u>

Next, the Plaintiffs argue that in creating a new definition for a "complete muffler or silencer device," the Final Rule essentially deletes the statutory requirements that a combination of parts constituting a silencer be "designed" and "intended" for that purpose. Doc No. 14 at 11. Instead, according to the Plaintiffs, the Final Rule would classify a silencer as any group of parts that merely "contains all the component parts necessary to function," which potentially criminalizes innocent ownership of countless innocuous household items. <u>Id.</u>

And once again, after reading the Final Rule, the Court disagrees. The definition of "complete muffler or silencer device" only pertains to "[a] firearm muffler or firearm silencer that contains <u>all component parts necessary to function</u>[.]" 87 Fed. Reg. at 24734 (emphasis added). Stated another way, the Final Rule only applies to items that already meet the definition of "firearm muffler" or "firearm silencer" under 18 U.S.C. § 921(a)(25), which specifically defines those terms, in part, as "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler." As such, the "designed" and

"intended" statutory language from the GCA was simply incorporated into the Final Rule's definition.

Relatedly, the Plaintiffs also assert the Final Rule conflicts with the GCA in creating and defining a new statutory term of "firearm muffler or silencer frame or receiver." Doc. No. 14 at 11. The statutory definition of "firearm" includes "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3). Under the NFA, the ATF is specifically charged with issuing regulations regarding the identification of firearms. See 26 U.S.C. § 5842. Under 26 U.S.C. § 5842(a), "[e]ach manufacturer and importer and anyone making a firearm shall identify each firearm . . . by a serial number which may not be readily removed, obliterated, or altered . . . as [the ATF] may by regulations prescribe." 26 U.S.C. § 5842(a). As discussed, the Final Rule specifically seeks to identify firearms with a single serial number. 87 Fed. Reg. at 24723. Accordingly, a firearm muffler or firearm silencer must have a frame or receiver, so that manufacturers know which part must be serialized.

g.    National Gun Registry

Continuing on, the Plaintiffs next assert the Final Rule violates 18 U.S.C. § 926(a), which prohibits the Attorney General from promulgating any new regulations requiring the records that must be maintained under the GCA "be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof," or establishing any "system of registration of firearms." Id. Here, the Final Rule simply extends the period an FFL must maintain the records of its firearm sales from 20 years to the duration of the FFL's business. 87 Fed. Reg. at 24690.  This extension does not create a new regulation requiring the recording or transfer of firearms records to a government facility and in no way results in a national

firearm registration. To make such assertions in the face of the plain text of the Final Rule certainly strains credibility. The Final Rule is consistent with 18 U.S.C. § 926(a).

> h.   Repudiated Legal Test

Finally, the Plaintiffs argue the Final Rule is contrary to law because it is based upon a "repudiated legal test." Specifically, several comments received during the notice and comment period expressed concerns that the NPRM may potentially violate the Second Amendment. 87 Fed. Reg. at 24676. In response, the Final Rule included a brief statement positing that the rule was consistent with the United States Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008) because there are compelling governmental interests in the serialization of privately made firearms. Id. The Final Rule also discusses other cases that considered the Government's interest in regulating firearms. Id. However, as recently as two months ago, the Supreme Court declined to weigh the Government's interest in regulating firearms, which distinguishes Heller and its progeny, at least to some degree. See generally N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022).

As an initial matter, while not specifically argued by the Plaintiffs, the Court believes the ATF's response to the Second Amendment concerns brought up during the notice and comment period to the NPRM was sufficient. As noted in the Final Rule, concerns regarding constitutionality of the proposed rule were raised by multiple commenters. The ATF appropriately responded by indicating its belief that the proposed rule was consistent with Second Amendment jurisprudence at the time the Final Rule was drafted and explained why. It is difficult to fathom what more the ATF could have said in response at the time, as it could not have predicted the future development in the law.

16   **ADD-16**

Turning to the substance of <u>Bruen</u>, that case concerned an unconstitutional "proper cause" requirement for issuance of conceal and carry permits in the State of New York—quite distinguishable from the facts here. Nonetheless, the question is whether the Final Rule would pass constitutional muster post-<u>Bruen</u> where, as the Court reads <u>Bruen</u>, an individual's right to keep and bear arms for self-defense may not be arbitrarily denied by a state. From the outset, however, it is crucial to note the Final Rule concerns the <u>commercial sale of firearms</u>. The Final Rule does not infringe on <u>any</u> individuals' or business' ability to completely manufacturer a firearm for personal use, nor does it restrict the ability to obtain the weapon kits at issue. Instead, the Final Rule simply requires serialization of a firearm, when in the stream of commerce, so that it may be tracked in the event a crime is committed with the firearm. There is a longstanding distinction between the right to keep and bears arms and commercial regulation of firearm sales. <u>See</u> <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626-27 (2008); <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 786 (2010); <u>Bruen</u>, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (reiterating that many regulations of firearms, including commercial regulations, remain consistent with the Second Amendment). As such, in this Court's view, the Final Rule was and remains constitutional under the Second Amendment.

Despite the multitude of arguments to the contrary advanced by the Plaintiffs, the Court cannot conclude they have met their burden of showing the Final Rule is not in accordance with the law. As such, the Plaintiffs have not demonstrated a likelihood of success on these claims.

### 3.  Arbitrary and Capricious

With that set of arguments resolved, the remaining merits arguments by the Plaintiffs focus on whether the Final Rule is arbitrary and capricious. The arbitrary and capricious standard "is a highly deferential standard of review." <u>Adventist Health Sys./SunBelt, Inc. v. HHS</u>, 17 F.4th 793,

803 (8th Cir. 2021). "[T]he role of courts in reviewing arbitrary and capricious challenges is to simply ensure that the agency has acted within a zone of reasonableness." <u>Biden v. Missouri</u>, 142 S. Ct. 647, 654 (2022). The reviewing court "defers to agency action so long as an agency examined the relevant data and articulated a satisfactory explanation for its action." <u>Adventist Health Sys./SunBelt</u>, 17 F.4th at 803. A court may not substitute its judgment for that of the agency <u>Id.</u> "[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). The Plaintiffs argue the Final Rule has each of these "in spades." Doc. No. 14 at 15.  However, after thorough review, the Court disagrees.

a.    <u>Internally Conflicting</u>

To begin, the Plaintiffs argue the Final Rule is not the product of reasoned decision-making because it is internally conflicting. A promulgated regulation is internally conflicting when it advances two diametric approaches to solve the same problem, reaches dissimilar results for nearly identical items, or is not a product of reasoned decision-making. <u>See</u> <u>AFGE, Local 2924</u> <u>v. FLRA</u>, 470 F.3d 375, 380 (D.C. Cir. 2006).

First, the Plaintiffs allege the Final Rule presumes that any serialized part of a firearm is the firearm's frame or receiver, which may lead to situations where a firearm has multiple frames or receivers. As noted previously, the ATF modified the Final Rule and agreed with many commenters that there should be only one "frame" for a handgun, and only one "receiver" for a long gun. Though the Final Rule presumes the marked subparts of a multi-piece frame or receiver

18    <b>ADD-18</b>

to be parts of a weapon's "frame" or "receiver," when these subparts are assembled, they comprise a single frame or receiver. So, while undoubtedly technical, as the Court reads the Final Rule, a firearm can have but one frame or receiver, which is internally consistent.

Next, the Plaintiffs argue that after laying out the new regulatory definition of "frame or receiver," the Final Rule contains a "nonexclusive list" of firearms whose prior classifications conflict with that definition, yet are not overruled (Doc. No. 14 at 15), and that this will lead to significant confusion regarding whether certain firearms are subject to the Final Rule. Id. Nevertheless, the Final Rule states that all ATF classifications of existing complete frame or receiver designs that the agency determined before April 26, 2022, to be the firearm "frame or receiver" remain effective. See 87 Fed. Reg. at 24739. While again highly technical, as the Court reads the Final Rule, manufacturers can ensure compliance by determining whether the classification was issued before April 26, 2022, and whether the weapon was complete and assembled when it was submitted for the ATF's examination. Id. at 24739, 24741.

The Plaintiffs then argue the Final Rule is internally conflicting because of dissimilar treatment of functionally identical items, such as top/bottom "split" receivers (where only one portion is serialized) versus left/right "multi-piece" receivers (where both portions are serialized). Doc. No. 14 at 16. However, the Final Rule thoroughly explains the different treatment of split and multi-piece receivers, and the ATF's reasons for treating these two types of receivers differently for purposes of serialization.

A "split" frame or receiver typically has two different parts that house one or more fire control components, which are referred to as the "upper" and "lower" portions of the receiver. 87 Fed. Reg. at 24652, 24655. Under the Final Rule's definition of "frame" and "receiver," only one

of these two parts is the "frame" or "receiver." 87 Fed. Reg. at 24735. This is done so that the firearm will have only one serial number.

A "multi-piece" frame or receiver is one that can be disassembled into multiple modular subparts (i.e., standardized units that may be replaced or exchanged). 87 Fed. Reg. at 24671; 24739. The Final Rule includes a definition of "multi-piece frame or receiver," (id. at 24671), and explains which portion(s) of a multi-piece receiver needs to be serialized. 87 Fed. Reg. at 24747. In general, the outermost housing designed to house either the sear, the bolt, or breechblock must contain the serial number. Id. at 24747; see also id. at 24671-72. And if more than one outermost subpart is similarly designed to provide a structure for these components, each of those subparts must be identified with the serial number. Id. at 24671-72, 24747. Without this requirement, multi-piece frames or receivers could be broken down and sold as individual subparts and replaced without any traceable marks of identification. Id. at 24672. Given this distinction, the need for distinguishing between split and multi-piece frames is quite clear and appears to be the product of thoughtful and reasoned decision-making.

> b.   Policy Shifts

Next, the Plaintiffs argue the ATF has failed to appropriately explain their significant policy shifts. An agency changing its position must "display awareness that it is changing position . . . and may sometimes need to account for prior factfinding or certain reliance interests created by a prior policy[.]" FCC v. Fox TV Stations, Inc., 556 U.S. 502, 503 (2009). However, [w]hen an agency reverses its prior policy, 'it need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one.'" Northport Health Servs. v. HHS, 14 F.4th 856, 875 (8th Cir. 2021). "[I]t suffices that the new policy is permissible under the statute, that there are

good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Id.

Here the Plaintiffs rekindle their argument regarding the definition of multi-piece frames or receivers as not being adequately explained for policy purposes. However, because the policy is that a multi-piece frame or receiver is defined as "a frame or receiver that may be disassembled into multiple modular subparts" (87 Fed. Reg. at 24739), requiring multiple, but identical, serial numbers on any subparts entering the stream of commerce is necessary if the ATF wishes to track the subparts when sold in piecemeal fashion. As the Court sees it, this adequately explains the unique serialization requirement of multi-piece frames or receivers.

The Plaintiffs then rehash their argument as to the use and definition of the term "readily" as it applies to unfinished 80% frames and receivers as being a significant shift in policy. The parties each go deep into detail regarding the alleged policy shift; however, such depth is unnecessary. Without a doubt, the Final Rule adequately explains the policy shift to regulate weapon kits more tightly, as these wholly untraceable weapons present serious challenges for law enforcement and the community. While the ATF's prior approach may have focused on the specific degree of machining related to the weapon kits, the goal of serializing the frames and receivers entering commerce fully explains any changes.

Further, the Plaintiffs assert the Final Rule makes the existing ATF classification system even worse by formally adopting a recent ATF policy change to refuse to classify numerous firearms related items and also creating a new requirement that the industry seek ATF guidance through submissions filed under penalty of perjury. Codification of the ATF's position regarding classification cannot be considered a change in policy as it has been the ATF's formal position since 2018. Compare ATF, Notice: Discontinuance of Accessory Classifications (last reviewed

Dec. 11, 2018) https://www.atf.gov/firearms/notice-discontinuance-accessory-classifications, with 87 Fed. Reg. at 24743.

Additionally, while the Final Rule does not explicitly explain the requirement of firearms classifications to be requested under penalty of perjury, it does stand to reason that these statements must be truthful to be considered. In any event, it is already a crime to "make any materially false, fictitious, or fraudulent statement or representation" or "mak[ing] or us[ing] any false writing or document knowing the same to contain" such a statement or representation "within the jurisdiction of the executive . . . branch" of the United States. 18 U.S.C. § 1001. As such, the requirement that individuals submit classification requests under penalty of perjury does not appear to be a significant change to the ATF's policy.

Finally, the Plaintiffs assert that the ATF has not previously considered certain parts kits that may readily be converted to functioning firearms to constitute "firearms" under the GCA and as such, has failed to properly explain and justify the new regulations in the Final Rule. Doc. No. 14 at 19-20. Along these same lines, the Plaintiffs argue the ATF has made a significant policy shift by regulating firearm parts instead of only frames and receivers. Id. As discussed above, a non-operational weapon which can be made operational already qualifies as a firearm under 18 U.S.C. § 921(a)(3)(A). As a result, regulating a non-operational kit that can be readily turned into an operational firearm is not a significant change. Further, any adjustments to the way these kits, or the parts they contain, are treated has been thoroughly explained. See 87 Fed. Reg. at 24652, 24688-89.

c.    Consideration of Comments

The final subset of Plaintiffs' arguments as to the Final Rule being arbitrary and capricious is that the ATF did not appropriately respond to relevant comments. As part of the APA's notice

and comment process, a federal agency is required to, "[a]fter consideration of the relevant matter presented . . . incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). Further, "although an agency 'need not address every comment' . . . 'it must respond in a reasoned manner to those that raise significant problems," and "the failure to respond to comments is significant [because] it demonstrates that the agency's decision was not based on a consideration of the relevant factors." Huntco Pawn Holdings, LLC v. United States DOD, 240 F. Supp. 3d 206, 219 (D.C. Cir. 2016) (citations omitted); see also Champion v. Shalala, 33 F.3d 963, 966 n.4 (8th Cir. 1994) (conducting the same analysis).

First, the Plaintiffs contend that their comment indicating the GCA authorizes licensed manufacturers and importers—but not licensed dealers—to mark firearms was not given proper consideration. However, in response to this assertion, the ATF explained that in enacting the GCA, Congress understood that persons and entities other than licensed manufacturers and importers may need to mark firearms. 87 Fed. Reg. at 24687. Further, the ATF has the authority to promulgate regulations necessary to enforce the GCA and requiring licensed dealers to mark PMFs is squarely within the ATF's regulatory authority. Id. The GCA requires FFLs to record firearm information for purposes of tracing, but as discussed, some PMFs have no serial number to record. Requiring licensed dealers—like licensed manufacturers and importers—to mark these firearms as they enter commerce is necessary to fulfill Congress's intent to allow for tracing of commercially sold firearms. Id. The Court finds the ATF's response appropriate and legally accurate.

Additionally, the Plaintiffs argue that the ATF did not adequately respond to a comment raising concerns that the Final Rule does not require the agency to notify the submitter of a voluntary classification request that the agency has accepted or rejected the request. However, the

23   **ADD-23**

ATF did respond and disagreed. 87 Fed. Reg. at 24709. The ATF explained that while it was willing to help individuals and entities achieve compliance, there is no requirement that they do so or that they complete the task in a certain timeframe. Id. at 24709-10. While the Plaintiffs may not like the response they received, the ATF did adequately respond and explain its position.

After considering all the arguments advanced by the Plaintiffs, the Court cannot conclude they have met their burden of showing the Final Rule is arbitrary and capricious.  As such, the Plaintiffs have not demonstrated a likelihood of success on these claims either.[5]

### B.    Remaining Preliminary Injunction Factors

Because the Plaintiffs are unlikely to succeed on the merits of their claims, consideration of the remaining factors is unnecessary.  See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 737 (8th Cir. 2008) (en banc).  That said, the remaining factors (irreparable harm and the balance of equities and public interest) also weigh against a preliminary injunction.

As to irreparable harm, the timeline for the filing of the motion for preliminary injunction gives the Court serious pause.  The ATF issued the Final Rule on April 26, 2022, and the Plaintiffs, given their activity in the notice and comment period, were certainly aware of the Final Rule when it was issued.  Nonetheless, the Plaintiffs waited until July 25, 2022 (or essentially three months) to file their motion for injunctive relief.  While not necessarily dispositive of the outcome, the delay here tends to weigh against a finding of irreparable harm. Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 894 (8th Cir. 2013); Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs., 17 F.4th 793, 806 (8th Cir. 2021).

---

[5] While the amended complaint also advances several constitutional claims, neither party raised or argued these claims in their briefing on the motion currently before the Court. As such, the Court declines to address these claims any further but to note that it independently reviewed each claim in this case.

**ADD-24**

Setting the timing issue aside, the irreparable harm alleged by the Plaintiffs largely consists of arguments that the Final Rule is vague, will cause uncertainty, and will result in businesses needing to "revamp business practices" and stop selling certain products. Doc. No. 14 at 25. However, uncertainty because of a new federal regulation certainly does not constitute irreparable harm, and "ordinary compliance costs are typically insufficient to constitute irreparable harm." Freedom Holding, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005); see also Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1331 (7th Cir. 1980). Indeed, much of the alleged irreparable harm is entirely speculative and is not the type of "great" harm that constitutes irreparable harm for the purposes of a preliminary injunction. Roudachevski v. All–Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011) (harm must be certain and great and of such imminence that there is a clear and present need for equitable relief). Thus, the Court concludes the Plaintiffs have not met their burden to demonstrate irreparable harm.

The final factor, balance of the equities and public interest, is perhaps a closer call, but given the failure to demonstrate likelihood of success on the merits and irreparable harm, the Court concludes this final factor also weighs against injunctive relief. The rather speculative risk of harm to the Plaintiffs, on the one hand, does not outweigh the harm to the ATF's interest in law enforcement and public safety, on the other. Moreover, there would be consequences to the public as well if the Final Rule is enjoined. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (courts must consider the public consequences when deciding whether to employ the extraordinary remedy of injunction).

In conclusion, the Plaintiffs have failed to demonstrate likelihood of success on the merits and irreparable harm. Accordingly, the balance of the Dataphase factors weigh against injunctive relief, and the Court denies the Plaintiffs' motion for a preliminary and/or permanent injunction.

### C.        Corrections to the Final Rule

Finally, on August 22, 2022, the ATF issued corrections to the Final Rule (the "Corrections"), explaining that "[d]ue to the complexity of this rulemaking process and the resulting significant number of comments and revisions in response, the final rule inadvertently contained some technical errors in the regulatory text that this document corrects." Definition of "Frame or Receiver" and Identification of Firearms; Corrections, 87 Fed. Reg. 51249 (August 22, 2022). The Corrections list eight technical errors, noting it "corrects those technical errors before the final rule's effective date." Id. (emphasis added). That same day, Plaintiffs filed a "Supplemental Memorandum In Response to ATF's Notice of Amended Regulations," arguing that the ATF has failed to publish its corrections as required by the APA, among other things. Doc. No. 83 at 2 (citing 5 U.S.C. § 553(d)).

The Court has independently reviewed the Corrections and disagrees. Here, the Corrections were issued before the Final Rule's effective date and are simply a correction of technical or clerical errors. Accordingly, as the Court sees it, the Corrections are a logical outgrowth of the proposed rule and do not trigger a new notice and comment period. Nevertheless, assuming arguendo, that the Plaintiffs are correct, and the Corrections violated the notice and comment period of the APA, the Plaintiffs have failed to cite any authority that this would lead to invalidation of the entirety of the Final Rule. To the contrary, the cases cited by Plaintiffs appear to support a finding that, at best, only the Corrections would be invalidated. See Util. Solid Waste Activities Grp. v. E.P.A., 236 F.3d 749, 755 (D.C. Cir. 2001) ("Finding the amendment, as opposed to the rule, violated the APA's procedural requirement—the Court set aside the amendment). Additionally, within the context of the preliminary injunction, as these changes are merely technical, they have no substantive impact on the outcome of the Court's decision.

III.   <u>**CONCLUSION**</u>

Without a doubt, this case presents divisive issues that all parties care about deeply and that are of national concern and importance, as demonstrated by the participation of nearly every state in this country in this action.   Nevertheless, the Court's role and responsibility remains the same—to apply the law to the facts (and not the arguments or policy) of each case.   After doing so here, the balance of the <u>Dataphase</u> factors do not weigh in favor of granting the Plaintiffs a preliminary injunction.   Accordingly, the motions (Doc. Nos. 14 and 19) are **DENIED**, and the Court **FINDS AS MOOT** the Plaintiffs' motion for oral argument (Doc. No. 25).

**IT IS SO ORDERED**.

Dated this 23rd day of August, 2022.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

27   **ADD-27**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | | |
|---|---|---|
| Morehouse Enterprises, LLC, d/b/a/ Bridge City Ordnance, et al., | ) ) ) | **ORDER DENYING MOTION FOR INJUNCTION PENDING APPEAL** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 3:22-cv-116 |
| Bureau of Alcohol, Tobacco, Firearms and Explosives, et al., | ) ) ) | |
| Defendants. | ) | |

On April 26, 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") promulgated an administrative rule updating regulations concerning federal firearms laws.  See Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, and 479) (the "Final Rule"). The Final Rule took effect on August 24, 2022. Id.

Prior to the Final Rule taking effect, the Plaintiffs filed a motion for preliminary and/or permanent injunction. Doc. No. 14. The Defendants opposed the motion. Doc. No. 43.  On August 23, 2022, this Court denied the motion for preliminary and/or permanent injunction. Doc. No. 85. Two days later, the Plaintiffs filed an interlocutory appeal of that decision (Doc. No. 87) and filed this motion for injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(d). Doc. No. 89. The Defendants again oppose the motion (Doc. No. 94), and the Plaintiffs filed a reply. Doc. No. 97.

Federal Rule of Civil Procedure 62(d) permits motions for injunctive relief while an appeal is pending from an interlocutory order.  Fed. R. Civ. P. 62(d).  Under that Rule, the Plaintiffs seek an injunction of the Final Rule pending their interlocutory appeal.  They reassert their view that

**ADD-28**

they are likely to succeed on the merits and incorporate their arguments from the original motion for injunctive relief. Doc. No. 89-1 at 2. A motion for injunctive relief under Federal Rule of Civil Procedure 62(d) is reviewed under the same four-factor test articulated in the Court's prior order:

(1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits;
(2) whether the party seeking the stay will be irreparably injured without a stay;
(3) whether a stay would substantially injure other parties; and
(4) the public's interest.

Org. for Black Struggle v. Ashcroft, 978 F.3d 603, 607 (8th Cir. 2020); Dish Network Serv. LLC v. Laducer, No. 4:12-CV-058, 2012 WL 12860123, at *1 (D.N.D. Aug. 15, 2012). Likelihood of success on the merits remains the most important factor. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011).

After a careful review, the Court remains unpersuaded that the four-factors weigh in favor of injunctive relief. To the extent the Plaintiffs reassert their arguments from the original motion for injunctive relief, the Court incorporates here its prior analysis of these argument under the four-factor test. See Doc. No. 85. And for the same reasons, the Plaintiffs are not entitled to injunctive relief pending appeal.

In addition to their prior arguments, the Plaintiffs also raise additional arguments in support of their motion pending appeal. The Plaintiffs argue the Court, in its prior order, did not directly address the irreparable harm to the Plaintiff States. More specifically, the Plaintiff focus on the alleged irreparable harm to the Plaintiff States through the loss of tax revenue.[1] Doc. No. 89-1 at 3-4. While a small amount of tax revenue loss is a theoretical possibility, even assuming such losses exist (which has not been established), this factor must be weighed against the most

---

[1] This argument did not appear in the Plaintiffs' initial briefing, though the delay is understandable given the timing of the Plaintiff States joining the litigation.

2   **ADD-29**

important factor—likelihood of success on the merits. And here, the Court finds that the minimal and speculative tax revenue loss potentially lost by the Plaintiff States is far outweighed by the absence of likelihood of success on the merits.

Next the Plaintiffs argue the Court did not properly weigh the Plaintiff States' interests when balancing the equities and public interest. Specifically, the Plaintiffs argue the Plaintiff-States' interests, expressed through their own permissive legal schemes, and the sovereign injury they incur through the federal overreach in the Final Rule, merits further consideration. Id. at 4. However, these broad and vague assertions do not outweigh the ATF's interest in law enforcement and public safety.  And even if these vague assertions were assumed to trump the ATF's interest in public safety, the interest is, again, far outweighed by the absence of likelihood of success on the merits.

To bolster their argument as to irreparable harm, the Plaintiffs submitted evidence of Google searches concerning a non-party manufacturer of AR-15 receivers having fewer products for sale on its website following the Final Rule going into effect. Id. at 3. Curiously, though, the manufacturer at issue is not a party to this litigation, and the Court is not inclined to rely on Google search results in assessing irreparable harm.  Even if the Court assumes *arguendo* that the Google search results constitute irreparable harm, it is once again outweighed by the absence of likelihood of success on the merits.

Finally, the Plaintiffs cite <u>VanDerStok v. Garland</u>, in support of their argument that irreparable harm exists and an injunction pending appeal is necessary. No. 4:22-CV-00691-O, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022). In <u>VanDerStok</u>, various Plaintiffs sought a nationwide preliminary injunction enjoining the Final Rule. Id. at *2. The United States District Court for the Northern District of Texas granted a narrow preliminary injunction preventing

3   **ADD-30**

enforcement of the Final Rule against one plaintiff. Id. at *10-11. That court's reasoning in finding irreparable harm was evidence that the Final Rule had caused Tactical Machining substantial and unrecoverable financial injury. Id. at *9.  No irreparable harm was established as to the remaining Plaintiffs. Id. at 10.  Here, unlike in VanDerStok, the Court has not been presented with similar evidence of concrete and substantial financial injury. Nevertheless, even if the Court had received any evidence of certain and substantial financial injury, that injury must be weighed against the likelihood of success on the merits.  And on this factor, this Court stands by its prior analysis and is not persuaded by the merits analysis in VanDerStok.

For the reasons provided above, the four factors do not weigh in favor of granting an injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(d).  Accordingly, the Plaintiffs' motion for injunction pending appeal (Doc. No. 89) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 27th day of September, 2022.

*/s/ Peter D. Welte*_____
Peter D. Welte, Chief Judge
United States District Court

4   **ADD-31**

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment II. Keeping and Bearing Arms

U.S.C.A. Const. Amend. II

Amendment II. Keeping and Bearing Arms

Currentness

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S.C.A. Const. Amend. II, USCA CONST Amend. II
Current through P.L. 117-185. Some statute sections may be more current, see credits for details.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-32**

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 921

§ 921. Definitions

Effective: October 1, 2022

Currentness

**(a)** As used in this chapter--

**(1)** The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

**(2)** The term "interstate or foreign commerce" includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

**(3)** The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**(4)** The term "destructive device" means--

  **(A)** any explosive, incendiary, or poison gas--

    **(i)** bomb,

    **(ii)** grenade,

    **(iii)** rocket having a propellant charge of more than four ounces,

    **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,

    **(v)** mine, or

    **(vi)** device similar to any of the devices described in the preceding clauses;

  **(B)** any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

  **(C)** any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

# ADD-33

**(5)** The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

**(6)** The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches.

**(7)** The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

**(8)** The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

**(9)** The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.

**(10)** The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

**(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

**(12)** The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

**(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

**(14)** The term "indictment" includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

**(15)** The term "fugitive from justice" means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

(16) The term "antique firearm" means--

**(A)** any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

**(B)** any replica of any firearm described in subparagraph (A) if such replica--

**(i)** is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

**(ii)** uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

**(C)** any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

## ADD-34

**(17)(A)** The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

**(B)** The term "armor piercing ammunition" means--

**(i)** a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

**(ii)** a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

**(C)** The term "armor piercing ammunition" does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

**(18)** The term "Attorney General" means the Attorney General of the United States[1]

**(19)** The term "published ordinance" means a published law of any political subdivision of a State which the Attorney General determines to be relevant to the enforcement of this chapter and which is contained on a list compiled by the Attorney General, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

**(20)** The term "crime punishable by imprisonment for a term exceeding one year" does not include--

**(A)** any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

**(B)** any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(21)** The term "engaged in the business" means--

**(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

**(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

**(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

**(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**ADD-35**

Appellate Case: 22-2812     Page: 37     Date Filed: 10/21/2022 Entry ID: 5210113

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended--

**(i)** to intimidate or coerce a civilian population;

**(ii)** to influence the policy of a government by intimidation or coercion; or

**(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended--

**(i)** to intimidate or coerce a civilian population;

**(ii)** to influence the policy of a government by intimidation or coercion; or

**(iii)** to affect the conduct of a government by assassination or kidnapping.

**(24)** The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

**(25)** The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

**(26)** The term "school zone" means--

**(A)** in, or on the grounds of, a public, parochial or private school; or

**(B)** within a distance of 1,000 feet from the grounds of a public, parochial or private school.

**(27)** The term "school" means a school which provides elementary or secondary education, as determined under State law.

**(28)** The term "motor vehicle" has the meaning given such term in section 13102 of title 49, United States Code.

**ADD-36**

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(29)** The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

**(30)** The term "handgun" means--

    **(A)** a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

    **(B)** any combination of parts from which a firearm described in subparagraph (A) can be assembled.

**[(31)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000.]

**(32)** The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.

**(33)(A)** Except as provided in subparagraphs (B) and (C), the term "misdemeanor crime of domestic violence" means an offense that--

    **(i)** is a misdemeanor under Federal, State, Tribal, or local law; and

    **(ii)** has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim.

**(B)(i)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless--

    **(I)** the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

    **(II)** in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

        **(aa)** the case was tried by a jury, or

        **(bb)** the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

**(ii)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(C)** A person shall not be considered to have been convicted of a misdemeanor crime of domestic violence against an individual in a dating relationship for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had firearm rights restored unless the expungement, pardon, or restoration of rights expressly provides that the person may not ship, transport, possess, or receive firearms: *Provided*, That, in the case of a person who has not more than 1 conviction of a misdemeanor crime of domestic violence against an individual in a dating relationship, and is not otherwise prohibited under this chapter, the person shall not be disqualified from shipping, transport, possession, receipt, or purchase of a firearm under this chapter if 5 years have elapsed from the later of the judgment of conviction or the completion of the person's custodial or supervisory sentence, if any, and the person has not subsequently been convicted of another such offense, a misdemeanor under Federal, State, Tribal, or local law which has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, or any other offense that would disqualify the person under section 922(g). The national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act (34 U.S.C. 40901) shall be updated to reflect the status of the person. Restoration under this subparagraph is not available for a current or former spouse, parent, or guardian of the victim, a person with whom the victim shares a child in common, a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or a person similarly situated to a spouse, parent, or guardian of the victim.

**(34)** The term "secure gun storage or safety device" means--

**(A)** a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;

**ADD-37**

Appellate Case: 22-2812   Page: 39   Date Filed: 10/21/2022 Entry ID: 5210113

**(B)** a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or

**(C)** a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

**(35)** The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.

**(36)** The term "local law enforcement authority" means a bureau, office, department or other authority of a State or local government or Tribe that has jurisdiction to investigate a violation or potential violation of, or enforce, a State, local, or Tribal law.

**(37)(A)** The term "dating relationship" means a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature.

**(B)** Whether a relationship constitutes a dating relationship under subparagraph (A) shall be determined based on consideration of--

    **(i)** the length of the relationship;

    **(ii)** the nature of the relationship; and

    **(iii)** the frequency and type of interaction between the individuals involved in the relationship.

**(C)** A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a dating relationship under subparagraph (A).

**(b)** For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

## CREDIT(S)

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 226; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1214; Pub.L. 93-639, § 102, Jan. 4, 1975, 88 Stat. 2217; Pub.L. 99-308, § 101, May 19, 1986, 100 Stat. 449; Pub.L. 99-360, § 1(b), July 8, 1986, 100 Stat. 766; Pub.L. 99-408, § 1, Aug. 28, 1986, 100 Stat. 920; Pub.L. 101-647, Title XVII, § 1702(b)(2), Title XXII, § 2204(a), Nov. 29, 1990, 104 Stat. 4845, 4857; Pub.L. 103-159, Title I, § 102(a)(2), Nov. 30, 1993, 107 Stat. 1539; Pub.L. 103-322, Title XI, §§ 110102(b), 110103(b), 110105(2), 110401(a), 110519, Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1997, 1999, 2000, 2014, 2020, 2150; Pub.L. 104-88, Title III, § 303(1), Dec. 29, 1995, 109 Stat. 943; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, § 658(a)], Sept. 30, 1996, 110 Stat. 3009-314, 3009-371; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 119(a)], (h) [Title I, § 115], Oct. 21, 1998, 112 Stat. 2681-50, 2681-69, 2681-480, 2681-490; Pub.L. 107-273, Div. C, Title I, § 11009(e)(1), Nov. 2, 2002, 116 Stat. 1821; Pub.L. 107-296, Title XI, § 1112(f)(1) to (3), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-162, Title IX, § 908(a), Jan. 5, 2006, 119 Stat. 3083; Pub.L. 115-232, Div. A, Title VIII, § 809(e)(2), Aug. 13, 2018, 132 Stat. 1842; Pub.L. 117-103, Div. W, Title XI, §§ 1101(b), 1104(a), Mar. 15, 2022, 136 Stat. 919, 921; Pub.L. 117-159, Div. A, Title II, §§ 12002, 12005(a), (c), June 25, 2022, 136 Stat. 1324, 1332.)

## Footnotes

<sup>1</sup>     So in original. Probably should be followed by a period.

18 U.S.C.A. § 921, 18 USCA § 921
Current through P.L. 117-185. Some statute sections may be more current, see credits for details.

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## ADD-38

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 923

§ 923. Licensing

Effective: September 13, 2004

Currentness

**(a)** No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General. The application shall be in such form and contain only that information necessary to determine eligibility for licensing as the Attorney General shall by regulation prescribe and shall include a photograph and fingerprints of the applicant. Each applicant shall pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:

  **(1)** If the applicant is a manufacturer--

    **(A)** of destructive devices, ammunition for destructive devices or armor piercing ammunition, a fee of $1,000 per year;

    **(B)** of firearms other than destructive devices, a fee of $50 per year; or

    **(C)** of ammunition for firearms, other than ammunition for destructive devices or armor piercing ammunition, a fee of $10 per year.

  **(2)** If the applicant is an importer--

    **(A)** of destructive devices, ammunition for destructive devices or armor piercing ammunition, a fee of $1,000 per year; or

    **(B)** of firearms other than destructive devices or ammunition for firearms other than destructive devices, or ammunition other than armor piercing ammunition, a fee of $50 per year.

  **(3)** If the applicant is a dealer--

    **(A)** in destructive devices or ammunition for destructive devices, a fee of $1,000 per year; or

    **(B)** who is not a dealer in destructive devices, a fee of $200 for 3 years, except that the fee for renewal of a valid license shall be $90 for 3 years.

**(b)** Any person desiring to be licensed as a collector shall file an application for such license with the Attorney General. The application shall be in such form and contain only that information necessary to determine eligibility as the Attorney General shall by regulation prescribe. The fee for such license shall be $10 per year. Any license granted under this subsection shall only apply to transactions in curios and relics.

**(c)** Upon the filing of a proper application and payment of the prescribed fee, the Attorney General shall issue to a qualified applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license. Nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer. If any firearm is so disposed of by a licensee within one year after its transfer from his business inventory into such licensee's personal collection or if such disposition or any other acquisition is made for the purpose of willfully evading the restrictions placed upon licensees

**ADD-39**

by this chapter, then such firearm shall be deemed part of such licensee's business inventory, except that any licensed manufacturer, importer, or dealer who has maintained a firearm as part of a personal collection for one year and who sells or otherwise disposes of such firearm shall record the description of the firearm in a bound volume, containing the name and place of residence and date of birth of the transferee if the transferee is an individual, or the identity and principal and local places of business of the transferee if the transferee is a corporation or other business entity: *Provided,* That no other recordkeeping shall be required.

**(d)(1)** Any application submitted under subsection (a) or (b) of this section shall be approved if--

**(A)** the applicant is twenty-one years of age or over;

**(B)** the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter;

**(C)** the applicant has not willfully violated any of the provisions of this chapter or regulations issued thereunder;

**(D)** the applicant has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application;

**(E)** the applicant has in a State (i) premises from which he conducts business subject to license under this chapter or from which he intends to conduct such business within a reasonable period of time, or (ii) in the case of a collector, premises from which he conducts his collecting subject to license under this chapter or from which he intends to conduct such collecting within a reasonable period of time;

**(F)** the applicant certifies that--

**(i)** the business to be conducted under the license is not prohibited by State or local law in the place where the licensed premise is located;

**(ii)(I)** within 30 days after the application is approved the business will comply with the requirements of State and local law applicable to the conduct of the business; and

**(II)** the business will not be conducted under the license until the requirements of State and local law applicable to the business have been met; and

**(iii)** that the applicant has sent or delivered a form to be prescribed by the Attorney General, to the chief law enforcement officer of the locality in which the premises are located, which indicates that the applicant intends to apply for a Federal firearms license; and

**(G)** in the case of an application to be licensed as a dealer, the applicant certifies that secure gun storage or safety devices will be available at any place in which firearms are sold under the license to persons who are not licensees (subject to the exception that in any case in which a secure gun storage or safety device is temporarily unavailable because of theft, casualty loss, consumer sales, backorders from a manufacturer, or any other similar reason beyond the control of the licensee, the dealer shall not be considered to be in violation of the requirement under this subparagraph to make available such a device).

**(2)** The Attorney General must approve or deny an application for a license within the 60-day period beginning on the date it is received. If the Attorney General fails to act within such period, the applicant may file an action under section 1361 of title 28 to compel the Attorney General to act. If the Attorney General approves an applicant's application, such applicant shall be issued a license upon the payment of the prescribed fee.

**(e)** The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter or fails to have secure gun storage or safety devices available at any place in which firearms are sold under the license to persons who are not licensees (except that in any case in which a secure gun storage or safety device is

ADD-40

temporarily unavailable because of theft, casualty loss, consumer sales, backorders from a manufacturer, or any other similar reason beyond the control of the licensee, the dealer shall not be considered to be in violation of the requirement to make available such a device). The Attorney General may, after notice and opportunity for hearing, revoke the license of a dealer who willfully transfers armor piercing ammunition. The Secretary's[1] action under this subsection may be reviewed only as provided in subsection (f) of this section.

**(f)(1)** Any person whose application for a license is denied and any holder of a license which is revoked shall receive a written notice from the Attorney General stating specifically the grounds upon which the application was denied or upon which the license was revoked. Any notice of a revocation of a license shall be given to the holder of such license before the effective date of the revocation.

**(2)** If the Attorney General denies an application for, or revokes, a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation of a license, the Attorney General shall upon the request of the holder of the license stay the effective date of the revocation. A hearing held under this paragraph shall be held at a location convenient to the aggrieved party.

**(3)** If after a hearing held under paragraph (2) the Attorney General decides not to reverse his decision to deny an application or revoke a license, the Attorney General shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under paragraph (2). If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.

**(4)** If criminal proceedings are instituted against a licensee alleging any violation of this chapter or of rules or regulations prescribed under this chapter, and the licensee is acquitted of such charges, or such proceedings are terminated, other than upon motion of the Government before trial upon such charges, the Attorney General shall be absolutely barred from denying or revoking any license granted under this chapter where such denial or revocation is based in whole or in part on the facts which form the basis of such criminal charges. No proceedings for the revocation of a license shall be instituted by the Attorney General more than one year after the filing of the indictment or information.

**(g)(1)(A)** Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe. Such importers, manufacturers, and dealers shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section. The Attorney General, when he has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises, may, upon demonstrating such cause before a Federal magistrate judge and securing from such magistrate judge a warrant authorizing entry, enter during business hours the premises (including places of storage) of any licensed firearms importer, licensed manufacturer, licensed dealer, licensed collector, or any licensed importer or manufacturer of ammunition, for the purpose of inspecting or examining--

**(i)** any records or documents required to be kept by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector under this chapter or rules or regulations under this chapter, and

**(ii)** any firearms or ammunition kept or stored by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector, at such premises.

**(B)** The Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer without such reasonable cause or warrant--

**(i)** in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee;

**(ii)** for ensuring compliance with the record keeping requirements of this chapter--

**ADD-41**

**(I)** not more than once during any 12-month period; or

**(II)** at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee; or

**(iii)** when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

**(C)** The Attorney General may inspect the inventory and records of a licensed collector without such reasonable cause or warrant--

**(i)** for ensuring compliance with the record keeping requirements of this chapter not more than once during any twelve-month period; or

**(ii)** when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

**(D)** At the election of a licensed collector, the annual inspection of records and inventory permitted under this paragraph shall be performed at the office of the Attorney General designated for such inspections which is located in closest proximity to the premises where the inventory and records of such licensed collector are maintained. The inspection and examination authorized by this paragraph shall not be construed as authorizing the Attorney General to seize any records or other documents other than those records or documents constituting material evidence of a violation of law. If the Attorney General seizes such records or documents, copies shall be provided the licensee within a reasonable time. The Attorney General may make available to any Federal, State, or local law enforcement agency any information which he may obtain by reason of this chapter with respect to the identification of persons prohibited from purchasing or receiving firearms or ammunition who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition, and he may provide information to the extent such information may be contained in the records required to be maintained by this chapter, when so requested by any Federal, State, or local law enforcement agency.

**(2)** Each licensed collector shall maintain in a bound volume the nature of which the Attorney General may by regulations prescribe, records of the receipt, sale, or other disposition of firearms. Such records shall include the name and address of any person to whom the collector sells or otherwise disposes of a firearm. Such collector shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section.

**(3)(A)** Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person. The report shall be prepared on a form specified by the Attorney General and forwarded to the office specified thereon and to the department of State police or State law enforcement agency of the State or local law enforcement agency of the local jurisdiction in which the sale or other disposition took place, not later than the close of business on the day that the multiple sale or other disposition occurs.

**(B)** Except in the case of forms and contents thereof regarding a purchaser who is prohibited by subsection (g) or (n) of section 922 of this title from receipt of a firearm, the department of State police or State law enforcement agency or local law enforcement agency of the local jurisdiction shall not disclose any such form or the contents thereof to any person or entity, and shall destroy each such form and any record of the contents thereof no more than 20 days from the date such form is received. No later than the date that is 6 months after the effective date of this subparagraph, and at the end of each 6-month period thereafter, the department of State police or State law enforcement agency or local law enforcement agency of the local jurisdiction shall certify to the Attorney General of the United States that no disclosure contrary to this subparagraph has been made and that all forms and any record of the contents thereof have been destroyed as provided in this subparagraph.

**(4)** Where a firearms or ammunition business is discontinued and succeeded by a new licensee, the records required to be kept by this chapter shall appropriately reflect such facts and shall be delivered to the successor. Where discontinuance of the business is absolute, such records shall be delivered within thirty days after the business discontinuation to the Attorney General. However, where State law or local ordinance requires the delivery of records to other responsible authority, the Attorney General may arrange for the delivery of such records to such other responsible authority.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(5)(A)** Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify.

**(B)** The Attorney General may authorize such record information to be submitted in a manner other than that prescribed in subparagraph (A) of this paragraph when it is shown by a licensee that an alternate method of reporting is reasonably necessary and will not unduly hinder the effective administration of this chapter. A licensee may use an alternate method of reporting if the licensee describes the proposed alternate method of reporting and the need therefor in a letter application submitted to the Attorney General, and the Attorney General approves such alternate method of reporting.

**(6)** Each licensee shall report the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is discovered, to the Attorney General and to the appropriate local authorities.

**(7)** Each licensee shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Attorney General for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation. The requested information shall be provided orally or in writing, as the Attorney General may require. The Attorney General shall implement a system whereby the licensee can positively identify and establish that an individual requesting information via telephone is employed by and authorized by the agency to request such information.

**(h)** Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the premises covered by the license.

**(i)** Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.

**(j)** A licensed importer, licensed manufacturer, or licensed dealer may, under rules or regulations prescribed by the Attorney General, conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show or event sponsored by any national, State, or local organization, or any affiliate of any such organization devoted to the collection, competitive use, or other sporting use of firearms in the community, and such location is in the State which is specified on the license. Records of receipt and disposition of firearms transactions conducted at such temporary location shall include the location of the sale or other disposition and shall be entered in the permanent records of the licensee and retained on the location specified on the license. Nothing in this subsection shall authorize any licensee to conduct business in or from any motorized or towed vehicle. Notwithstanding the provisions of subsection (a) of this section, a separate fee shall not be required of a licensee with respect to business conducted under this subsection. Any inspection or examination of inventory or records under this chapter by the Attorney General at such temporary location shall be limited to inventory consisting of, or records relating to, firearms held or disposed at such temporary location. Nothing in this subsection shall be construed to authorize the Attorney General to inspect or examine the inventory or records of a licensed importer, licensed manufacturer, or licensed dealer at any location other than the location specified on the license. Nothing in this subsection shall be construed to diminish in any manner any right to display, sell, or otherwise dispose of firearms or ammunition, which is in effect before the date of the enactment of the Firearms Owners' Protection Act, including the right of a licensee to conduct "curios or relics" firearms transfers and business away from their business premises with another licensee without regard as to whether the location of where the business is conducted is located in the State specified on the license of either licensee.

**(k)** Licensed importers and licensed manufacturers shall mark all armor piercing projectiles and packages containing such projectiles for distribution in the manner prescribed by the Attorney General by regulation. The Attorney General shall furnish information to each dealer licensed under this chapter defining which projectiles are considered armor piercing ammunition as defined in section 921(a)(17)(B).

**(l)** The Attorney General shall notify the chief law enforcement officer in the appropriate State and local jurisdictions of the names and addresses of all persons in the State to whom a firearms license is issued.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 5

**CREDIT(S)**

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 231; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1221; Pub.L. 97-377, Title I, § 165(b), Dec. 21, 1982, 96 Stat. 1923; Pub.L. 99-308, § 103, May 19, 1986, 100 Stat. 453; Pub.L. 99-360, § 1(c), July 8, 1986, 100 Stat. 766; Pub.L. 99-408, §§ 3 to 7, Aug. 28, 1986, 100 Stat. 921; Pub.L. 100-690, Title VII, § 7060(d), Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-647, Title XXII, § 2203(a), Title XXXV, § 3525, Nov. 29, 1990, 104 Stat. 4857, 4924; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 103-159, Title II, § 201, Title III, § 303, Nov. 30, 1993, 107 Stat. 1544, 1545; Pub.L. 103-322, Title XI, §§ 110102(d), 110103(d), 110105(2), 110301(a), 110302 to 110307, Title XXXIII, § 330011(i), Sept. 13, 1994, 108 Stat. 1998, 1999, 2000, 2012, 2013, 2014, 2145; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title I, § 118], Sept. 30, 1996, 110 Stat. 3009-314, 3009-326; Pub.L. 104-294, Title VI, § 603(j)(1), (k), (l), Oct. 11, 1996, 110 Stat. 3504, 3505; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 119(b), (c)], Oct. 21, 1998, 112 Stat. 2681-50, 2681-69; Pub.L. 107-296, Title XI, § 1112(f)(5), (6), Nov. 25, 2002, 116 Stat. 2276.)

**Footnotes**

[1]     So in original. Probably should be "Attorney General's".

18 U.S.C.A. § 923, 18 USCA § 923
Current through P.L. 117-185. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.        6