## UNITED STATES COURT OF APPEALS
### FOR THE EIGHTH CIRCUIT

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE; ELIEZER JIMENEZ; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION,

*Plaintiffs-Appellants*

STATE OF ARIZONA; STATE OF WEST VIRGINIA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF UTAH; and STATE OF WYOMING,

*Plaintiffs,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and STEVEN M. DETTELBACH as the DIRECTOR OF ATF,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of North Dakota
The Honorable District Court Judge Peter D. Welte
Case No. 3:22-cv-116

## PRIVATE PLAINTIFFS-APPELLANTS' OPENING BRIEF

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us

*Counsel for Morehouse Enterprises, LLC d/b/a Bridge City Ordnance, Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners Foundation*

## SUMMARY OF THE CASE

Appellants seek the reversal of an order declining to enjoin a sweeping, omnibus ATF rulemaking that exceeds the bounds of ATF's Congressional grant of authority, conflicts with the statutory text under which it was promulgated, and was issued in violation of procedural and substantive requirements of federal law, including the Administrative Procedure Act. The District Court erred in denying Appellants' motion for preliminary and permanent injunctions, allowing ATF to manipulate language of the Gun Control Act of 1968, and granting deference to its counsel's post-hoc rationalization of the Rule's rewriting of longstanding definitions and creation of burdensome requirements for both the private manufacture of and commercial trade in firearms parts.

Appellants include a coalition of private parties, interest groups, and state attorneys general. To enhance judicial economy and avoid duplicative briefing, the Private Appellants and State Appellants address different issues in their respective briefs, but each incorporates the arguments presented by the other. Due to the size and scope of both the regulation and the interests affected, Appellants respectfully request 30 minutes per side for oral argument.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 8th Cir. R. 26.1.A., Plaintiff-Appellant Morehouse Enterprises, LLC, d/b/a Bridge City Ordnance certifies that it is an active, limited liability company, formed in North Dakota. Bridge City Ordnance operates as a Trade Name of Morehouse Enterprises, LLC. Morehouse Enterprises, LLC has no parent corporation and no publicly held corporation holds any stock in Morehouse Enterprises, LLC.

Gun Owners of America, Inc. ("GOA") certifies that it is a non-profit, non-stock corporation. GOA has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOA.

Gun Owners Foundation ("GOF") certifies that it is a non-profit, non-stock corporation. GOF has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOF.

Appellate Case: 22-2812    Page: 3    Date Filed: 10/27/2022 Entry ID: 5212365

# TABLE OF CONTENTS

SUMMARY OF THE CASE...................................................................i

CORPORATE DISCLOSURE STATEMENT...........................................ii

TABLE OF AUTHORITIES........................................................v

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF THE ISSUES PRESENTED.........................................2

STATEMENT OF THE CASE........................................................3

SUMMARY OF THE ARGUMENT ................................................4

ARGUMENT .................................................................9

    I.    The District Court Erred in Concluding Plaintiffs Were
         Unlikely to Succeed on the Merits. ........................................9

        A.    The District Court Erred by Sanctioning the
             Agency's Additions to the Statutory Text......................9

            1.    The Final Rule Represents an Attempt to
                  Improperly Regulate Items Congress
                  Explicitly Left Unregulated. ...............................11

            2.    The District Court Erred by Permitting ATF
                  to Rewrite the Statute to Transform Items
                  that ATF Admits _Are Not_ Frames or
                  Receivers into "Firearms". ...............................15

            3.    The District Court Erroneously Concluded
                  that a "Firearm" Need Not Have a "Frame of
                  Receiver."....................................................20

            4.    The District Court Erred by Rewriting the
                  Final Rule to Add Language ATF Had
                  Carefully Excised ..............................................24

Appellate Case: 22-2812    Page: 4    Date Filed: 10/27/2022 Entry ID: 5212365

5.     The District Court Permitted ATF to Create Entirely New Statutory Requirements Governing Homemade Firearms. ........................30

B.     The District Court Erred by Sanctioning the Final Rule's Codification of an Arbitrary and Capricious Classification System ....................................39

II.     Plaintiffs Are Being, and Will Continue to Be, Irreparably Harmed Without an Injunction. ........................43

A.     The Private Plaintiffs....................................................45

B.     The Plaintiff-States.......................................................51

C.     The Three Months to File ............................................51

III.    The Balance of Equities and Public Interest Supports an Injunction. ................................................................54

CONCLUSION ................................................................................56

CERTIFICATE OF COMPLIANCE........................................................58

CERTIFICATE OF SERVICE..............................................................59

iv

# TABLE OF AUTHORITIES

## CASES

*Adam-Mellang v. Apartment Search*, 96 F.3d 297 (8th Cir. 1996)... 47, 49

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) ............................ 54

*Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466 (8th Cir. 1994) ........... 44

*BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964 (11th Cir. 2005) ..................................................... 50

*Bender v. Gutierrez*, Nos. 2:03CV519, 2:04CV300, 2006 U.S. Dist. LEXIS 96720 (E.D. Va. Sept. 19, 2006) ................................................ 18

*Chavez-Alvarez v. AG United States*, 850 F.3d 583 (3d Cir. 2017) ........ 39

*Christensen v. Harris County*, 529 U.S. 576 (2000) ................................ 10

*Citizens Coal Council v. Babbitt*, No. CIV.A. 00-0274(JR), 2002 WL 35468435 (D.C. Cir. June 5, 2002) ....................................................... 48

*D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019) ................................................................................................. 46

*Dig. Realty Trust, Inc. v. Somers*, 138 S. Ct. 767 (2018) ........................ 10

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ...................................... 50

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................... 46

*Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887 (8th Cir. 2000) .............. 50

*Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312 (8th Cir. 2009) ............................................................................................................... 44

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) ................................. 52

*Gordon v. Novastar Mortg., Inc. (In re Hedrick)*, 524 F.3d 1175 (11th Cir. 2008) ................................................................................................. 35

*Gun Owners of America, Inc. v. Garland*, 992 F.3d 446 (6th Cir. 2021) 41

Appellate Case: 22-2812    Page: 6    Date Filed: 10/27/2022 Entry ID: 5212365

*Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) ............................................................................... 41

*Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014) . 25

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) ........... 55

*Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094 (8th Cir. 2013) ............................................................................... 9

*Loughrin v. United States*, 573 U.S. 351 (2014) ..................................... 16

*Lydo Enters., Inc. v. City of Las Vegas,* 745 F.2d 1211 (9th Cir. 1984)..52

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) (*en banc*) .............................................................. 9

*N. Mariana Islands v. United States*, 686 F.Supp.2d 7 (D.D.C. 2009) .. 55

*New York State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022) 2, 46

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................... 54

*Packard Elevator v. I.C.C.*, 782 F.2d 112 (8th Cir. 1986) ..................... 44

*Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992 (10th Cir. 2019) ......................................................................... 18

*Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724 (8th Cir. 2008) ............................................................................. 46

*Planned Parenthood of Minnesota, Inc. v. Citizens for Cmty. Action*, 558 F.2d 861 (8th Cir. 1977) ..................................................... 46

*Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62 (D.D.C. 2018) ...... 11

*S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844 (6th Cir. 2017) .................................................................. 50

*Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931 (8th Cir. 2002) ........ 52

Appellate Case: 22-2812    Page: 7    Date Filed: 10/27/2022 Entry ID: 5212365

*Small Hearts Daycare, II, LLC v. Quick*, No. 4:09CV2132 HEA, 2010 WL 427766 (E.D. Mo. Feb. 1, 2010) ..................................................... 49

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ....................... 47

*Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694 (8th Cir. 2021) .... 9

*United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737 (8th Cir. 2002) .......................................................................................................... 45

*United States v. Annis*, 446 F.3d 852 (8th Cir. 2006) ....................... 23, 24

*United States v. Annis*, 6:04-cr-02032 (N.D. Ia.) .................................... 24

*United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010) ........................... 25

*United States v. Davis,* 139 S. Ct. 2319 (2019) ......................................... 9

*United States v. Price*, No. 2:22-cr-00097 (S.D. W. Va., Oct. 12, 2022) .. 39

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) .............. 10, 34

*VanDerStok, et al., v. Garland, et al.*, Civil Action No. 4:22-cv-00691-O (N.D. Tx.) ................................................................................... passim

*Whitfield v. Anheuser-Busch, Inc.,* 820 F.2d 243 (8th Cir. 1987) ........... 52

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ........... 32

## STATUTES

18 U.S.C. § 1001 ....................................................................................... 43

18 U.S.C. § 921(a)(25) .................................................................. 24, 25, 29

18 U.S.C. § 921(a)(3) ......................................................................... passim

18 U.S.C. § 922(k) .................................................................................... 39

18 U.S.C. § 923(g)(1)(A) ........................................................................... 37

18 U.S.C. § 923(i) .............................................................. 30, 33, 34, 36, 37

18 U.S.C. § 926(a) .................................................................................... 35

Appellate Case: 22-2812     Page: 8     Date Filed: 10/27/2022 Entry ID: 5212365

26 U.S.C. § 5842(a) .................................................................. 29, 30, 38

26 U.S.C. § 5845(a) ............................................................................ 24

26 U.S.C. § 5861(h) ............................................................................ 39

5 U.S.C. § 706 ...................................................................................... 2

5 U.S.C. § 706(2)(A) .......................................................................... 11

5 U.S.C. § 706(A) ............................................................................... 43

## OTHER AUTHORITIES

A. Scalia and B. Garner, <u>Reading Law</u>, Thompson/West (2012)............ 27

H.R.377, Homemade Firearms Accountability Act of 2015, 114th
    Congress (2015-2016), https://www.congress.gov/bill/114th-
    congress/house-bill/377 ........................................................... 38

Richard Winton, "What we know about the crude, homemade gun used
    in Shinzo Abe's assassination," *Los Angeles Times*, July 8, 2022,
    https://lat.ms/3KfVvwU ........................................................... 21

The Firearm Blog, https://www.thefirearmblog.com/blog/wp-
    content/uploads/2019/03/25zipgun.jpg. ................................... 21

U.S. Const. amend. II ........................................................................... 2

## REGULATIONS

27 C.F.R. § 479.11 .............................................................................. 24

27 C.F.R. § 478.11 .................................................................... 5, 24, 27

87 FR 24652 (Apr. 26, 2022) ...................................................... passim

Appellate Case: 22-2812    Page: 9    Date Filed: 10/27/2022 Entry ID: 5212365

## JURISDICTIONAL STATEMENT

Appellants seek review of the district court's August 23, 2022 order denying their motion for a preliminary injunction. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over this interlocutory appeal of an order refusing an injunction under 28 U.S.C. § 1292(a)(1). Appellants filed their notices of appeal timely on August 25, 2022 (individual and organizational plaintiffs) and August 26, 2022 (state plaintiffs).

Appellate Case: 22-2812    Page: 10    Date Filed: 10/27/2022 Entry ID: 5212365

# STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court erred in denying Plaintiffs-Appellants' Motion for Preliminary and/or Permanent Injunction.

**Most Apposite Cases:**

1. *VanDerStok, et al., v. Garland, et al.*, Civil Action No. 4:22-cv-00691-O (N.D. Tx.).

2. *New York State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022).

3. *United States v. Davis*, 139 S. Ct. 2319 (2019).

4. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014).

**Most Apposite Constitutional and Statutory Provisions:**

1. U.S. Const. amend. II

2. 5 U.S.C. § 706

3. 18 U.S.C. § 921

4. 18 U.S.C. § 923

# STATEMENT OF THE CASE

On July 5, 2022, the original Plaintiffs filed their Complaint ("Compl.") for Declaratory and Injunctive Relief (App. 28; R. Doc. 1) in the district court below, along with 61 Exhibits, challenging many of the provisions of the Final Rule. On July 25, 2022, the original Plaintiffs filed a Motion for Preliminary and/or Permanent Injunction and accompanying Memorandum in Support ("Mem."). App. 464; R. Doc. 14, 14-1. On July 27, 2022, Plaintiffs filed their Amended Complaint for Declaratory and Injunctive Relief, adding seventeen States as co-Plaintiffs. R. Doc. 22. The state Plaintiffs then filed a Notice of Joinder in the motion for injunctive relief. R. Doc. 24.

On August 15, 2022, Defendants filed their Opposition ("Opp.") (App. 494; R. Doc. 43) and, on August 19, 2022, Plaintiffs filed their Reply ("Reply") (App. 542; R. Doc. 78). On August 19, 2022, the district court held a status conference of the parties. R. Doc. 80. On August 23, 2022, the court issued an Order Denying Motion for Preliminary Injunction ("Op.") finding, primarily, that Plaintiffs had failed to demonstrate a likelihood of success on the merits, but also opining that Plaintiffs had not demonstrated irreparable harm. App. 1; R. Doc. 85.

3

Subsequent to the district court's denial of their motion for preliminary injunction and, pursuant to FRAP 8(a), Plaintiffs filed a Motion for Injunction Pending Appeal (App. 570; R. Doc. 89, 89-1), arguing that the nature of this case, which raises numerous, significant, and complex questions of federal law supports an injunction pending appeal. Contemporaneously with that filing, both sets of Plaintiffs filed notices of appeal with this Court (Docket Nos. 22-2812 and 22-2854). The district court denied Plaintiffs' Motion for Injunction Pending Appeal on September 27, 2022 (ADD-28; R. Doc. 102). Finally, Plaintiffs sought an injunction pending appeal from this Court on September 7, 2022, which was denied on October 4, 2022. Judge Grasz would have granted the motion.

## SUMMARY OF THE ARGUMENT

This case involves a challenge to various regulations promulgated as part of an omnibus rulemaking issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on April 26, 2022, 2021R-05F, 87 FR 24652, and which recently took effect on August 24, 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms" ("Final Rule") (App. 641). That Final Rule consists of hundreds of pages of

4

preamble and explanation, a cornucopia of new regulatory enactments, and a lengthy economic impact analysis detailing the acknowledged harms to the Second Amendment community that are now occurring. In the days since its implementation, the Final Rule already has had widespread and deleterious effects on the firearms community, producing confusion and uncertainty about how to come into compliance with its inherently vague terms, and causing varied, significant, and irreparable harm to both the individual plaintiffs named herein and the countless of the members and supporters of the organizational plaintiffs. In addition, the Plaintiff States suffer sovereign injury under the Final Rule, which disrupts their policy choices through overreach, and will suffer unrecoverable economic loss as the Final Rule's market disruptions decrease tax revenue.

Among its numerous regulatory enactments, the Final Rule has redefined the statutory term "frame or receiver" contained in the 1968 Gun Control Act's ("GCA") definition of "firearm" (18 U.S.C. 921(a)(3)), replacing the prior regulatory definition that existed unmolested for more than five decades (27 C.F.R. § 478.11). Whereas the prior regulation was a fairly simple and straightforward definition of 30 words,

the Final Rule put in its place a nebulous, multi-section definition consisting of nearly 1,700 words, replete with 6 parts, 20 subparts and sub-sub parts, 19 pictures, and several unenumerated "examples" of how the definition should be applied (and, at times, should not be applied) to certain firearms.

Expanding the statutory text far beyond the limits of what Congress chose to regulate, this new definition of "frame or receiver" was designed to eliminate the budding DIY firearms market, wherein countless law-abiding gun owners purchase unfinished and incomplete firearm precursors known as "80 percent" frames and receivers and, after additional manufacturing, fitting, and finishing, acquire additional unregulated gun parts with which to lawfully construct a homemade firearm. The Final Rule concedes that this time-honored tradition of homemade firearms is perfectly legal, but nevertheless pejoratively terms such firearms as "ghost guns," and maligns them as a threat to law enforcement and the weapons of choice of criminals and "terrorists."

In so doing, the Final Rule reverses decades of contrary and consistent guidance from the ATF, including scores of classification letters ruling that certain "partially complete or unassembled frames or

Appellate Case: 22-2812    Page: 15    Date Filed: 10/27/2022 Entry ID: 5212365

receivers" (even those including parts, tools, and instructions to assist in the manufacturing process) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are *entirely unregulated* by federal law. Replacing this mountain of prior (and consistent) legal guidance, the Final Rule advances, for the first time, an entirely novel (and entirely wrong) "interpretation" of the GCA that the agency apparently has suddenly now discovered for the first time in 54 years. As a federal district court in Texas recently concluded, "[r]ather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers." *VanDerStok, et al., v. Garland, et al.*, No. 4:22-cv-691 (N.D. Tex.), ECF #56 (Sept. 2, 2022); App. 3; R. Doc. 85, at 3.

Not content with making it difficult (if not impossible) for the average, law-abiding gun owner to manufacture a homemade firearm, the Final Rule blatantly rewrote the GCA in order to regulate and control any such "privately made firearm" that slips through the regulatory cracks. Although conceding that ATF cannot outright ban the manufacture of homemade firearms, the Final Rule nevertheless regulates them in direct contravention of the statute Congress enacted. The Final Rule thus creates out of thin air a mandate that "federal

firearms licensees" ("FFL") who clean, paint, repair, or accessorize a "privately made firearm" first must take that firearm into their inventory, engrave it with a government issued serial number, enter its existence into a government-mandated record system, store those records in perpetuity on behalf of the government, and eventually transmit those records to a centralized, government-controlled database of guns and gun owners. Not one of these requirements is found in the Gun Control Act.

At its core, the Final Rule represents a blatant attempt by ATF to enact many of the restrictions found on the legislative wish lists of the nation's most radical anti-Second Amendment groups – an anti-gun agenda which Congress has never seriously considered (much less enacted). Indeed, the Final Rule was designed from the ground up not to merely "interpret" the statutes Congress enacted, but instead to nakedly implement the President's political agenda that Congress has declined to pass. *See VanDerStok* Op. at 8 ("ATF added an entirely new section expanding its jurisdiction."). Yet regardless of how one feels about homemade firearms or the policies underlying the Final Rule, it is not within the purview of the Executive Branch – and certainly not ATF's unelected and unaccountable bureaucrats – to bypass the People's

representatives in Congress, and implement the President's gun control agenda through bureaucratic fiat.

## ARGUMENT

Denial of a preliminary injunction is reviewed "for abuse of discretion and reverse[d] 'where the district court rests its conclusion on clearly erroneous factual finding or erroneous legal conclusions.'" *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 698-99 (8th Cir. 2021) (*quoting Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (*en banc*)). Here, the district court made several erroneous legal conclusions, each of which is fatal to the denial of preliminary injunction. A district court's legal conclusions are reviewed *de novo*. *Id.* at 699 (*citing Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013)).

## I. The District Court Erred in Concluding Plaintiffs Were Unlikely to Succeed on the Merits.

### A. The District Court Erred by Sanctioning the Agency's Additions to the Statutory Text.

As Justice Gorsuch explained in *United States v. Davis,* 139 S. Ct. 2319, 2323 (2019), "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." Indeed,

9

agencies are not free to edit statutes at will. As the Supreme Court made abundantly clear in 2014, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms ... to suit its own sense of how the statute should operate. ... [The agency's] need to rewrite [the statute] should have alerted [it] that it had taken a wrong interpretive turn." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 325-28 (2014). *See also Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (an agency may not, "under the guise of interpreting a regulation ... create *de facto* a new regulation."). *See also Dig. Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 782 (2018) ("[t]he statute's unambiguous ... definition ... precludes the [agency] from more expansively interpreting that term."). Rather, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *Davis*, 139 S. Ct. at 2324. Nor are "[a]gencies … free to 'adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.'" *Util. Air,* 573 U.S. at 328 (citation omitted).

The district court acknowledged that, "if the Final Rule did contradict the plain language of the GCA, that would result in an agency

effectively circumventing the intent of Congress." App. 9; R. Doc. 85, at 9. Yet shortly after announcing that principle, the district court repeatedly abandoned it, permitting the agency to rewrite the statute on the theory that Congress would have intended it to be that way. But when an agency rewrites a Congressionally enacted statute, or adopts a regulation or "interpretation" in obvious conflict with its plain terms, the agency's actions are "not in accordance with law" under the APA. *See* 5 U.S.C. § 706(2)(A); *Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute.").

1. **The Final Rule Represents an Attempt to Improperly Regulate Items Congress Explicitly Left Unregulated.**

Under the statutory text in 18 U.S.C. § 921(a)(3), a "firearm" is, first and foremost, "(A) any *weapon* (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Alternatively, "(B) *the frame or receiver* of any such weapon" is a "firearm" by itself. However, the statute does not further

11

define what constitutes a "frame or receiver" of a "firearm."

Prior to the Final Rule, the existing ATF regulation defining "frame or receiver" had existed unmolested for more than half a century, delineating as a "frame or receiver … that part of a firearm which provides housing" for three specific components of many firearms. App. 38-41; R. Doc. 1, at 11-14, ¶¶24-34. The problem for ATF was that this definition – beginning immediately upon its adoption in 1968 – resulted in many firearms not having any identifiable frame or receiver, as no single part housed the three requisite components in the regulation. App. 42-45; R. Doc. 1, at 15-18, ¶¶35-52. However, rather than fix a definition that never worked, ATF spent the next several decades ignoring its regulatory definition, and proceeding on an arbitrary, *ad hoc* basis with respect to classifying firearm frames and receivers. App. 45-49; R. Doc. 1, at 18-22, ¶¶53-70. In recent years, the agency's fast-and-loose system began to cause it further problems, as courts began to overturn criminal convictions on the basis that the charged items did not constitute "firearms" under the plain text of ATF's regulation. App. 49-52; R. Doc. 1, at 22-25, ¶¶71-86. Unsurprisingly, rather than accept blame for its faulty regulation, ATF blamed the courts for their faithful application of

12

the text.  App. 51; R. Doc. 1, at 24, ¶81.

The Final Rule represents itself to be ATF's attempt, after 54 years of inaction, (i) to craft a definition of "frame or receiver" which will alleviate the problems caused by its prior definition, so that every firearm will have one clearly identifiable frame or receiver, while at the same time (ii) to harmonize ATF's past conflicting classifications to the extent possible.  But while that may be the agency's claimed purpose of the Final Rule, that is hardly all the Final Rule accomplishes.

On the contrary, the Final Rule implements by regulation the President's political agenda that Congress would not enact into law, against what are pejoratively called "ghost guns," which in reality are merely homemade firearms that have existed since the founding of this nation.  First, the Final Rule declares that an item which ATF admits to be an *in*complete and *un*finished firearm "frame or receiver" – known colloquially as an "80% receiver" – is nevertheless a firearm.  As a federal district court in Texas explained when analyzing the Final Rule, "[r]ather than merely updating the terminology, ATF decided to regulate partial frames and receivers."  *VanDerStok* Op. at 3.  Second, the Final Rule declares that what it labels a "weapon parts kit" – an 80% receiver

13

together with some combination of other unregulated parts, tools, and/or instructions for manufacture – is more than the sum of its parts, and constitutes a "firearm." Cf. *VanDerStock* Op. at 12 ("A weapon parts kit is not a firearm," and "ATF has no general authority to regulate weapon parts.").

In order to accomplish this policy agenda, the Final Rule adopts a nebulous, hopelessly confusing definition of what now constitutes a "frame or receiver," replacing a simple prior definition of 30 words with a disjointed scramble of 1,700 words.[1] As Plaintiffs have explained, no one could ever hope to navigate this new regulatory thicket.[2] In addition,

---

[1] The Final Rule's definition of "frame or receiver" represents a dramatic departure from the definition originally proposed in the NPRM, under which most firearms would have *multiple* frames and receivers, in direct contradiction to the statutory text "the frame or receiver." App. 55-60; R. Doc. 1, at 28-33, ¶¶99-121.

[2] Within this new definition, the Final Rule manages to conflict both with the GCA and with itself. For example, 18 U.S.C. § 921(a)(3) defines as a "firearm" the part that is "**the** frame or receiver of any such weapon." Emphasis added. This language obviously denotes a *singular* object, whereby each "firearm" contains *only one* "frame" or one "receiver." The Final Rule, while in one breath acknowledging this statutory reality (App. 57; R. Doc. 1, at 30,¶ 109) – conceding that the NPRM was wrong to declare firearms to have multiple frames and receivers – nevertheless continues to take the opposite approach, still claiming that some firearms have *more than one* frame or receiver. *See* App. 61-63, 70; R. Doc. 1, at 34-36, 43, ¶¶ 123, 129, 132, 170 (presumption that *all* serialized parts are "frames or receivers"), ¶¶134-141 ("multi-piece frame or receiver"

14

the Final Rule now defines the word "readily" as it appears in Section 921(a)(3)(A), with an amorphous glob of concepts that have no clear meaning, provide no fixed standards, and which seem designed to provide the agency with maximum latitude to act however it wishes. App. 71-77; R. Doc. 1, at 44-50, ¶¶173-207. The district court committed clear error by permitting this to occur.

> **2.  The District Court Erred by Permitting ATF to Rewrite the Statute to Transform Items that ATF Admits _Are Not_ Frames or Receivers into "Firearms."**

The district court erroneously approved of ATF's reappropriation of the statutory term "readily" found in 18 U.S.C. § 921(a)(3)(A), as applied to what constitutes the "frame or receiver" and thus a firearm under 18 U.S.C. 921(a)(3)(B), to find that *incomplete* and *unfinished* frames and receivers – items that ATF says *are not frames or receivers* – are nevertheless firearms. App. 11-12; R. Doc. 85, at 11-12; App. 78-82; R. Doc. 1, at 51-55, ¶¶208-229. As Plaintiffs argued below, the term "readily" applies *only where it appears* in the statute (subsection (A)'s

_____

with left and right half receivers that each must be serialized). The statute simply will not permit this "interpretation."

"weapon"), and does not apply where it does not appear – to what constitutes a "frame or receiver" under subsection (B).[3] App. 473; R. Doc. 14-1, at 9. *See VanDerStok* at *12 (the Final Rule "cop[ies] language used throughout the statutory definition" and "cobbl[es] them together to form ATF's own definition," which "may add a patina of credibility to the drafting, but … tarnish[es] Congress's carefully crafted definition."). Indeed, the agency has never used the concept of "readily" from subsection (A) to determine what constitutes a "frame or receiver" in subsection (B) and, in fact, as recently as last year, *made Plaintiffs' argument* in federal court when defending its frame or receiver classifications. *Id.* at 18; App. 82-86; R. Doc. 1, at 55-59, ¶¶230-250.

And for good reason, because ATF's attempt to explain the term

---

[3] Indeed, "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (emphasis added). According to the district court, however, the statute need not be interpreted precisely and according to its text, since "Plaintiffs have pointed to no provision of federal law foreclosing th[e] possibility" that the concept of "readily" could be applied in places it does not appear. App. 11; R. Doc. 85, at 11. If the district court is correct — that statutes must affirmatively prevent their own misinterpretation by explicitly "foreclose[ing]" the importation of additional language and concepts — then a whole host of regulatory abuses will follow.

16

"readily," and how it applies to an *unfinished* "frame or receiver" (Final Rule at 24,739), boggles the mind. *See* App. 71-79, 81-82; R. Doc. 1, at 44-52, 54-55, ¶¶173-207 (detailing the utter lack of clarity and specificity in the Final Rule's definition of "readily," asking questions like "how long" and "how difficult" rather than providing any specifics); ¶¶210-214 (explaining how, in order to be "readily converted," an object first must be a weapon); ¶¶ 223-229 (explaining how ATF's definition of "readily" was improperly "cobbled together from" various provisions of different statutory enactments).

Changing course from its prior black-and-white approach to what constitutes a frame or receiver (based on which specific machining steps have been performed), the Final Rule now adopts infinite shades of gray, opining that even a "partially complete" or "nonfunctional frame or receiver," including a "frame or receiver parts kit" (an unfinished frame or receiver sold together with "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" to finish it) – *i.e.*, items that ATF admits are *not* a "frame or receiver" – nevertheless *may be* a "frame or receiver" if they can be "readily … completed" into a frame or receiver. App. 103-04; R. Doc. 1, at 76-77, ¶309-317; *but see VanDerStok* Op. at 8

17

("[t]hat which *may become* a receiver is not itself a receiver.").

ATF apparently recognizes that, in spite of the Final Rule's lengthy definition of what allegedly constitutes "readily" completed or converted, no one will have any idea which items are "readily completed" into a "frame or receiver." Thus, ATF promises that an item will not be a "frame or receiver" unless it is "clearly identifiable" as such. App. 103; R. Doc. 1, at 76, ¶310. Recognizing, in turn, that no one will be able to anticipate which items are "clearly identifiable" as a "frame or receiver," ATF explains that such an item will have "reached a critical stage of manufacture" where "a substantial step has been taken or a critical line crossed." App. 106; R. Doc. 1, at 79, ¶326. Next, attempting to explain what constitutes such a "substantial step" or "critical line." ATF promises that an item "in a primordial state" has not reached any of those "critical stages." *Id.* Finally, ATF defines "primordial state," since that term as well is entirely unclear. App. 107; R. Doc. 1, at 80, ¶331.[4]

---

[4] Substantive definitions necessary to understand a regulatory term should be in the promulgated regulation, not the preamble of a rulemaking. *See Bender v. Gutierrez*, Nos. 2:03CV519, 2:04CV300, 2006 U.S. Dist. LEXIS 96720, at *16-17 (E.D. Va. Sept. 19, 2006) and *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019).

Appellate Case: 22-2812     Page: 27     Date Filed: 10/27/2022 Entry ID: 5212365

In other words, in order to regulate 80% frames and receivers which it admits *are not* frames or receivers, ATF has created an informal definition (primordial state), within another informal definition (clearly identifiable), within another informal definition (partially complete frame or receiver), within a regulatory statutory rewrite ("readily"), within a statutory definition ("frame or receiver"), of a statutory term ("firearm").

The Final Rule thus spins an impenetrable web, with layer upon layer of gobbledygook, which is not only unconstitutionally vague but also in direct conflict with the plain text of the statute. Indeed, a far less ambiguous state statute was overturned as unconstitutionally vague. *See* App. 109; R. Doc. 1, at 82, ¶338.

Nevertheless, the district court overlooked the Final Rule's numerous levels of incomprehensibility, simply adopting the Final Rule's logic that, "certain frame or receiver kits ... are ... a frame or receiver of a weapon because they can be 'readily' converted to be a frame or receiver...." App. 11; R. Doc. 85, at 11. Providing only one line of analysis to support this conclusion, the district court opined that "the plain language of the GCA … clearly identified 'firearms' more broadly than a

19

fully operational weapon." *Id.* But in that statement, the district court commits the very same error as the Final Rule that Plaintiffs challenge – relying on the concept of "weapon" in subsection (A) to inform its understanding of "frame or receiver" in subsection (B). It was clear error for the district court to permit ATF to "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is *not* a frame or receiver…." *VanDerStok* Op. at 10.

### 3. The District Court Erroneously Concluded that a "Firearm" Need Not Have a "Frame of Receiver."

The district court upheld ATF's entirely new theory that a so-called "weapon parts kit" (defined by agency to be an assemblage of <u>*unregulated*</u> firearm parts together with an <u>*incomplete and unfinished (and thus unregulated) frame or receiver*</u>) is somehow a "firearm" on the theory that a "weapon parts kit" becomes more than the sum of its parts, since it "may readily be converted to expel a projectile."[5] App. 10; R. Doc. 85, at

---

[5] ATF has recognized numerous times that the GCA does not regulate "firearm parts." App. 97; R. Doc. 1, at 70, ¶¶ 283-286. Moreover, ATF has repeatedly approved the unregulated manufacture and sale of the very "weapon parts kits" it now asserts the power to regulate, having previously opined that the addition of parts, tools, jigs, instructions, etc. to a "kit" with an 80% frame or receiver does not change its classification

10. In support of its conclusion, the court opined that "Congress defined 'firearm' more broadly than simply a fully operational weapon, as the statute expressly includes _items_ that 'may readily be converted to expel a projectile.'" _Id._ (emphasis added). By that logic, hardware stores would need a federal firearms license, because they sell pieces of wood and metal pipe which constitute "_items_ that 'may readily be converted to expel a projectile,'" such as the homemade firearm used to kill Shinzo Abe.[6] Indeed, a crude, improvised firearm can be made in just a few minutes utilizing common household objects, as seen here.[7]



Clearly, the statute requires more than merely "items" (such as those present in every homeowner's garage) which _could_ be used to

---

into a "firearm." App. 100-02; R. Doc. 1, at 73-75, ¶ 300-306. The Final Rule never explains why this prior guidance was wrong, not even expressly recognizing that the agency has made this significant policy shift.

[6] _See_ Richard Winton, "What we know about the crude, homemade gun used in Shinzo Abe's assassination," _Los Angeles Times_, July 8, 2022, https://lat.ms/3KfVvwU.

[7] _See_ The Firearm Blog, https://www.thefirearmblog.com/blog/wp-content/uploads/2019/03/25zipgun.jpg.

Appellate Case: 22-2812   Page: 30   Date Filed: 10/27/2022 Entry ID: 5212365

construct a firearm. As the Texas court explained, "a firearm is first and foremost a *weapon*." *VanDerStok* Op. at *7. Indeed, the Gun Control Act does not include in its definition of "firearm" merely "items" that can be *constructed into* a firearm,[8] but rather only a "weapon" or "the frame or receiver of any such weapon." ADD-33; 18 U.S.C. § 921(a)(3). ***Under*** ***either category of Section 921(a)(3), in order to be a "firearm,"*** ***there must be a "frame or receiver,"*** which is every "firearm's primary structural component." App. 497; R. Doc. 43, at 1 (emphasis added). By contrast, by ATF's own admission, a prohibited ***"weapon parts kit"*** ***does not contain a "frame or receiver*** ," but merely an *unfinished* and *incomplete* part that could be constructed into a frame or receiver. *See* App. 524; R. Doc. 43, at 28; *see VanDerStok* Op. at *10 (ATF may not "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is *not* a frame or receiver.").

   As Plaintiffs argued below, if a given item is determined by ATF to *not yet constitute* a "frame or receiver," then that item (even with

---

[8] As Plaintiffs' Complaint explained, whereas Congress previously regulated all firearm parts in the Federal Firearms Act of 1938, the Gun Control Act of 1968 repudiated that scheme, instead limiting agency authority to regulate only a single, serialized, regulated "frame or receiver" of each firearm. App. 39-40; R. Doc. 1, at 12-13, ¶¶ 24-29.

Appellate Case: 22-2812     Page: 31     Date Filed: 10/27/2022 Entry ID: 5212365

additional unregulated parts) cannot be a "weapon" – because, again, by definition, a "weapon" *must* have a "frame or receiver." App. 557; R. Doc. 78, at 15; *see also VanDerStock* Op. at *8 ("[t]hat which *may become* a receiver is not itself a receiver.") The district court acknowledges Plaintiffs' argument (*see* App. 87-88; R. Doc. 1, at 60-61, ¶¶ 256-259), conceding that "a 'frame or receiver' may be considered a firearm much sooner in the process than a 'weapon,'"[9] but glosses over the point, opining that "Plaintiffs have pointed to no provision of federal law foreclosing th[e] possibility" that a "weapon parts kit" can be considered a weapon even without having a "frame or receiver." App. 11-12; R. Doc. 85, at 11-12. On the contrary, the statutory language itself forecloses the clearly erroneous conclusion by the district court – that there is such thing as a "firearm" with no "frame or receiver."[10]

---

[9] If a "weapon parts kit" *did* include a finished "frame or receiver," then that item would already be a "firearm" under Section 921(a)(3)(B) without respect to the other "parts" in the "kit."

[10] The district court relied on this Court's decision in *United States v. Annis*, 446 F.3d 852 (8th Cir. 2006), as authority for its conclusion that a "firearm" need not have a "frame or receiver." App. 10; R. Doc. 85, at 10. But the district court makes the same mistake as Defendants (*see* App. 508; R. Doc. 43, at 12; App. 546; R. Doc. 78, at 4), pointing to a case that involved "a sawed-off rifle" that was "was missing both the clip and the bolt," but which otherwise could be made "operational in just a few seconds by putting the bolt in" – meaning the firearm contained a "frame

### 4. The District Court Erred by Rewriting the Final Rule to Add Language ATF Had Carefully Excised.

Purporting to flesh out the statutory terms "firearm silencer" and "firearm muffler" found in the GCA at 18 U.S.C. § 921(a)(25), and referenced in the NFA at 26 U.S.C. § 5845(a),[11] the Final Rule created two nearly identical definitions of what it terms a "complete muffler or silencer device."[12] In both definitions, the Final Rule defines – as a silencer – any object or group of objects "that contains all component parts necessary to function" as a silencer, "whether or not assembled or operable." App. 736; Final Rule at 24,747.

---

or receiver." *Annis,* 446 F.3d at 856-57. Indeed, the indictment in that case alleged that the defendant possessed "a weapon made from a .22 Mossberg rifle." *United States v. Annis*, 6:04-cr-02032 (N.D. Ia.), First Superseding Indictment, ECF #22 at 2. *See VanDerStok* Op. at 14-15 (rejecting the government's use of *Annis*). Neither the government nor the district court has identified, nor are Plaintiffs aware of any, case (prior to the Final Rule) where any court has determined that an item or group of items constitutes a "firearm" under Section 921(a)(3) ___***without***___ having a "frame or receiver."

[11] This statutory definition states "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

[12] These definitions are now found at 27 C.F.R. § 478.11 and 27 C.F.R § 479.11.

Appellate Case: 22-2812    Page: 33    Date Filed: 10/27/2022 Entry ID: 5212365

Objecting to these definitions, Plaintiffs noted that the statutory text reads quite differently referring, to be sure, to "any combination of parts," <u>but only to those</u> combinations which are "*designed* or redesigned, *and intended* for use in assembling or fabricating a firearm silencer…." ADD-36; 18 U.S.C. § 921(a)(25) (emphasis added); App. 126-32; R. Doc. 1, at 99-105, ¶¶ 412-444; App. 507-08, R. Doc. 43, at 11-12. In other words, whereas the statute requires that a combination of items must be "*for use in*"[13] a silencer, the Final Rule eliminates that *mens rea* requirement, replacing the statutory language "designed or redesigned, and intended" with the strict liability phrase "necessary to function."

Yet as Plaintiffs explained, virtually every household in the United States "contains all component parts necessary to function" as a silencer because, as ATF admits, countless innocuous, everyday household items such as "cleaning solvent traps, automotive oil/fuel filters, flashlights, bottles, rubber washers, copper pads, [] steel wool," or a thousand other items, *could* be used to construct a crude firearm silencer, and thus would

---

[13] *See Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 29-30 (D.D.C. 2014); *United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010) (explaining that "the statute does not refer either to capability or adaptation," but that the word "for" is "one of purpose").

25

constitute "all component parts necessary to function." *See* App. 129-130; R. Doc. 1, at 102-103, ¶¶ 430-436. Certainly, ATF may not have *intended* the Final Rule to turn every American homeowner into an unwitting felon-in-possession of an unregistered silencer, but that is what it does.

Apparently sensitive to its *faux pas*, ATF responds that the statutory "concepts" of "designed and intended" are somehow "incorporated" into the Final Rule. App. 514; R. Doc. 43, at 18. First, ATF claims that the Final Rule's definition "specified that it only applies to '[a] *firearm muffler or firearm silencer* that contains all component parts necessary to function....'" *Id.* In other words, ATF claims, the Final Rule's definition "only applies to devices that are already considered to be a 'firearm muffler' or 'firearm silencer.'" *Id.*

This rationalization is nonsensical. The Final Rule's regulations provide a *definition* explaining the point at which "components" constitute a "complete" firearm silencer. If something were "*already* considered to be" a silencer, there would be no need for further definition. If it "*already*" is clear what items (or groups of items) constitute silencers, then the Final Rule's definitions are redundant. If ATF's claim is correct,

then the Final Rule's definition, in effect, means "a silencer includes a complete silencer, which includes something that is already a silencer."

The district court adopted the government's reasoning, virtually word-for-word, without any further analysis (*see* App. 14-15; R. Doc. 85, at 14-15), concluding that "the 'designed' and 'intended' statutory language from the GCA was simply incorporated into the Final Rule's definition." *Id.*. But agency regulations do not have penumbras and emanations, and the district court's conclusion ignores that the (i) Final Rule *eliminated* the "designed" and "intended" language from the prior iteration of 27 C.F.R. § 478.11, and (ii) ATF *deleted* the words "as designed" which appeared in the NPRM, but which do not appear in the *Final* Rule. *Cf*. App. 653, 723, 736; Final Rule at 24,664, 24,734, 24,747. *See* A. Scalia and B. Garner, <u>Reading Law</u>, Thompson/West (2012), at 93-94 ("The … omitted-case canon … principle that a matter not covered is not covered is so obvious that it seems absurd to recite it," and an "absent provision cannot be supplied by the courts … '[t]o supply omissions transcends the judicial function.'"). Even more, congressionally deleted words cannot be added back in by either agencies or courts.

27

Based on the Final Rule's statutory revision, law-abiding gun owners, such as those represented by Plaintiffs, are at risk of felony criminal prosecution for innocently possessing common household items that in theory represent "all component parts necessary to function" as a silencer, even if a person has no knowledge, intent, or desire to construct an actual silencer. *See* App. 131-32; R. Doc. 1, at 104-05, ¶¶ 439, 441 . Indeed, contemporaneously with promulgating the Final Rule, ATF already has begun to threaten gun owners who possess objects designed and intended for legitimate non-silencer uses, and which ATF previously has concluded are *not* silencers. *See* App. 132-39; R. Doc. 1, at 105-112, ¶¶ 445-488.

Relatedly, the Final Rule conflicts with the statute by creating and defining an entirely new regulatory term "firearm muffler or silencer frame or receiver," an entirely unnecessary concept (App. 139-43; R. Doc. 1, at 112-16, ¶¶ 489-503) which directly contradicts (without explanation) the agency's prior claim that "*there is no* specific frame/receiver to a silencer…." App. 142; R. Doc. 1, at 115, ¶ 501 (emphasis added). App. 475-76; R. Doc. 14-1, at 11-12. Indeed, whereas the statute defines "firearms" (Section 921(a)(3)) and "machineguns" (26 U.S.C. § 5845(b)) to

28

have a "frame or receiver," that language is conspicuously missing from the statutory definition of "silencer" (Section 921(a)(25)). In defense of this statutory revision, ATF (and the court below) concluded that silencers "must have a frame or receiver" so that they can be marked. App. 514; R. Doc. 43, at 18; App. 15; R. Doc. 85, at 15.[14] Yet while silencers have been regulated since 1934, this "must have" requirement did not exist until the Final Rule.

ATF further relies on 26 U.S.C. § 5842(a), claiming that firearms must be marked "by a serial number … *as [ATF] may by regulations prescribe*." App. 513; R. Doc. 43, at 17. But that is not what the statute says, and ATF's careful use of ellipses misleadingly implies a far broader authority than what the text actually provides. Rather, the unedited version of Section 5842(a) requires that a person "shall identify" a silencer "by [i] a serial number … [ii] the name of the manufacturer, importer, or maker, and [iii] *such other identification* as the Secretary may by regulations prescribe." (Emphasis added). In other words, the statute permits ATF authority to decide *what* information must be

---

[14] Once again, the district court merely adopted ATF's position, nearly verbatim, without any further analysis. App. 15; R. Doc. 85, at 15.

Appellate Case: 22-2812     Page: 38     Date Filed: 10/27/2022 Entry ID: 5212365

marked on a silencer, but not to determine *where* a silencer must be marked. Indeed, whereas GCA "firearms" must be marked "by means of a serial number engraved or cast *on the receiver or frame*" (ADD-43; 18 U.S.C. § 923(i)), 26 U.S.C. § 5842(a) contains no such location requirement for NFA "silencers" – because they do not have a "frame or receiver." *Expressio unius est exclusio alterius*. Silencer manufacturers such as the members and supporters of the organizational Plaintiffs should have the flexibility to decide where to serialize their products (silencer tube, end cap, *etc*.).

>    **5.    The District Court Permitted ATF to Create Entirely New Statutory Requirements Governing Homemade Firearms.**

Next, the Final Rule improperly creates new federal law regulating homemade firearms (App. 110-13; R. Doc. 1, at 83-86, ¶¶ 340-51) – what the agency has termed "privately made firearms" or "PMFs" – by forcing licensed firearm dealers to serialize, record, and register such firearms on behalf of the federal government. However, no Congressional statute contains any of these requirements, and ATF is entirely without authority to enact these new requirements by regulatory fiat.

30

In its briefing below, ATF claimed that this expansion of the statute was necessary to "clarify[y] that [a] 'firearm' includes a 'privately made firearm.'" App. 502; R. Doc. 43, at 6. On the contrary, privately made firearms have existed since this country's founding (in reality, since firearms were invented), and the GCA's definition of what constitutes a "firearm" under federal law has not changed since 1968. Thus, there has never been an iota of uncertainty that homemade firearms qualify as "firearms" under federal law.

Rather, the Final Rule is designed to solve an entirely different purported "problem" that the agency claims to have identified – the reality that federal law <u>does not require</u> homemade guns to bear a serial number, <u>does not mandate</u> gun owners to be licensed before they can manufacture their own guns, and <u>does not command</u> that homemade firearms be registered in the records of any dealer. *See* App. 111; R. Doc 1, at 84, ¶ 345.

According to ATF, however, this lack of a statutory framework regulating homemade guns creates an unacceptable political situation, alleging that unserialized homemade firearms (even though perfectly lawful) "hamstring[] law enforcement's ability to investigate crimes," and

31

"ATF has found it extremely difficult to complete [] traces…." App. 610-12; NPRM at 27,723-25; App. 112; R. Doc. 1, at 85, ¶ 347. ATF further asserts that "technological advancements" have made it easier for gun owners to manufacture their own firearms, leading to more such firearms being constructed, allegedly further hampering law enforcement. App. 112; R. Doc. 1, at 85, ¶ 347. But regardless of whether any of this is true, it is indisputably the role of Congress alone – not of anti-gun bureaucrats – to decide whether to change the law to address changes the agency perceives.[15] Glossing over the reality that authority for its PMF regulations is nowhere to be found in the statute, the agency offers four defenses. Each justification was adopted by the district court without critical analysis, and each is erroneous.

First, ATF claims that "the GCA … required **_all_** firearms to be marked,"[16] and that "PMFs, like commercially produced firearms, **_must_**

---

[15] *See Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ("Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law."); *see also* App. 113; R. Doc. 1, at 86, ¶ 350.

[16] This patently false claim that all guns must be serialized is belied not only by the plain text of the statute, but also by the fact that the Final Rule "does not require that all PMFs receive a serial number – it

32

**_be able_** to be traced."  App. 633-34; NPRM at 27,746-47; App. 665; Final

Rule at 24,676 (emphasis added).  Of course, completely missing from

these bold claims is citation to any statutory authority.  If the relevant

statute, 18 U.S.C. § 923(i), had been cited, it would have been manifest

that Congress had clearly specified *exactly which* firearms must be

marked – only "licensed importers and licensed manufacturers shall

identify by means of a serial number … each firearm imported or

manufactured."  (Emphasis added); *see also* 27 CFR 478.92(a)(1); App.

115-16; R. Doc. 1, at 88-89, ¶¶ 356-361.[17]

---

only requires a PMF [obtained by] an FFL to be given a serial number."
App. 14; R. Doc. 85, at 14.  Moreover, the Final Rule does not require *any*
pre-1968 firearms to be serialized, exempting them from its mandate.
App. 706; Final Rule 24,717; App. 116; R. Doc. 1, at 89, ¶ 362.  Finally,
the Final Rule does nothing to prohibit intra-state transfers of
unserialized PMFs between residents of the same state – "commerce"
which is perfectly lawful under the laws of most states (not to mention
the GCA.  If it were true that the "GCA … required **_all_** firearms" to be
serialized, none of the above examples of unserialized firearms would be
possible.

[17] Indeed, the NPRM candidly admitted that "PMFs are those firearms
that were made by nonlicensees without the markings required by this
section."  App. 617, 619; NPRM at 27,730; *see also* 27,732 (PMFs "do not
have the identifying markings required of commercially manufactured
firearms.").

Appellate Case: 22-2812     Page: 42     Date Filed: 10/27/2022 Entry ID: 5212365

Upholding ATF's extension of Section 923(i) to <u>licensed dealers</u>, the district court acknowledged that even though the GCA only "requires licensed importers and manufacturers to identify firearms by serial number," that requirement ***should be extended to dealers*** because, "[w]ithout a serial number, PMFs become untraceable firearms – an outcome the ATF is well within its regulatory authority to prevent." App. 14; R. Doc. 85, at 14 (emphasis added).

On the contrary, this Court should reject the district court's startling claim that ATF has broad regulatory flexibility to "prevent … outcome[s]." *Cf. VanDerStok* Op. at 13-14 ("Congress could have … But Congress did not…."). Instead, ATF is tasked with enforcing the laws that Congress enacts, regardless of whether the agency – or even federal judges – believe different policies would better serve alleged societal needs, Congress's purported intent, or a statute's perceived purpose. *See* App. 548-49; R. Doc. 78, at 6-7; App. 80-81; R. Doc. 1, 53-54, ¶ 222. An agency simply may not "rewrite ... unambiguous statutory terms" to suit "bureaucratic policy goals." *Utility Air,* 573 U.S. at 325-26. Rather, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *Davis*, 139 S. Ct. at 2323.

Appellate Case: 22-2812    Page: 43    Date Filed: 10/27/2022 Entry ID: 5212365

The district court continued that "[r]equiring licensed dealers—like licensed manufacturers and importers—to mark these firearms as they enter commerce is *necessary to fulfill Congress's intent* to allow for tracing of commercially sold firearms."  App. 23; R. Doc. 85, at 23 (emphasis added).  In other words, the district court first "sa[id] what the law is," but then decided as a matter of policy what the law *should be*, permitting allegedly "necessary" modifications to the statute to fulfill perceived "Congress[ional] intent."  Of course, courts "interpret and apply statutes, not congressional purposes," and for that reason judges cannot:

> interpret a statute contrary to the plain meaning of its words if doing so would, in the court's view, better further the purpose it thinks Congress had in mind....  As the Supreme Court recently reminded us, 'law depends on respect for language.' ...('[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.') ... '[t]he best evidence of that [legislative] purpose is the statutory text....'" *Gordon v. Novastar Mortg., Inc. (In re Hedrick)*, 524 F.3d 1175, 1187-88 (11th Cir. 2008).

Second, ATF makes the grandiose claim that it "has statutory authority to regulate 'firearms,'" relying on an alleged "broad grant of regulatory authority" found in 18 U.S.C. § 926(a).  App. 512; R. Doc. 43, at 16; *see also* App. 14, 23; R. Doc. 85, at 14, 23 (adopting ATF's claim without analysis).  On the contrary, Section 926(a) merely provides ATF

35

authority to enact regulations "necessary to carry out *the provisions of*" federal law. This general authority in no way permits an agency to create new "provisions of" federal law – and serialization *by dealers* is not among "'the provisions' of the GCA." *See* <u>Reading Law</u> at 107 (discussing the "negative-implication canon," or *expressio unius est exclusion alterius*); *Cf.* App. 676, Final Rule at 24,687 (opining that "Section 923(i) *does not prohibit* others from" serializing firearms and "cannot be construed as a *prohibition* against any marking requirement through regulation."). (Emphasis added). Agencies are not free to exercise any authority a statute does not expressly "*prohibit*," but instead have only that authority a statute *grants* them. Certainly, if Congress had wanted to include "dealers" in Section 923(i), it would have done so, and ATF cannot backdoor such a requirement based on some broad claim of authority to "regulate firearms."[18]

---

[18] Nor does the Final Rule's serialization requirement for dealers comport with the framework of Section 923(i). Whereas the statute requires *manufacturers* to serialize firearms *they* manufacture, and *importers* to serialize firearms *they* import, the Final Rule requires *dealers* to serialize firearms that *someone else* has manufactured, a concept entirely foreign to the GCA (and even the NFA, which similarly requires the person who manufactures an item to serialize it).

Appellate Case: 22-2812     Page: 45     Date Filed: 10/27/2022 Entry ID: 5212365

Third, ATF claims that 18 U.S.C. § 923(g)(1)(A) provides it the authority missing from Section 923(i), in that subsection (g) permits ATF to require recordkeeping of firearms "in such form [] as the Attorney General may by regulation prescribe." App. 512; R. Doc. 43, at 15; App. 14; R. Doc. 85, at 14 (adopting ATF's claim). But this bootstraps agency authority – drawing from a recordkeeping requirement (that dealers must record the serial numbers of a firearm) the power to impose substantive requirement (that dealers must physically serialize firearms). The district court's conclusion that physically engraving a firearm with a serial number is the equivalent of "recordkeeping" stretches language to its breaking point.

Fourth, ATF claims that it has authority to require serialization of PMFs on the theory that "Congress clearly understood that in some circumstances persons and entitles other than licensed manufacturers and importers may be required to mark firearms with a serial number."[19]

---

[19] Of course, this claim is immediately belied by ATF's contrary position that "when Congress enacted the GCA, it likely did not consider that PMFs would enter" FFL inventories "in any significant number." App. 676-77; Final Rule at 24,687-88. ATF cannot have it both ways – that Congress "clearly understood" something that "Congress … did not consider."

Appellate Case: 22-2812    Page: 46    Date Filed: 10/27/2022 Entry ID: 5212365

App. 513; R. Doc. 43, at 17; *see also* App. 676; Final Rule at 24,687; App. 23; R. Doc. 85, at 23 (regurgitating ATF's claim without analysis). As evidence of this claim, however, ATF misleadingly points not to the GCA's requirement that manufacturers and importers serialize firearms (Section 923(i)), but rather to the NFA's requirement that "anyone making a [NFA] firearm" must serialize it (26 U.S.C. § 5842(a)). Indeed, whereas the GCA does not prohibit or regulate the manufacture of homemade firearms, the NFA heavily regulates homemade silencers and short-barreled rifles, mandating they be registered with ATF, along with payment of a $200 tax stamp. The agency's reliance on *an entirely different statutory scheme* to justify ignoring the plain text of Section 923(i) is misleading at best.[20]

What is more, Congress has considered – but declined to enact – legislation that would have, like the Final Rule, required PMFs to be serialized.[21] If ATF is correct that Congress "clearly understood" the

---

[20] Indeed, the Final Rule makes explicitly clear that NFA firearms are excluded from its definition. App. 724; Final Rule at 24,735.

[21] *See* H.R.377, Homemade Firearms Accountability Act of 2015, 114th Congress (2015-2016), https://www.congress.gov/bill/114th-congress/house-bill/377.

Appellate Case: 22-2812     Page: 47     Date Filed: 10/27/2022 Entry ID: 5212365

agency to already have this authority, there would have been no need to introduce this legislation – and certainly no reason to fail to enact it.[22]

## B. The District Court Erred by Sanctioning the Final Rule's Codification of an Arbitrary and Capricious Classification System.

---

[22] Plaintiffs also claimed that the Final Rule improperly creates a new federal crime for obliterating a PMF serial number that no federal law requires in the first place. App. 119-20; R. Doc. 1, at 92-93,¶¶ 372-380; *see Chavez-Alvarez v. AG United States*, 850 F.3d 583, 589 (3d Cir. 2017) ("the Executive Branch, whether through the President or one of its agencies, cannot create criminal statutes; only Congress can do so.").

The district court did not agree that a new crime had been created, opining that "obliteration of a PMF serial number would be treated the same as obliteration of any firearm's serial number, which has long been a crime under federal law. *See* 18 U.S.C. § 922(k); 26 U.S.C. § 5861(h)." App. 13; R. Doc. 85, at 13. But that is a *non sequitur*. Suppose the Final Rule required serialization of toy squirt guns, and provided that a person would be subject to felony charges if he obliterated this serial number – which no federal statute requires. A court's observation that "obliteration of a [squirt gun] serial number would be treated the same as obliteration of any firearm's serial number" would not make such a regulation of squirt guns lawful.

Interestingly enough, a federal district court recently found Section 922(k)'s crime of obliterating a serial number to be unconstitutional. *See United States v. Price*, No. 2:22-cr-00097 (S.D. W. Va., Oct. 12, 2022), ECF #48 at 15. Thus, separately and aside from the agency's utter lack of any statutory authority, the Final Rule's attempt to add to an unconstitutional statute through regulation should give this Court serious pause.

39

Apparently cognizant that the Final Rule's expansive new regulatory enactments, along with its voluminous, incomprehensible definitions, will create chaos and confusion in the firearms industry and Second Amendment community, ATF proffers that "to the extent … certain applications of the Rule [might] be ambiguous, the Rule provides a regulatory mechanism to resolve any such ambiguity: parties may submit requests for voluntary classifications as to whether a particular item is a 'firearm' within the meaning of the GCA and its regulations." App. 531-32; R. Doc. 43, at 35; *see also* at 36 ("any purported uncertainty is not irreparable but can be remedied through the administrative process."). But an agency cannot escape judicial review by reserving unto itself the dictatorial power to resolve confusion that its poorly drafted rulemaking has created.

Indeed, Plaintiffs challenged the Final Rule's codification of ATF's existing, horribly flawed classification system, which is the very model of an arbitrary and capricious process. App. 143-57; R. Doc. 1, at 116-130, ¶¶ 504-569. Indeed, the ATF classification system – whereby industry members and the public ask ATF to provide its opinion as to the proper classification of a given item or firearm – has produced perverse,

40

conflicting, and inconsistent results. App. 146-47, 151-54; R. Doc. 1, at 119-20, 124-27, ¶¶ 522-525, 542-555. First, ATF historically has refused to make its opinions available to the public, preferring to operate in secret, and claiming (unlawfully[23]) that its guidance is limited to a particular item and particular requester. App. 144; R. Doc. 1, at 117, ¶ 512. Second, ATF operates its classification system without any fixed rules or standard operating procedures, and with little-to-no formalized training for its firearm examiners, which has led to numerous congressional calls for reform. App. 147; R. Doc. 1, at 120, ¶ 524-525. Third, as a result, ATF has repeatedly issued conflicting guidance, reversed and flip-flopped its positions from letter to letter, product to product, and requester to requester, claiming to reserve the right to unilaterally change its opinion at any time. *See Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021) (vacated by grant of *en banc* review) (noting "the ATF's frequent reversals on major policy issues"). App. 146; R. Doc. 1, at 119, ¶ 522-523. Fourth, the agency has given preferential classification treatment to favored requesters and

---

[23] *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) ("[t]he treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent.")

41

preferred types of products, while delaying for years (or flatly refusing to issue) classifications to disfavored requesters (including Plaintiffs' members and supporters) and with respect to disfavored products (such as 80 percent frames and receivers). App. 151-53; R. Doc. 1, at 124-26, ¶ 542-553. Together, these factors have led to a system where ATF has acted with impunity, doing literally whatever it wants, for any reason it wishes, to the detriment of both the industry and the public.

Below, the agency responded not by defending the virtue of its classification system, but instead by opining that no law requires ATF to operate its classification system fairly, as there is no statute requiring ATF to "act on any such requests (or to act on them within a prescribed time frame)," nor any statute requiring anyone to submit a request in the first place. App. 525; R. Doc. 43, at 29; *see also* App. 24; R. Doc. 85, at 24 ("there is no requirement that [ATF] help individuals ... achieve compliance … in a certain timeframe."). In other words, according to ATF, since its informal classification system is entirely a product of its own voluntary creation, it is free operate that system however arbitrarily, illogically, and indiscriminately as it pleases. On the contrary, the APA prohibits agencies from acting arbitrarily and

42

capriciously, and from unreasonably delaying or unlawfully withholding action. 5 U.S.C. § 706(A).

The district court's opinion failed to address the above claims. Rather, the court homed in on Plaintiffs' additional argument that the Final Rule improperly creates a requirement that a product submission be made "under the penalties of perjury," something that is (i) not required by federal law and (ii) not necessary merely to seek ATF guidance on a particular product. App. 149-50; R. Doc. 1, at 122-23, ¶¶ 533-536. According to the district court, again parroting the agency's brief, the Final Rule's demand of a statement under penalty of perjury is not "a significant change to the ATF's policy," as "it is already a crime to 'make any materially false, fictitious, or fraudulent statement or representation" under 18 U.S.C. § 1001. App. 22; R. Doc. 85, at 22; *see* App. 522; R. Doc. 43, at 26. Of course, neither ATF nor the district court bother to explain how, in the context of a classification *request*, a requestor could *make* a false statement subject to § 1001.

## II. Plaintiffs Are Being, and Will Continue to Be, Irreparably Harmed Without an Injunction.

43

Below, Plaintiffs met their burden to show irreparable harm, which happens whenever a plaintiff does not have an "adequate remedy at law" (such as damages). *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Plaintiffs did not need to show that such a harm would "in fact" occur, but only that it was "likely" to. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). And they needed to show only one qualifying injury to justify an injunction. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

The private Plaintiffs and Plaintiff-States collectively showed many different irreparable injuries. These harms included the direct harm that the Final Rule inflicted on constitutional interests (like those that the Second Amendment protects), the new compliance obligations that upend the firearms industry, the States' impaired ability to fight crime given the Final Rule, the inability of law-abiding gun owners to acquire the materials to manufacture their own firearms, and more. Yet the district court rejected these substantial injuries in two short, conclusory paragraphs. In the district court's view, each of these harms were "speculative," insufficiently "great," and purportedly tainted by a three-month "delay" in filing this suit. App. 12; R. Doc. 85, at 12.

Appellate Case: 22-2812   Page: 53   Date Filed: 10/27/2022 Entry ID: 5212365

For several reasons, the district court's findings on harm were clearly erroneous—and thus afford even more reason to reverse. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 740 (8th Cir. 2002) (irreparable harm reviewed under clear-error standard).

## A. The Private Plaintiffs.

The private Plaintiffs pointed to many examples of irreparable harm that the district court wrongfully rejected—or worse, ignored.

*First*, the Final Rule unconstitutionally interferes with Plaintiffs' Second Amendment rights. *See* App. 39, 91, 124; R. Doc. 1, at 12, 64, 97, ¶¶23, 267, 403; App. 490-91; R. Doc. 14-1, at 26-27. Again, gun owners (like Mr. Jimenez and the members of both organizational plaintiffs) must now serialize their privately manufactured firearms under ATF's registration scheme, and gun dealers must transfer records of those firearms and their owners to ATF. App. 490; R. Doc. 14-1, at 26. Moreover, because of the Final Rule, Plaintiffs are deprived of access to the components, parts, and materials to manufacture their own firearms. App. 488-89; R. Doc. 14-1, at 24-25.

Appellate Case: 22-2812    Page: 54    Date Filed: 10/27/2022 Entry ID: 5212365

Any infringement of constitutional rights, including the Second Amendment right, "unquestionably constitutes irreparable injury."[24] *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (finding that students would suffer irreparable harm from being denied participation in dance teams "in probable violation of their constitutional rights"); *Planned Parenthood of Minnesota, Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977). The district court found otherwise, concluding that the Final Rule was constitutional under the Second Amendment and *Bruen*. App. 16-17; R. Doc. 85, at 16-17. But because the lower court's harm analysis rested on this "error[] of law," the factual conclusion about harm is automatically erroneous, too. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733, 737 n.11 (8th Cir. 2008).

*Second*, the Final Rule harms members of the firearms community, App. 475; R. Doc. 14-1, at 11, including lawful individual gun owners like Mr. Jimenez (who privately manufacture firearms) and shops like Bridge

---

[24] Although Plaintiffs' preliminary injunction motion does not brief their constitutional claims, the irreparable harms arising from those violations are still properly considered for purposes of injunctive relief factors.

City (which participates in the gun trade). The Final Rule creates new federal crimes from thin air.[25] Already, ATF's enforcement of the Final Rule led to the serving of criminal search warrants, App. 560-61; R. Doc. 78, at 18-19, and has disturbed and disrupted (if not ended entirely) those engaged in the business of selling unregulated firearm parts with which gun owners manufacture homemade firearms. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *accord Adam-Mellang v. Apartment Search*, 96 F.3d 297, 301 (8th Cir. 1996). For example, Mr. Jimenez is now apprehensive about continuing his private gun-making, as he cannot confidently purchase parts without exposing himself to potential criminal liability under the Final Rule's unclear language and vague threats of criminal enforcement. App. 32-33; R. Doc. 1, at 5-6, ¶4. Of course, that is even if he could buy the materials with which to manufacture a firearm, as the Final Rule has eliminated the marketplace

---

[25] Among these new crimes, the Rule threatens vague application of federal conspiracy and "structuring" crimes wholly untethered from the GCA (see App. 89; R. Doc. 1, at 62, 263) meaning that individuals, like Plaintiff Jimenez, will not be able to purchase from retailers all component parts needed to complete a "PMF" or will be chilled from purchasing combinations of different *legal and ATF-approved* parts for fear that some unknown—and undefined—combination of parts purchases will trigger application of the new "structuring" crime. App. 90-92; R. Doc. 1, at 63-65, ¶¶ 265-269.

for such items. These kind of harms are more than sufficient for injunctive relief. *See, e.g.*, *VanDerStok*, 2022 WL 4809376, at *5 ("[A] plaintiff's purported choice to comply—or else—with a challenged government dictate, as evidenced by the plaintiff's decision to desist from engaging in the regulated activity, is adequate to establish irreparable harm.").

The lower court seemed to dismiss the effect of the Final Rule by arguing that "uncertainty because of a new federal regulation does not constitute irreparable harm." App. 25; R. Doc. 85, at 25. Other courts disagree. *See, e.g.*, *Citizens Coal Council v. Babbitt*, No. CIV.A. 00-0274(JR), 2002 WL 35468435, at *1 (D.C. Cir. June 5, 2002) (finding that "substantial uncertainty" in federal regulatory scheme constituted irreparable harm justifying stay pending appeal); *see also VanDerStok* at *18 (rejecting the idea that "compliance costs are not an irreparable harm," because "'complying with a regulation later held invalid almost always produces … nonrecoverable compliance costs,'" and "nonrecoverable means irreparable.").

But even if regulatory uncertainty and compliance were not irreparable harm, that notion would be irrelevant. Plaintiffs' injury is

Appellate Case: 22-2812    Page: 57    Date Filed: 10/27/2022 Entry ID: 5212365

not the Final Rule's uncertainty. Rather, harm results because that uncertainty—paired with ATF's intent to enforce the Rule—compels an unwanted change in behavior out of fear of criminal sanction. *Adam-Mellang*, 96 F.3d at 301; *see also, e.g.*, *Small Hearts Daycare, II, LLC v. Quick*, No. 4:09CV2132 HEA, 2010 WL 427766, at *2 (E.D. Mo. Feb. 1, 2010) (where "Plaintiffs' reputation [wa]s impinged by the notification to third parties" and Plaintiffs faced "the threat of criminal penalties," their "irreparable harm [wa]s evident"). The entire Second Amendment community has changed its behavior with respect to privately made firearms, out of fear of ATF reprisal under the Final Rule.

Defendants separately counter that any "purported uncertainty" is curable through an administrative process run by ATF, *see* App. 732; Final Rule at 24,743; App. 534-35; R. Doc. 43, at 38-39, but this argument also falls short. The Rule's effects extend beyond the small pool of individuals (usually well-financed industry members) who have the knowledge, means, connections, and time to ensure compliant behavior through ATF's classification process. Even if one indulged the fiction that every individual resorted to the administrative process, the costs of doing so would be so great as to constitute irreparable harm in and of

49

themselves. See *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000). In the end, ATF should not get the benefit of providing a cumbersome and partial "cure" for the problems that its own poor rulemaking has created.

*Third*, the Final Rule upends the firearms industry, saddling dealers with significant new costs, lost customers, and closed businesses. Although general economic damages usually cannot support a preliminary injunction, a showing of significant customer loss or "loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *AdvancePCS*, 316 F.3d at 741; *accord S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *accord BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).

Moreover, "substantial loss of business and ... bankruptcy" constitutes classic irreparable harm, *Doran*, 422 U.S. at 932, and Defendants *admit* these are inevitable outcomes of the Final Rule. In estimating the Final Rule's costs to the industry, ATF "revised its estimates to reflect companies that could dissolve their business." App.

50

707; Final Rule at 24,718. Meanwhile, for non-FFL manufacturers like Bridge City, ATF concedes that the Rule would have a "significant impact" on their business. App. 623; NPRM at 27,736. Thus, even ATF concluded that Plaintiffs will suffer irreparable loss because of the Final Rule, yet the district court found otherwise.

Given the constitutional, regulatory, and significant economic effects of the Final Rule, Plaintiffs will be irreparably harmed.

### B.    The Plaintiff-States.

The Plaintiff States set out their harms in their Opening Brief, and Private Plaintiff adopt their presentation of those irreparable harms.

### C.    The Three Months to File

Half the district court's perfunctory harm analysis centered on the fact that Plaintiffs filed their motion for injunctive relief not quite three months after ATF published the Final Rule. App. 12; R. Doc. 85, at 12. Of course, it took ATF nearly a year after its NPRM to publish the Final Rule on this complicated matter. App. 37-38; R. Doc. 1, at 10-11, ¶¶ 15, 18. To be sure, delay can be a *factor* in evaluating irreparable harm. But it is not dispositive—and courts are "loath to withhold relief solely

51

on that ground." *Lydo Enters., Inc. v. City of Las Vegas,* 745 F.2d 1211, 1214 (9th Cir. 1984); *accord Gordon v. Holder*, 632 F.3d 722, 724-25 (D.C. Cir. 2011).  In analyzing delay, courts consider whether the interval of time to file was "unreasonable," *Whitfield v. Anheuser-Busch, Inc.,* 820 F.2d 243, 245 (8th Cir. 1987), which turns on the "facts of each case," *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002). Here, Plaintiffs filed their motion shortly after suing (and the same day the executed summonses were filed), so the district court focused on the "delay" measured from the date of the Final Rule until the motion. App. 24; R. Doc. 85, at 24.

That Plaintiffs took slightly over two months from the Final Rule's publication to file this suit was in no way "unreasonable." *Whitfield*, 820 F.2d at 245.  The parties were not dallying; they had actively commented on and challenged ATF's Rule when the agency issued its notice of proposed rulemaking in May 2021.  App. 544-45; R. Doc. 78, at 2-3; App. 607-40; NPRM at 27,720-53. [26]

---

[26] The Complaint in this matter was docketed on July 5, 2022.  The *VanDerStok* case was filed over a month later on August 11, 2022, and their motion for preliminary injunction was filed on August 18, 2022.

But the Final Rule was markedly different from the NRPM, departing in unforeseeable, substantive, and important ways. App. 560; R. Doc. 78, at 18. ATF changed everything from policy to critical definitions in short order, not to mention that the Final Rule is extraordinarily long – nearly 100 pages of small, compressed Federal Register text (plus a lengthy regulatory impact analysis), and three times the length of the initial NPRM. App. 641-738; Final Rule at 24,652-749. The Plaintiffs thus needed time to review the Rule, determine how it changed, evaluate the harms it imposed, chart out the best plan going forward, and prepare a Complaint that was in excess of 150 pages. F.R.C.P. 11 requires parties investigate before they make a federal case of something, and Plaintiffs took that requirement seriously. Plus, any legal documents Plaintiffs had already drafted in anticipation of challenging the NPRM were worthless when the Final Rule was promulgated, given the striking divergence between that proposal and the Final Rule. Even so, Plaintiffs were still the first coalition to challenge the Final Rule, App. 560; R. Doc. 78, at 18, and they did so quickly, diligently, and *reasonably* within three months—and a full month before the Final Rule even became effective. *See VanDerStok*, Op.

53

at 9 (finding that an even greater delay did not erase lesser irreparable harm, on similar facts).

In short, all the Plaintiffs here have suffered—and continue to suffer—irreparable harm from the Final Rule. The reasonable amount of time and significant amount of work necessary to prepare and file this suit does not override these harms. The lower court clearly erred in finding otherwise.

## III. The Balance of Equities and Public Interest Supports an Injunction.

When the "government is the opposing party," the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As the Supreme Court recently affirmed, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends. …. even the Government's belief that its action 'was necessary to avert a national catastrophe' could not overcome a lack of congressional authorization." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021). The district court's opinion does not substantively address these prongs of the preliminary injunction test, focusing instead on "the

Appellate Case: 22-2812    Page: 63    Date Filed: 10/27/2022 Entry ID: 5212365

likelihood of success on the merits" and alleged "speculative risk of harm…" App. 25; R. Doc. 85, at 25.

Nevertheless, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F.Supp.2d 7, 21 (D.D.C. 2009). Indeed, "[t]here is an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1977). Shrugging off Congress's APA mandates, the ATF has issued an arbitrary and capricious rule that contains provisions of which the public was never given proper notice. Implementation of this rule is costing businesses millions of dollars, halting and infringing protected Second Amendment activity, and interfering with the States' sovereign laws. Meanwhile, ATF will not be harmed by delaying—for the purposes of proper judicial review—the enforcement of a regulation it took nearly a year and a half to promulgate from the NPRM to the effective date. Rather, the irreparable harm Appellants face and the ATF's unclean hands in skirting the APA support a finding that the balance of the equities and

Appellate Case: 22-2812    Page: 64    Date Filed: 10/27/2022 Entry ID: 5212365

public interest favor reversing the district court below and enjoining the Final Rule.

## CONCLUSION

The sheer size and complexity of the Final Rule alone (the rule and its regulatory impact analysis total 505 pages of double-spaced, 12-point type, more than a full ream of paper) should give this Court pause with respect to allowing its continued wholesale implementation. In purporting to "interpret" provisions of the Gun Control Act that have existed since 1968, ATF suddenly now advances new "interpretations," understandings, and applications of the statutory text that the agency apparently never new existed until now, more than a half century later. The district court below clearly erred by permitting the agency to (i) rewrite federal law, (ii) create new federal crimes, (iii) fail to align the rule with the Second Amendment, (iv) promulgate an arbitrary and capricious classification system, (v) create substantive rules without providing a notice and comment period, (vi) depart from longstanding agency policy without even recognizing much less explaining the shift, (vii) fail to respond to substantive comments, and (viii) create a prohibited national gun registry. For the reasons stated, the district

Appellate Case: 22-2812     Page: 65     Date Filed: 10/27/2022 Entry ID: 5212365

court's opinion should be reversed, and a preliminary injunction enjoining the Final Rule should be entered.

Respectfully submitted,

Date: October 26, 2022

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

*Counsel for Morehouse Enterprises, LLC d/b/a Bridge City Ordnance, Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners Foundation*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 11,715 words as determined by the word-counting feature of Microsoft Word 365.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Century Schoolbook font.

And this motion complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Kaspersky Antivirus and no virus was detected.

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh

Appellate Case: 22-2812     Page: 67     Date Filed: 10/27/2022 Entry ID: 5212365

## CERTIFICATE OF SERVICE

I certify that on October 26, 2022, I electronically filed the foregoing motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

Appellate Case: 22-2812    Page: 68    Date Filed: 10/27/2022 Entry ID: 5212365