# In the United States Court of Appeals for the Eighth Circuit

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE, *et al.*,

*Plaintiffs-Appellants,*

*v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of North Dakota, Case No. 3:22-cv-116 (Hon. Peter D. Welte)

## Brief of *Amici Curiae* Gun Violence Prevention Groups in Support of Defendants-Appellees and Affirmance

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

ADAM M. KATZ
RACHEL H. ALPERT
COOLEY LLP
500 Boylston St.
Boston, MA 02116
akatz@cooley.com
ralpert@cooley.com
(617) 937-2351

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 776-2042
dgrooms@cooley.com

*Counsel for Amici Curiae Gun Violence Prevention Groups*

# TABLE OF CONTENTS

Disclosure Statement ..................................................................... 1

Statement of Interest .................................................................... 1

Introduction ..................................................................................... 3

Argument........................................................................................... 9

    I.    The Rule Implements the Gun Control Act and
Prevents its Subversion ........................................................ 9

        A.  The Rule Implements the Act's Clear Definition of
"Firearm".................................................................... 9

        B.  The Rule Advances the Act's Purpose............................ 12

    II.   The Rule Properly Considers the Practical Reality that
Ghost Guns Can be Quickly and Easily Assembled by
Nonexperts ......................................................................... 23

    III.  The Rule Comports with ATF's Longstanding View
that Partially Complete Frames and Receivers Can Be
Firearms .............................................................................. 29

Conclusion ....................................................................................... 33

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramski v. United States,*
573 U.S. 169 (2014) ............................................ 3, 16, 19, 20

*Barrett v. United States,*
423 U.S. 212 (1976) ............................................ 16

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............................................ 16

*District of Columbia v. Polymer80, Inc.,* No. 2020-CA-002878
(D.C. Sup. Ct. Aug. 10, 2022) ............................................ 25

*Huddleston v. United States,*
415 U.S. 814 (1974) ............................................ 13, 15

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n
v. Pellella,*
350 F.3d 73 (2d Cir. 2003) ............................................ 10

*Nat'l Shooting Sports Found., Inc. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013) ............................................ 21, 22

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ............................................ 16

*Shawano Gun & Loan, LLC v. Hughes,*
650 F.3d 1070 (7th Cir. 2011) ............................................ 19

*United States v. Cooper,*
714 F.3d 873 (5th Cir. 2013) ............................................ 24

*United States v. Fuller-Ragland,*
931 F.3d 456 (6th Cir. 2019) ............................................ 21

*United States v. Hardin,*
889 F.3d 945 (8th Cir. 2018) ............................................ 24

Appellate Case: 22-2812     Page: 3     Date Filed: 12/19/2022 Entry ID: 5228384

*United States v. Harris,*
720 F.3d 499 (4th Cir. 2013) ........................................................ 20

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ...................................................... 20, 22

*United States v. Mobley,*
956 F.2d 450 (3d Cir. 1992) ........................................................ 22

*United States v. Mullins,*
446 F.3d 750 (8th Cir. 2006) ...................................................... 24

*United States v. Rivera,*
415 F.3d 284 (2d Cir. 2005) ...................................................... 23

*United States v. Smith,*
477 F.2d 399 (8th Cir. 1973) ...................................................... 24

*United States v. St. Hilaire,*
960 F.3d 61 (2d Cir. 2020) ........................................................ 21

## Statutes

18 U.S.C.

§ 921(a)(3) .......................................................................... *passim*
§ 922(a)(1)(A) ...................................................................... 14
§ 922(a)(6) ...................................................................... 17, 19
§ 922(b) ............................................................................ 14
§ 922(d) ............................................................................ 14
§ 922(g)(1)(A) ...................................................................... 21
§ 922(m) ............................................................................ 17
§ 922(t) ............................................................................ 16
§ 922(t)(1) ......................................................................... 15
§ 923(i) ............................................................................ 21
§ 923(a) ............................................................................ 14
§ 923(g)(1)(B) ...................................................................... 21
§ 923(g)(3) ......................................................................... 14
§ 924(a)(3) ......................................................................... 17

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 .......... *passim*

U.S.S.G. § 2K2.1(b)(4)(B) ........................................................ 21

**Other Authorities**

27 C.F.R.
    § 478.92 ................................................................................ 21
    § 478.99 ................................................................................ 14
    § 478.101 .............................................................................. 14
    § 478.102(a) .......................................................................... 15
    § 478.121 .............................................................................. 21

87 Fed. Reg.
    24652 ............................................................................. *passim*
    24676 ...................................................................................... 8

*About*, R&B Tactical Tooling (last visited Nov. 19, 2021),
    https://bit.ly/3oNKmZU ..................................................... 18

Admin. Record, *City of Syracuse, et al. v. Bur. of Alcohol,*
    *Tobacco, Firearms & Explosives*, 1:20-CV-6885,
    ECF No. 60 (S.D.N.Y. Dec. 8, 2020) .................................. 32

Aff. of T. Hart, *In the Matter of the Search of the Business*
    *and Federal Firearms Licensee known as Polymer80*, 3:20-
    mj-123 (D. Nev. Dec, 9, 2020) ........................................... 31

*Are Felons Restricted from Owning a Firearm that Was Built*
    *from an 80% Receiver?*, Polymer80 Blog (Oct. 21, 2020),
    *formerly at* https://bit.ly/3DDzXGo ATF ........................... 18

ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl .................... 19

Ben Lambert, *New Haven Police See "Ghost Guns" On the*
    *Rise in City*, New Haven Register (Aug. 17, 2022),
    https://bit.ly/3THs9e5 ............................................................ 4

Compl., *People v. Blackhawk Mfg. Grp., Inc., et al.*,
    CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ............... 28

Appellate Case: 22-2812    Page: 5    Date Filed: 12/19/2022 Entry ID: 5228384

Decl. of J. McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 1:20-CV-6885, ECF No. 64-34 (S.D.N.Y. Dec. 9, 2020) ...................... 28

Dept. of Justice, *Sauk Rapids Man Pleads Guilty to Manufacturing, Selling Ghost Guns* (Sept. 29, 2022), https://bit.ly/3Eemiam ........................................................... 4

*Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury (June 2000), https://bit.ly/3JXi6OP ............................................ 19

*Ghost Gun Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt .................................. 5

*Ghost Gunner*, Ghost Guns (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj .......................................................... 18

Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (Nov. 14, 2021), https://nyti.ms/3EYiedv ..................................................... 27

*GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 ........................................... 27

Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa ................. 5

H. Rep. 116-88 (2019) ........................................................... 22

H. Rep. No. 90-1577 (1968) ................................................... 12

*How-To Manuals*, Polymer80 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt ....................................................... 27

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9 ..................................................... 26

*JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply (last visited Feb. 12, 2022), https://bit.ly/3rKrgqj ................ 18

v

Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022), https://bit.ly/3C757bc .................................................................. 5

Keegan Hamilton, *The Stockton Serial Killer Suspect Was Using an Untraceable Ghost Gun*, VICE (Oct. 20, 2022), https://bit.ly/3O7aOKp ................................................................ 4

Kevin Vaughan, *Club Q Suspect Carried 'Ghost Guns' With No Serial Numbers, Sources Say*, 9News (Nov. 22, 2022), https://bit.ly/3UnqhYi ................................................................. 4

Prelim. Inj. Mem., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-00525, ECF No. 9, (S.D.N.Y. June 29, 2022) ................... 28

S. Rep. No. 89-1866 (1966) .................................................................. 17

S. Rep. No. 90-1501 (1968) .................................................................. 12

SS Arms, *Lower Receiver* (last visited Dec. 14, 2021), https://bit.ly/3GAVvVo ...................................................................... 18

Tactical, *The Router Jig Pro Multiplatform – AR-15 / AR-9/AR-45/.308/AR-10* (last visited Nov. 19, 2021), https://bit.ly/3x72bqx ....................................................................... 27

*The History of Legally Buying Firearms Without an FFL*, 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU ................... 18

*Trafficking & Straw Purchasing*, Giffords Law Center (last visited Dec. 14, 2021) https://bit.ly/3FBTtnv ..................................... 19

*Untraceable: The Rising Specter of Ghost Guns,* Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj .............................. 26

*Webster's Third New International Dictionary* 1889 (1965).................. 30

Appellate Case: 22-2812    Page: 7    Date Filed: 12/19/2022 Entry ID: 5228384

## DISCLOSURE STATEMENT

Brady, Everytown for Gun Safety Action Fund ("Everytown"), and March For Our Lives ("MFOL") ("Gun Violence Prevention Groups") are nonprofit corporations with no parent corporations. No publicly held company owns 10% or more of the stock of Brady, Everytown, or MFOL.

## STATEMENT OF INTEREST[1]

The Gun Violence Prevention Groups submit this *amicus* brief in support of Defendants-Appellees and affirmance.

Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and advocacy. Brady has researched the prevalence of ghost guns, created resources to demonstrate the ease with which ghost guns can be obtained and assembled, and advocated on behalf of commonsense measures to stop the spread of ghost guns.

Everytown is the largest gun-violence-prevention organization in the nation. Everytown has advocated on behalf of measures to limit the

---

[1] *Amici* certify that no person or entity, other than *amici*, their members, or their counsel, contributed in any way to the preparation or submission of this brief.

1

proliferation of unserialized guns and studied the detrimental effects of these guns on safety and federal and state laws.

MFOL is a nationwide organization of young people committed to advocating on behalf of sensible gun-violence-prevention policies. MFOL has fought to curtail the rapid rise of ghost guns and has focused on the deadly effects of ghost guns on teenagers.

The Gun Violence Prevention Groups regularly submit *amicus* briefs regarding gun violence and regulation[2] and have litigated cases concerning ghost guns.[3] Indeed, the Gun Violence Prevention groups filed an *amicus* brief in the action below and *amicus* briefs in two parallel litigations in the Northern and Southern Districts of Texas.[4]

---

[2] *See, e.g.*, Brady Br., *New York State Rifle & Pistol Ass'n, et al. v. The City of New York, et al.*, No. 18-280 (S. Ct. May 14, 2019); Everytown Br., *Kim Rhode, et al. v. Xavier Becerra, et al.*, 20-55437 (9th Cir. June 19, 2020); MFOL Br., *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., et al.*, 21-CV-11269, ECF No. 125 (D. Mass Feb. 3, 2022).

[3] *Everytown for Gun Safety Action Fund, et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*, 1:20-CV-6885 (S.D.N.Y.) (filed Aug. 26, 2020); *Mayor and City Council of Baltimore v. Polymer80, Inc., et al.*, 24-C-22-002482 (Cir. Ct. Baltimore Cty.) (filed June 1, 2022).

[4] Gun Violence Prevention Groups Br., *Morehouse Enterprises, LLC, et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*, 22-CV-116, ECF No. 66 (D.N.D. Aug. 16, 2022); Gun Violence Prevention Groups

2

## INTRODUCTION

To advance public safety, the Gun Control Act of 1968 ("Act"), Pub. L. No. 90-618, 82 Stat. 1213, as amended, subjects "firearms" to several critical requirements: background checks to prevent sales to persons who have committed felonies, who are fugitives, and who are minors; licensing for manufacturers, importers, and dealers to ensure that firearms are built and sold responsibly; and serialization to allow law enforcement to trace firearms to their first retail sale. 18 U.S.C. §§ 921–931. Congress adopted these requirements to "prevent guns from falling into the wrong hands" and to "assist law enforcement … in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 172–80 (2014).

The recent and rapid proliferation of "ghost guns" has undermined the Act and Congress's law-and-order objectives. A ghost gun is a fully functional, unserialized, and untraceable weapon that can be assembled in an hour or less from components freely available online or at gun shows (including as part of ghost gun "kits") with no background check

---

Br., *Division 80 LLC v. Merrick Garland, et al.*, 22-CV-148, ECF No. 24-1 (S.D. Tex. July 8, 2022); Gun Violence Prevention Groups Br., *VanDerStok, et al. v. Merrick Garland, et al.*, 22-CV-691, ECF No. 59 (N.D. Tex. Sept. 8, 2022).

3

and no questions asked.  Ghost guns thwart the Act by allowing criminals and other prohibited individuals to acquire, use, and traffic weapons, all while remaining undetectable to law enforcement.

In recent years, recoveries of ghost guns in connection with crimes have increased at an alarming rate.  Law enforcement reported 19,344 recoveries of ghost guns in 2021, compared to 1,758 recoveries in 2016; 692 ghost guns were recovered in connection with either a homicide or an attempted homicide.[5]  The threat posed by ghost guns shows no signs of abating on its own.  In October, an individual was arrested on suspicion of murdering at least six individuals with a ghost gun—which the individual possessed despite a prior felony drug conviction.[6]  In September, a 21-year-old pleaded guilty to selling 16 ghost guns from his home.[7]  In August, one municipal police department reported that ghost

---

[5] *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24656 (Apr. 26, 2022).

[6] Keegan Hamilton, *The Stockton Serial Killer Suspect Was Using an Untraceable Ghost Gun*, VICE (Oct. 20, 2022), https://bit.ly/3O7aOKp.

[7] Dept. of Justice, *Sauk Rapids Man Pleads Guilty to Manufacturing, Selling Ghost Guns* (Sept. 29, 2022), https://bit.ly/3Eemiam.

Appellate Case: 22-2812     Page: 11     Date Filed: 12/19/2022 Entry ID: 5228384

gun recoveries had increased "nearly ninefold" over the prior year.[8]  In July, a 17-year-old shot herself in the face with a ghost gun built by her cousin—despite that the family was not allowed to have guns due to the victim's mother's felony conviction.[9]  In June, four individuals were charged with trafficking 31 ghost guns across state lines.[10]  And it has been reported that the perpetrator of the already-infamous mass shooting at Club Q in Colorado Springs just last month may have used one or more ghost guns.[11]

ATF acted well within its authority in promulgating *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) (the "Rule"), which confirms that the core building blocks of ghost guns—unserialized, partially complete frames (the core

---

[8] Ben Lambert, *New Haven Police See "Ghost Guns" On the Rise in City*, New Haven Register (Aug. 17, 2022), https://bit.ly/3THs9e5.

[9] Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa.

[10] Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022), https://bit.ly/3C757bc; *see also*, *e.g.*, *Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt.

[11] Kevin Vaughan, *Club Q Suspect Carried 'Ghost Guns' With No Serial Numbers, Sources Say*, 9News (Nov. 22, 2022), https://bit.ly/3UnqhYi.

Appellate Case: 22-2812     Page: 12     Date Filed: 12/19/2022 Entry ID: 5228384

component of pistols) and partially complete receivers (the core component of long guns) and the kits enabling quick and easy conversion of these frames and receivers into operable ghost guns—are "firearms" under the plain language of the Act. The Act defines "firearm" to include not only fully complete firearms, but also "frame[s]" or "receiver[s]" that are "designed to" be or that "may readily be converted" into operable weapons. 18 U.S.C. § 921(a)(3). That unambiguously encompasses ghost gun kits and most commercially available partially complete frames and receivers, which are designed to be and, in fact, readily can be converted into operable and unserialized weapons, or the frames and receivers of such weapons, in an hour or less. Indeed, their *only* purpose is to be quickly and easily converted into untraceable weapons.

The District Court correctly rejected Plaintiffs' challenge to the Rule. R. Doc. 85. "No one disputes the ATF's authority to develop rules to interpret and enforce the GCA" and a "plain reading of the [Act] confirms that Congress defined 'firearm' more broadly than simply a fully operational weapon." R. Doc. 85 at 9–10. Indeed, precedent from the "Eighth Circuit" *already* confirms that "a non-operational weapon"—such as a nearly complete frame, receiver, or gun-building kit—"that can be

6

made operational qualifies as a firearm" under the Act. *Id.* at 10. As the District Court aptly noted, Plaintiffs complain that "under the [Rule], it is possible that a 'frame or receiver' may be considered a firearm much sooner in the process" than a complete weapon, but Plaintiffs "point[] to no provision of federal law foreclosing this possibility." *Id.* at 11–12. The District Court's ruling is correct and *amici* submit this brief to underscore three of the many reasons why.

**First**, the Rule implements the Act's language and prevents the subversion of its law-and-order purpose. The Act provides that "firearms" may be sold commercially only *by* licensed dealers and *to* law-abiding and responsible persons who pass a background check. Ghost gun kits and partially complete frames and receivers are "designed to" be and "may readily be converted" into operable firearms or the frames and receivers of such firearms, and thus are, by definition, firearms. 18 U.S.C. § 921(a)(3). Were they not regulated as such, they could continue to be sold *by* anyone and *to* anyone—the opposite of what Congress intended. The Act also requires commercial firearms to possess a serial number and criminalizes obliterating that number—all in order to help law enforcement fight crime. Ghost gun kits and partially

complete frames and receivers lack serial numbers and, as such, are largely invisible to law enforcement.[12]

**Second**, the Rule properly recognizes practical reality in accounting for the ease and speed with which ghost gun kits and partially complete frames and receivers can be completed into deadly firearms. As ghost gun companies' advertising and marketing materials make unmistakably clear, ghost gun kits and partially complete frames and receivers are designed with the sole purpose of being converted into fully functioning firearms. True to that singular purpose, such kits and partially complete frames and receivers in fact *do* allow sophisticated and novice purchasers alike to convert these items into operable firearms swiftly and easily.

**Third**, the Rule continues ATF's longstanding view that partially complete frames and receivers can be "firearms." Shortly after the Act's passage, ATF recognized that partially complete frames or receivers that could readily be converted into operable firearms were indeed "firearms,"

---

[12] References to background checks and serialization are limited to firearms that are distributed commercially, as the Rule does not require background checks on private firearm sales or restrict persons not otherwise prohibited from possessing firearms from making unserialized firearms for personal use. 87 Fed. Reg. 24652, 24676.

Appellate Case: 22-2812     Page: 15     Date Filed: 12/19/2022 Entry ID: 5228384

judging by the ease and speed with which they could be rendered functional.  That the ghost gun industry has flouted ATF's oversight by *hiding* the ease and speed with which ghost guns can be assembled confirms that the industry knows what the Act has said all along: partially complete frames and receivers "designed" to be or that may "readily be" converted into the frames and receivers of firearms are "firearms."  Plaintiffs' contention that the Rule is "entirely novel" and reliant upon authority "discovered for the first time in 54 years," Pl. Br. 7,[13] is thus ahistorical and belied by the industry's own behavior.

The District Court's ruling should be affirmed.

## ARGUMENT

## I.  THE RULE IMPLEMENTS THE GUN CONTROL ACT AND PREVENTS ITS SUBVERSION

### A.  The Rule Implements the Act's Clear Definition of "Firearm"

The Gun Control Act defines "firearm" as follows:

(A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device.

---

[13] "Pl. Br." refers to Private Plaintiffs' opening brief.  "State Pl. Br." refers to State Plaintiffs' opening brief.

9

18 U.S.C. § 921(a)(3) (emphases added).

Taken together, (A) and (B) classify as "firearms" partially complete frames and receivers and ghost gun kits that are "designed to" be or may "readily be converted" into operable firearms. That is because "firearm" is defined as the "frame or receiver of any such weapon," with "such weapon" in (B) referring back to "weapon" in (A). And (A), in turn, encompasses "any weapon" that is "designed to or may readily be converted to expel a projectile by the action of an explosive." In other words, when (B) refers to "the frame or receiver of any such weapon," it incorporates the description of "weapon" in (A), which covers items presently configured to fire *and* items that are "designed to [be] or may readily be converted" into operable firearms. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 81 (2d Cir. 2003) ("any such action" "refers back to" the phrase providing a right to "*institute* an *action*") (citation omitted). Because (A) includes not-yet-operable and not-yet-finished weapons, it follows that the "frame or receiver of any *such weapon*" in (B) includes partially complete frames or receivers as well (so long as they are "designed to" be or may "readily be converted" into the frame or receiver of an operable firearm).

Tellingly, Private Plaintiffs mention the phrase "such weapon" just three times in passing in a 57-page brief and do not try to reconcile the phrase with their reading, Pl. Br. 11, 14, 22; State Plaintiffs, in a 43-page brief, mention the phrase just once, State Pl. Br. 18. Moreover, Plaintiffs quietly concede that at least *some* partially complete frames and receivers qualify as firearms. That is because Plaintiffs endorse the so-called "80% rule," Pl. Br. 13, 19, 20, which posits that a frame or receiver that is "80%" complete has not yet reached a stage of manufacture to be a "firearm." Even that approach—which is divorced from the text of the Act—assumes that a partially complete frame or receiver can at some point qualify as a firearm (*e.g.*, an "85% complete" frame).

In short, under a straightforward application of the Act's definition of "firearm," partially complete frames and receivers, and the ghost gun kits used to assemble such frames and receivers into operable weapons, are "firearms" whenever they are "designed to" be or may "readily be converted" into operable firearms or the frames or receivers for an operable firearm. The sole purpose for which these frames, receivers, and kits are made, marketed, and sold, is to be converted into firearms, and

11

the actual conversion can be done with ease. Failing to regulate these items as "firearms" would contravene the Act's plain language.

## B.    The Rule Advances the Act's Purpose

The Act's purpose demands the same interpretation. The Act has two principal ends and two principal means, all of which are directly served by the Rule's approach.

The ends:  (1) promoting public safety by keeping guns out of the hands of persons who have committed felonies, have been convicted of domestic abuse, and are otherwise dangerous, and (2) assisting law enforcement in fighting crime. S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them … and to assist law enforcement … in combating … crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime").  Because unregulated ghost gun kits and partially complete frames and receivers allow dangerous and prohibited individuals to obtain deadly and untraceable firearms, failing to regulate these items as "firearms" undermines the Act's ends.

12

The means:  (1) regulating who may buy or sell firearms; and (2) imposing strict rules on how firearms and firearm transactions are documented and tracked.  *Infra.*  The Rule's coverage of ghost gun kits and near-complete frames and receivers as "firearms" is faithful to the means enshrined in the Act's language, as it ensures that such objects are subjected to the Act's tight limits on purchase, sale, and distribution. Indeed, as detailed *infra*, failing to regulate these items as what they are—firearms—would undermine both the Act and other firearm safety regulations that cross-reference or otherwise rely upon the Act's definition of "firearm."

**Federal firearms licensees.**  The Act designates federal firearms licensees ("FFLs")—those who manufacture, sell, or import firearms—the "principal agent of [law] enforcement" in "restricting … access to firearms."  *Huddleston v. United States*, 415 U.S. 814, 824 (1974).  If ghost gun kits and partially complete frames and receivers were not treated as firearms (as the Act requires), the effect would be to continue to sideline FFLs with respect to the sale and acquisition of a rapidly growing source of crime firearms across the country.

Appellate Case: 22-2812    Page: 20    Date Filed: 12/19/2022 Entry ID: 5228384

Under the Act, FFLs—and only FFLs—may "engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see id*. § 923(a). In exchange for this right to engage in the firearms business, FFLs must serve as the Act's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out-of-state (with limited exceptions), or have a criminal history. 18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep extensive inventory and transaction records and must report suspicious purchasing patterns. 18 U.S.C. § 923(g)(1)(A) (requiring FFLs to keep "such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business"); 27 C.F.R. §§ 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple handguns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who can and often do access these records to monitor, investigate, and combat firearm-related crimes. *See infra*.

FFLs that fail to meet these or other duties may become ineligible for license renewal or have their license revoked, 18 U.S.C. §§ 923(d), 923(e), and become susceptible to civil and criminal liability, *id*. §§ 922, 924.

The Act and its implementing regulations thus enshrine FFLs as scrutinizing gatekeepers at the point of sale, subject to harsh penalties

Appellate Case: 22-2812    Page: 21    Date Filed: 12/19/2022 Entry ID: 5228384

for noncompliance.[14]  But FFLs' functions and enforcement mechanisms attach only to "firearms."  If ghost gun kits and partially complete frames and receivers are not treated as "firearms," FFLs would be removed from their post as the "principal agent of [law] enforcement" for this rapidly expanding source of deadly and untraceable guns used to commit crimes. *Huddleston*, 415 U.S. at 824.

***Background checks.***    Under the Act, every individual who purchases a firearm from an FFL must submit to a background check. 18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a).  Absent recognizing ghost gun kits and partially complete frames and receivers as firearms—as the Act requires and the Rule confirms—untraceable and fully operational firearms could be acquired by anyone, regardless of background: criminals, domestic abusers, minors, and persons with severe mental illness, to name a few.

---

[14] In monitoring the point of sale, the Act keeps firearms out of dangerous hands in the first place, rather than forcing law enforcement to restrict possession after the firearms have entered circulation.  The Rule furthers this prophylactic premise: public safety is better served by preventing a violent criminal from purchasing a gun than it is by recovering a gun after a crime has already occurred.

Appellate Case: 22-2812     Page: 22     Date Filed: 12/19/2022 Entry ID: 5228384

Allowing unfettered access to dangerous weapons is the very opposite of what Congress envisioned. In tightly regulating who may purchase a firearm under the Act, "Congress … sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). That approach is consistent with a "longstanding" historical tradition of "prohibitions on the possession of firearms" that further public order, such as limiting possession by "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (reaffirming that the Constitution protects "the right of an ordinary, *law-abiding* citizen") (emphasis added); *see* R. Doc. 85 at 17 (District Court concluding that the Rule comports with *Bruen* and *Heller*). The Act continues that tradition by "establish[ing] a detailed scheme to enable the dealer to verify … whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); for a buyer to "make any false or fictitious

oral or written statement" concerning their identity, *id.* § 922(a)(6); and for FFLs to make any "false" statement in records relating to a buyer's identity, *id.* §§ 922(m), 924(a)(3). The Rule implements Congress's calibration of who may possess a firearm and the scheme for preventing circumvention of those rules. Plaintiffs' position would breathe life into the exact dangers the Act was designed to address. Congress saw "the ease with which any person can anonymously acquire firearms" as "a matter of serious national concern," and responded accordingly. Senate Report at 22. For instance, to curtail anonymous purchases, Congress barred "the commercial mail-order traffic in firearms to unlicensed persons." *Id.* at 23. In fact, Congress *rejected* earlier proposed legislation because such legislation failed to "prohibit the mail-order sale" of firearms known for "their susceptibility to crimes." S. Rep. No. 89-1866, at 34, 100 (1966).

Absent regulation as firearms, ghost gun kits and partially complete frames and receivers are the modern incarnation of mail-order guns: they allow anonymous buyers (including criminals) to purchase a gun remotely and have that gun shipped across state lines to facilitate crime. In recent years, this has occurred regularly and with increasing

Appellate Case: 22-2812    Page: 24    Date Filed: 12/19/2022 Entry ID: 5228384

frequency across the country. And prior to the Rule, ghost gun kit manufacturers, for their part, advertised anonymity and the avoidance of background checks as reasons to purchase their wares.[15]

**_Straw purchases._** Failing to classify ghost gun kits and partially complete frames and receivers as firearms would dilute the Act's ban on "straw purchases," _i.e._, gun purchases made by someone who can pass a background check on behalf of someone else—often a prohibited buyer. Purchasers of ghost gun kits or partially complete frames and receivers would not even need to cloak their identities with straw purchases if these items were not recognized as firearms.

The Act aims to prevent the diversion of firearms to the black market through several means, including by prohibiting "straw

---

[15] _See, e.g._, _Are Felons Restricted from Owning a Firearm that Was Built from an 80% Receiver?_, Polymer80 Blog (Oct. 21, 2020), _formerly at_ https://bit.ly/3DDzXGo ("Convicted felons are not restricted from purchasing and owning 80% frames…"); _The History of Legally Buying Firearms Without an FFL,_ 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU (no background check or serial number required); _JSD 80% Lower Receivers, Jigs, and Gun Parts Kits_, JSD Supply (last visited Feb. 12, 2022), https://bit.ly/3rKrgqj (same); _Ghost Gunner_, Ghost Guns (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj (same); _Lower Receiver,_ SS-Arms (last visited Dec. 14, 2021), https://bit.ly/3GAVvVo (same); _About,_ R&B Tactical Tooling (last visited Nov. 19, 2021), https://bit.ly/3oNKmZU (same).

Appellate Case: 22-2812     Page: 25     Date Filed: 12/19/2022 Entry ID: 5228384

purchases." Straw purchases have long fueled illegal gun trafficking. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury at 10 ("Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers.") (June 2000), https://bit.ly/3JXi6OP; *Trafficking & Straw Purchasing*, Giffords Law Center (last visited Dec. 14, 2021) https://bit.ly/3FBTtnv (noting that there are "30,000 attempted straw purchases each year").

Through several interlocking requirements, the Act forbids straw purchases. Gun buyers must fill out "Form 4473," attesting to their identity as the "actual transferee/buyer," ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl, and it is a crime to misrepresent—on Form 4473 or elsewhere—"any fact material to the lawfulness of the sale," 18 U.S.C. § 922(a)(6); *see Abramski*, 573 U.S. at 171. Further, an FFL that looks the other way and fails to stop straw purchases at the point of sale can lose its license and face civil and criminal liability. *See*, *e.g.*, *Shawano Gun & Loan, LLC v. Hughes,* 650 F.3d 1070, 1077–79 (7th Cir. 2011); *United States v. Carney*, 387 F.3d 436, 446 (6th Cir. 2004).

Appellate Case: 22-2812   Page: 26   Date Filed: 12/19/2022 Entry ID: 5228384

As the Supreme Court has recognized, protections against straw purchases are essential because, "[p]utting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw." *Abramski*, 573 U.S. at 183. Yet if ghost gun kits and partially complete frames and receivers were wrongly deemed not to be firearms under the Act, then none of the tools that ATF employs to combat straw purchases would be available for this segment of the market, leaving criminal buyers with few roadblocks to obtaining firearms: criminal purchasers could—and surely would—simply procure an unserialized gun directly and with little hassle from any one of many ghost gun purveyors.

**Serialization, record-keeping, and public safety.** Ghost guns contravene the Act's serialization and record-keeping provisions, making it more difficult for law enforcement to fight crime. *See*, *e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) ("[W]e think it plain that [serialization] serves a law enforcement interest."); *United States v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013) (same). By their very nature, ghost guns—easily assembled from the partially complete frames and receivers that Plaintiffs would carve out of the Act—are fully operational,

20

unmarked, and *untraceable* firearms, which impede law enforcement's ability to prevent, detect, and prosecute violent crime by tracing illegal weapons to their source.

The Act mandates that every firearm possess a unique serial number and makes it a crime to tamper with a serial number or even "receive" a firearm with an already-tampered-with serial number. 27 C.F.R. § 478.92; 18 U.S.C. §§ 923(i), 922(k). Serialization allows ATF "to link a suspect to a firearm." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013). Possessing a firearm with an altered serial number triggers a sentencing enhancement—even if law enforcement can reconstruct the number. U.S.S.G. § 2K2.1(b)(4)(B); *see United States v. St. Hilaire*, 960 F.3d 61, 64 (2d Cir. 2020); *United States v. Fuller-Ragland*, 931 F.3d 456, 467 (6th Cir. 2019).

The Act also assists law enforcement by subjecting FFLs to record-keeping duties to track firearm sales and inventory. 18 U.S.C. § 922(g)(1)(A); 27 C.F.R. §§ 478.121–134. Law enforcement may "examine the inventory and records of [FFLs] … without … reasonable cause or warrant," associated with any "reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R.

21

§ 478.121(b). "FFL records" allow ATF to "trace a firearm" and identify its "path through the distribution chain." *Nat'l Shooting Sports*, 716 F.3d at 204 (cleaned up).

Without serialization and record-keeping, these law enforcement mechanisms break down. As the District Court here observed, "wholly untraceable weapons present serious challenges for law enforcement and the community." R. Doc. 85 at 21. It is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes" and reconstructing a chain of custody without "serial numbers" is "virtually impossible." *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992). The inherent difficulty of tracing an unserialized firearm is one reason why "[f]irearms without serial numbers are of particular value to those engaged in illicit activity." *Marzzarella*, 614 F.3d at 98. Plaintiffs downplay the connection between "criminals," "terrorists," and "ghost guns," Pl. Br. 6, but common sense tells a different story. As a House Committee report warned, "[g]host guns" pose a "homeland security challenge" because they "hamstring[] law enforcement's ability to investigate crimes," as such crimes are "committed with untraceable weapons." H. Rep. No. 116-88, at 2 (2019). That makes sense: would-be

22

criminals will naturally prefer untraceable ghost guns to traceable firearm options.

* * *

In sum, the District Court rightly held that the Rule implements the Act's text, furthers its purpose, and prevents its subversion.

## II. THE RULE PROPERLY CONSIDERS THE PRACTICAL REALITY THAT GHOST GUNS CAN BE QUICKLY AND EASILY ASSEMBLED BY NONEXPERTS

The Act defines "firearm" in practical terms, covering not only fully complete weapons, but also partially complete frames and receivers that are designed to be or may readily be converted into operable firearms or the frames or receivers of such firearms—thus regulating items that are not quite finished but almost certainly *will* become operable firearms. 18 U.S.C. § 921(a)(3). The Rule implements this statutory definition and Congress's pragmatic approach, recognizing that ghost guns can be assembled from ghost gun kits and partially complete frames and receivers easily and without any technical expertise, in an hour or less.

Courts have widely agreed that, under the Act, a "weapon designed to fire a projectile" that is "temporarily incapable of effecting its purpose," is not "removed from" the definition of a "firearm." *United States v.*

Appellate Case: 22-2812     Page: 30     Date Filed: 12/19/2022 Entry ID: 5228384

*Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *see*, *e.g.*, *United States v. Hardin*, 889 F.3d 945, 949 (8th Cir. 2018) (rejecting argument that the "disrepair" of a gun, which rendered it inoperable, changed that the gun was "manufactured to be … a gun") (quotation marks omitted); *United States v. Cooper*, 714 F.3d 873, 881 (5th Cir. 2013) ("[W]e have consistently held that inoperable firearms can support convictions [under section 921(a)(3).]"). Likewise, as this Court has repeatedly recognized, an object that must be "modified" to function as a firearm, is no less a firearm in the eyes of the law. *See United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (gun that could be "modified," "without any specialized knowledge, in less than an hour," is "'readily convertible'"); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (finding a gun that was not "operational" until "putting the bolt in" was a "firearm"); *United States v. Christmann*, 193 F.3d 1023, 1024 (8th Cir. 1999) (interpreting what it means to "readily" be convertible into a "firearm" under the Sentencing Guidelines and explaining that it "turns on what the weapon is designed to do, not on whether it is capable of doing its job at the particular moment the crime was committed"); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (gun that required "8-hour working day in a

24

properly equipped machine shop" was "readily" convertible into an operational gun). And this past summer, the D.C. Superior Court held that partially complete frames, receivers, and kits sold by a ghost gun manufacturer—"regardless of their operability"—are "firearms" as they are "readily converted into firearms."[16]

Plaintiffs colorfully assert that the Rule's recognition that items that may "readily" be converted into firearms are in fact firearms "spins an impenetrable web, with layer upon layer of gobbledygook." Pl. Br. 19. Even ignoring that it is the Act and Congress itself—and not the Rule—that introduced the word "readily," the examples in the preceding paragraph illustrate that this Court and others have had no difficulty applying the Act to items that are "readily" convertible into firearms, just as Congress intended.

Not only is the statutory language dispositive, but a mountain of real-world evidence confirms that ghost gun kits and partially complete frames and receivers **are** designed to be and may readily be converted

---

[16] *District of Columbia v. Polymer80, Inc.*, No. 2020-CA-002878-B, at 5–6 (D.C. Sup. Ct. Aug. 10, 2022) ("On Polymer80's website, they provide instructions to consumers on how to build firearms with these unfinished frames, receivers, and … kits."), https://bit.ly/3A1f4EN.

Appellate Case: 22-2812     Page: 32     Date Filed: 12/19/2022 Entry ID: 5228384

into operable firearms, and thus are "firearms" under the Act. Manufacturers and distributors have advertised that these kits, frames, and receivers are designed for the sole purpose of being assembled into functional guns. And—consistent with that purpose—these items can, in fact, be easily assembled into functional weapons by the most novice of gun-builders, even a child.

Specifically, through a single website, prior to the Rule one could buy a complete, all-in-one kit that "package[s] the unfinished frame or receiver with all the other parts needed to complete the firearm." *Untraceable: The Rising Specter of Ghost Guns,* Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj. Once the kit is delivered, assembly is simple. The head of ATF's Los Angeles field office observed:

> If you can go to one of these big-box stores and put that type of furniture together, if you're putting together your kids Christmas toys, you can make a homemade gun. It's that easy.

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9. Below, Plaintiffs accused the Rule of supposing that all-in-one kits are "magically" assembled into ghost guns, R. Doc. 14-1 at 19—but there is nothing magical about a

process akin to putting together children's toys. On appeal, even Plaintiffs let slip that they are concerned not about the Rule's effect on innocent non-firearm tools and parts, but about its effect on a "budding … *firearms* market." Pl. Br. 6 (emphasis added).

Ghost gun kits are not only designed to be converted into firearms: they are designed to be converted *quickly*. Prior to the Rule, kit manufacturers and distributors touted this speed in marketing materials. *See, e.g.*, *GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 ("Our goal was for you to be able to go from opening the mail, to a competition or defense ready pistol in under 15 minutes."). Manufacturers and distributors also published how-to guides to walk novices through the fast-and-easy assembly. *See, e.g.*, *How-To Manuals,* Polymer80 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt.

Amateurs and experts alike have assembled kits in around an hour or less. *See* Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (Nov. 14, 2021), https://nyti.ms/3EYiedv ("[An] amateur can … turn [a kit] into a working firearm in *less than an hour*." (emphasis added)); Compl. at ¶¶ 74, 115,

Appellate Case: 22-2812     Page: 34     Date Filed: 12/19/2022 Entry ID: 5228384

*People v. Blackhawk Mfg. Grp., et al.*, CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) (officer assembled kit in "***less than 25 minutes***" with tools from a hardware store (emphasis added)); *id*. at ¶ 73 (ATF agent finished kit "in ***less than nineteen minutes***" (emphasis added)); Prelim. Inj. Mem., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-5525, ECF No. 9, at 11 (S.D.N.Y. June 29, 2022) (ghost gun assembled "in ***approximately an hour and a half***") (emphasis added). In earlier ghost gun litigation, one individual who had "never attempted to build a firearm using an unfinished frame or receiver," watched "videos on *YouTube* for thirty minutes," then built "a complete pistol from [a] handgun kit in ***86 minutes***." Decl. of J. McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 1:20-CV-6885 ("*City of Syracuse*"), ECF 64-34, at ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020) (emphasis added).

The reality correctly recognized by the Rule is that anyone with an internet connection, an hour or less of free time, and basic household tools can convert ghost gun kits and partially complete frames and receivers into operable and untraceable firearms.

## III. THE RULE COMPORTS WITH ATF'S LONGSTANDING VIEW THAT PARTIALLY COMPLETE FRAMES AND RECEIVERS CAN BE FIREARMS

Plaintiffs mistakenly contend that the Rule upends ATF's historical practice. Pl. Br. 6–7, 12–13, 17–19. To the contrary, for years after the Act's passage, ATF understood that Congress defined "firearm" to include some partially complete frames and receivers, and that the operative question is how quickly and easily—*i.e.*, how "readily"—a partially complete frame or receiver can "be converted" into an operable weapon. 18 U.S.C. § 921(a)(3). That some purveyors of ghost gun kits and parts have tried to affirmatively *hide* from ATF the ease with which their wares can be assembled only reinforces that a partially complete frame or receiver that can quickly and easily be converted into a firearm is indeed a "firearm" under the Act.

The Act was enacted in 1968. In 1976, ATF's Assistant Chief Counsel issued an opinion with a framework for assessing whether an "unfinished" frame or receiver is a "firearm." Admin. Record, *City of Syracuse*, ECF 60 (S.D.N.Y. Dec. 8, 2020), at ATF0265. The opinion explained that if "unfinished frames" or "castings" *"may readily be converted"* into firearms, "they are firearms." *Id.* at ATF0266 (emphasis

added). The opinion concluded that partially complete frames and receivers must be reviewed "case-by-case" to gauge if they are "readily convertible" into firearms:

> [W]e view the current Bureau procedure in classifying "firearms" on a case-by-case basis as consistent with the letter and spirit of the [] Act. It is obvious that what constitutes "readily convertible" depends upon the nature of each firearm. That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for … "readily convertible."

*Id.* at ATF0267.

For decades, ATF followed that conclusion in classification letters that turned on whether a partially complete frame or receiver could "readily be converted" into an operable firearm. *Id.* at ATF0001, ATF0014, AATF0020, ATF0023, ATF0050, AATF0051, AATF0053, ATF0065. Consistent with "readily" meaning "without much difficulty" or "with fairly quick efficiency,"[17] several of these letters referenced the ease and speed with which partially complete frames and receivers could be assembled into operable firearms. *Id.* at ATF0020 (receiver was a

---

[17] *Webster's Third New International Dictionary* 1889 (1965) (defining "readily").

"firearm" because it required "75 minutes" of assembly); *id.* at ATF0024 (frame was a "firearm" because it required "20 minutes" of assembly).

Notwithstanding this history, Plaintiffs complain that the Rule's focus on ease and speed of assembly marks a tectonic shift. Pl. Br. 17. That complaint is belied by the industry's behavior. The ghost gun industry has seemingly tried to hide from ATF the extent to which ghost gun kits and parts can "readily" be converted into firearms—a clear sign that, even before the Rule, the industry knew that the Act reaches these items. In an affidavit to support a warrant to search a facility operated by Polymer80 (the nation's largest public seller of ghost gun kits and parts), an ATF agent stated that, in 2017, Polymer80 sought an ATF determination that a partially complete pistol frame is not a firearm by misleadingly submitting just the partially complete frame without the rest of the kit sold with the frame, which included other parts and tools to complete the frame of a ghost gun. Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80*, 3:20-mj-123, ¶¶ 42–43 (D. Nev. Dec, 9, 2020) (https://on.wsj.com/3pivOCi). ATF responded to Polymer80 in a letter noting that, "the submitted sample is simply a component of a larger

31

product," and directing Polymer80 to "submit the complete … [k]it." *Id.* at ¶¶ 43–44.  As of December 2020, Polymer80 had not "resubmitted the … kit." *Id.* at ¶ 45.  ATF eventually obtained a kit through an informant who bought the "Buy Build Shoot" kit—advertised as having "all the necessary components" for a gun—with no background check, and assembled it into an operable gun in 21 minutes.  *Id.* at ¶ 69.

In short, ATF has long recognized that partially complete frames and receivers that can quickly and easily be assembled into operable firearms are "firearms."  That the ghost gun industry appears to have hidden the nature of its products from ATF only confirms that the industry knows it has been operating on borrowed time.

Appellate Case: 22-2812    Page: 39    Date Filed: 12/19/2022 Entry ID: 5228384

## <u>CONCLUSION</u>

This Court should affirm the District Court's ruling.

December 5, 2022

Respectfully Submitted,

By: */s/ Kathleen R. Hartnett*

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 776-2042
dgrooms@cooley.com

ADAM M. KATZ
RACHEL ALPERT
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

*Counsel for Amici Curiae*

Appellate Case: 22-2812    Page: 40    Date Filed: 12/19/2022 Entry ID: 5228384

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 6,483 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of the Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. This brief complies with Eighth Circuit Rule 28A(h)(2) because it has been scanned for viruses and is virus-free.

December 5, 2022

Respectfully Submitted,
By: */s/ Kathleen R. Hartnett*

34

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished through this Court's CM/ECF system.

December 5, 2022

Respectfully Submitted,
By: */s/ Kathleen R. Hartnett*

Appellate Case: 22-2812    Page: 42    Date Filed: 12/19/2022 Entry ID: 5228384