# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

MOREHOUSE ENTERPRISES, LLC d/b/a BRIDGE CITY ORDNANCE, *et al.*,
*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of North Dakota

---

## BRIEF FOR APPELLEES

---

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JENNIFER KLEMETSTRUD PUHL
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**<u>Page</u>**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ........................................................................2

STATEMENT OF THE ISSUE................................................................................3

STATEMENT OF THE CASE .................................................................................4

      A.     Legal Background .........................................................................4

      B.     Procedural Background..................................................................9

SUMMARY OF ARGUMENT............................................................................. 10

STANDARD OF REVIEW ................................................................................. 18

ARGUMENT ...................................................................................................... 18

I.     Plaintiffs Are Unlikely to Succeed on the Merits.................................... 18

      A.     The Rule Is Not Contrary to the Gun Control Act ...................19

            1.     A Nonfunctional Frame or Receiver May Constitute a "Frame" or "Receiver" Under the Gun Control Act....................19

            2.     Weapon Parts Kits May Constitute Firearms Under the Gun Control Act ................................................................22

            3.     The Rule's Requirement that Licensed Dealers Mark Unserialized Firearms Comports with the Gun Control Act........26

            4.     The Rule's Definition of a Complete Muffler or Silencer Device Is Not Contrary to Law ...............................................28

            5.     The Rule's Requirement that Mufflers and Silencers Be Marked on Their Frame or Receiver Does Not Conflict with the Gun Control Act.........................................................30

      B.     The Rule Is Not Arbitrary and Capricious ................................32

1. The Rule's Discussion of the Second Amendment Is Not Arbitrary and Capricious ..................................................... 32

2. The Rule Properly Explains Any Changes in ATF's Interpretation of the Relevant Statutory Provisions ..................... 36

C. Plaintiffs' Additional Arguments Are Unpersuasive ................................. 38

1. The Rule's Definitions of "Frame" and "Receiver" Are a Logical Outgrowth of the NPRM ..................................... 38

2. The Rule Does Not Create a National Gun Registry .................... 44

3. Plaintiffs' Attack on the Provisions Relating to ATF's Classification Process Fails ................................................. 46

II. Plaintiffs Are Not Entitled to the Extraordinary Remedy of a Preliminary Injunction .............................................................. 48

A. The Rule Does Not Irreparably Harm Plaintiffs ......................... 48

B. The Balance of the Equities and the Public Interest Strongly Favor Denying Injunctive Relief .................................... 55

C. Any Injunction Must Be Narrowly Tailored ............................. 57

CONCLUSION ........................................................................ 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

Appellate Case: 22-2812    Page: 3    Date Filed: 11/29/2022 Entry ID: 5221982

# TABLE OF AUTHORITES

**Cases:** **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ........................................................... 57

*American Coke & Coal Chems., Inc. v. EPA,*
    452 F.3d 930 (D.C. Cir. 2006) ........................................................... 42

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................... 58

*California v. Texas,*
    141 S. Ct. 2104 (2021) ....................................................................... 54

*Citizens Telecomms. Co. of Minn. v. FCC,*
    901 F.3d 991 (8th Cir. 2018) ................................... 3, 15, 40, 41, 42

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ........................................................... 42

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................... 54

*DHS v. New York,*
    140 S. Ct. 599 (2020) ................................................................... 59, 60

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ....................................................................... 34

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................................... 33, 35

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ........................................................... 3, 13, 32

*Florida v. Mellon,*
    273 U.S. 12 (1927) ............................................................................. 54

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005) ......................................................... 16, 49

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ....................................................................... 58

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................. 58

*Heuton v. Ford Motor Co.*,
    930 F.3d 1015 (8th Cir. 2019) ................................... 22, 25, 28, 51

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ..................................................... 50

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ................................................................. 40

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 54

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................. 34

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................. 32, 33, 34, 35

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 18

*Northport Health Servs. v. U.S. Dep't of Health & Human Servs.*,
    14 F.4th 856 (8th Cir. 2021) .....................................................38

*Northwest Airlines, Inc. v. Goldschmidt*,
    645 F.2d 1309 (8th Cir. 1981) ................................................... 40

*Novus Franchising, Inc. v. Dawson*,
    725 F.3d 885 (8th Cir. 2013) ..................................................... 50

*Padda v. Becerra*,
    37 F.4th 1376 (8th Cir. 2022) .................................................... 18

*Panhandle Co-op. Ass'n v. EPA*,
    771 F.2d 1149 (8th Cir. 1985) ................................................... 33

*PBGC v. LTV Corp.*,
    496 U.S. 633 (1990) ................................................................. 27

*Salt Lake Tribune Publ'g Co. v. AT&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ................................................. 52

Appellate Case: 22-2812    Page: 5    Date Filed: 11/29/2022 Entry ID: 5221982

*Shinseki v. Sanders,*
556 U.S. 396 (2009) ........................................................................ 33

*SIH Partners LLLP v. Commissioner,*
923 F.3d 296 (3d Cir. 2019) .......................................................... 36

*Simon v. Eastern Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) .......................................................................... 53

*St. Louis Effort for AIDS v. Huff,*
782 F.3d 1016 (8th Cir. 2015) ................................................. 17, 57

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
989 F.3d 368 (5th Cir. 2021) ........................................................ 58

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) ................................................................... 58

*United States v. Annis,*
446 F.3d 852 (8th Cir. 2006) ............................................. 3, 12, 23

*United States v. Roberts,*
881 F.3d 1049 (8th Cir. 2018) ...................................................... 36

*United States v. Stewart,*
451 F.3d 1071 (9th Cir. 2006) ...................................................... 23

*United States v. Wick,*
697 F. App'x 507 (9th Cir. 2017) ................................................. 23

*U.S. Steel Corp. v. EPA,*
649 F.2d 572 (8th Cir. 1981) ........................................................ 57

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982) ....................................................................... 21

*Warth v. Seldin,*
422 U.S. 490 (1975) ....................................................................... 54

*Winter v. NRDC,*
555 U.S. 7 (2008) ........................................................ 3, 18, 56, 57


**U.S. Constitution:**

Amend. II .............................................................................................. 35

**Statutes:**

Administrative Procedure Act (APA):

5 U.S.C. § 706 ............................................................................................ 33

5 U.S.C. § 706(2) ........................................................................................ 42

Gun Control Act of 1968, *codified as amended*,

18 U.S.C. § 921 *et seq.* ......................................................................... 4

18 U.S.C. § 921(a) .............................................................................. 3

18 U.S.C. § 921(a)(3) ....................................................................... 1, 4

18 U.S.C. § 921(a)(3)(A) ..................................................... 6, 19, 23, 24

18 U.S.C. § 921(a)(3)(B) ............................................................... 24

18 U.S.C. § 921(a)(25) ............................................................... 4, 29

18 U.S.C. § 922(k) ....................................................................... 28

18 U.S.C. § 922(t) ......................................................................... 4

18 U.S.C. §§ 922-923 ................................................................... 4

18 U.S.C. § 923 ............................................................................ 3

18 U.S.C. § 923(a) ........................................................................ 4

18 U.S.C. § 923(g)(1) .............................................................. 12, 26

18 U.S.C. § 923(g)(1)(A) ..................................................... 4, 44-45

18 U.S.C. § 923(g)(4) ................................................................. 45

18 U.S.C. § 923(i) ........................................................... 4, 13, 30, 31

18 U.S.C. § 926(a) ..................................... 3, 12, 15, 26, 31, 44

Pub. L. No. 99-308, 100 Stat. 449 (1986) .......................................... 45

18 U.S.C. § 1001(a) ..................................................................... 47

26 U.S.C. § 5842(a) ..................................................................... 31

26 U.S.C. § 5845(b) ..................................................................... 19

28 U.S.C. § 1292(a)(1) ................................................................... 2

28 U.S.C. § 1331 ......................................................................... 2

**Regulations:**

27 C.F.R. § 478.42(c)(2) ............................................................... 49

27 C.F.R. 478.125 (2021) ............................................................. 26

iv

Appellate Case: 22-2812    Page: 7    Date Filed: 11/29/2022 Entry ID: 5221982

**Rule:**

Fed. R. Civ. P. 23 ................................................................................ 59

**Legislative Material:**

H.R. 377, 114th Cong. (2015) ............................................................. 27

**Other Authorities:**

33 Fed. Reg. 18,555 (Dec. 14, 1968) .................................................. 4

86 Fed. Reg. 27,720 (May 21, 2021) ........................................... 14, 39

87 Fed. Reg. 24,652 (Apr. 26, 2022) .. 1, 5, 6, 7, 8, 14, 17, 21, 24, 25, 26, 28, 30, 34, 35, 36, 37, 38, 39, 40, 43, 46, 47, 51, 55, 56, 57

ATF Ruling 2022-01, *Electronic Storage of Forms 4473* (Aug. 17, 2022),
    https://www.atf.gov/file/170116/download ....................................... 45-46

*Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers*
    (Sept. 27, 2022), www.atf.gov/firearms/docs/open-letter/all-ffls-september-
    2022-impact-final-rule-2021-05f-partially-complete-ar/download ............................ 22

Appellate Case: 22-2812    Page: 8    Date Filed: 11/29/2022 Entry ID: 5221982

# INTRODUCTION

Federal licensing, background check, and recordkeeping requirements ensure that law enforcement may trace firearms used in crimes and that firearms are not sold to those, such as felons, who cannot lawfully possess them. In delimiting these requirements, Congress defined "firearm" to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and the "frame or receiver" (that is, the major structural component) of any such weapon. 18 U.S.C. § 921(a)(3). These expansive definitions reflect Congress's understanding that limiting the statute to operational weapons would allow persons to circumvent the statute by selling or purchasing a nearly complete firearm without obtaining a license, marking the weapon with a traceable serial number, keeping records, or running a background check.

Responding to technological advances that have led to an increasing variety of frames and receivers and the proliferation of kits and parts that permit individuals to easily assemble firearms, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) promulgated the rule at issue in this case. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022). At a high level, the Rule updates the definition of "frame or receiver" to reflect modern firearms and clarifies that kits or aggregations of parts that enable a purchaser to readily assemble an operational weapon, or a functional frame or receiver, fall within the statutory definition of "firearm." The Rule also includes additional

provisions similarly directed at effectively implementing the statutory serialization and other requirements, including a directive regarding which part of a firearm silencer or muffler must be marked with a serial number, a provision extending the time that licensees are required to maintain transaction records, and a requirement that licensees mark unserialized firearms that they take into inventory.

Although the Rule does not prohibit the purchase, sale, or possession of any firearm, plaintiffs nonetheless asked the district court to grant them a preliminary injunction of the Rule, claiming that the Rule inflicted irreparable harm. The district court properly denied plaintiffs' request. The Rule represents reasoned decisionmaking reflecting the best interpretation of statutory terms. And it fulfills ATF's duty to ensure the continued effectiveness of longstanding federal background check, recordkeeping, serialization, and licensure requirements, which serve critical law-enforcement and public-safety interests. As in district court, plaintiffs fail in this Court to identify any error in the Rule or any basis upon which a court could exercise its equitable discretion to enjoin the Rule.

## STATEMENT OF JURISDICTION

The district court denied plaintiffs' preliminary injunction motion on August 23, 2022. *See* App. 1; R. Doc. 85, at 1. The private and State plaintiffs filed timely notices of appeal from that denial on August 25 and August 26, 2022, respectively. *See* App. 760-61. The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

2

# STATEMENT OF THE ISSUE

Plaintiffs challenge an ATF rule that ensures the continued proper implementation of provisions of the Gun Control Act requiring that firearms be sold by licensed dealers and that those dealers conduct background checks on purchasers and maintain records of transactions. The district court denied a motion for a preliminary injunction, concluding that plaintiffs were unlikely to succeed on any of their challenges under the Administrative Procedure Act (APA), that they had failed to demonstrate irreparable harm, and that the balance of the equities and the public interest weighed against relief.

The question presented is whether the district court abused its discretion in denying plaintiffs' motion for a preliminary injunction.

- *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021)

- *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)

- *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991 (8th Cir. 2018)

- *United States v. Annis*, 446 F.3d 852 (8th Cir. 2006)

- 18 U.S.C. § 921(a)

- 18 U.S.C. § 923

- 18 U.S.C. § 926(a)

3

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** Through the Gun Control Act of 1968, *codified as amended*, 18 U.S.C. § 921 *et seq.*, Congress has enacted requirements for persons who import, manufacture, or deal in "firearms," *id.* §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain records of firearm acquisition and disposition, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). In addition, Congress has required importers and manufacturers to identify each firearm they import or manufacture with a serial number on the receiver or frame. *Id.* § 923(i).

The statutory scheme hinges on the definition of "firearm." Congress defined that term to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive" as well as "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Congress also defined "firearm" to include "any firearm muffler or firearm silencer." *Id.* § 921(a)(3), (25).

Because Congress did not define the terms "frame" or "receiver," in 1968, ATF defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation provided direction as to which portion of a weapon constituted the frame or receiver for licensing, serialization, and recordkeeping purposes and ensured that a

4

component necessary for the weapon's functioning could be traced if the weapon were used in a crime. *See* App. 641; 87 Fed. Reg. at 24,652.

**2.** In the last half-century, advances in weapon design have rendered ATF's regulatory definition obsolete. Today, most weapons have a split or multi-piece receiver, or they incorporate a striker rather than a hammer to fire the weapon. *See* App. 641; 87 Fed. Reg. at 24,652. As a result, as many as 90% of firearms do not have a single component that houses a hammer, a bolt or breechblock, and a firing mechanism; under a strict application of the 1968 regulation, those firearms would have no frame or receiver. *Id.*

In addition, technological advances have made it easier to create and sell firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers. Although these items meet the statutory definition of "firearm," some entities have been selling them to unlicensed buyers without complying with the Gun Control Act. App. 641; 87 Fed. Reg. at 24,652. Such sales permit unlicensed persons who have not completed a background check to assemble firearms easily. And because these privately made firearms usually lack serial numbers, they are nearly impossible for law enforcement to trace when they are used in crimes. App. 641, 648; 87 Fed. Reg. at 24,652, 24,659.

**3.** Against that backdrop, ATF promulgated the Rule. As relevant here, the Rule includes provisions generally aimed at ensuring that ATF's regulatory definitions

5

and requirements related to serializing, recordkeeping, and licensing reflect the modern realities of firearm design.

First, the Rule amends the definitions of "frame" and "receiver." The Rule defines the "frame" of a handgun as the housing or structure for the component designed to hold back the hammer, striker, bolt, or similar primary energized component before initiating the firing sequence. The Rule defines the "receiver" of long guns (*e.g.*, rifles) and other projectile weapons as the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *See* App. 716, 724; 87 Fed. Reg. at 24,727, 24,735. These updated definitions are intended to identify one serialized component for each weapon as the "frame" or "receiver." In addition, the Rule clarifies that frames and receivers that are partially complete, disassembled, or nonfunctional (such as a frame or receiver parts kit) constitute frames or receivers subject to regulation if they are designed to, or may readily be converted to, function as a frame or receiver. App. 652, 716-17, 728; 87 Fed. Reg. at 24,663, 24,727-28, 24,739.

Second, the Rule amends the regulatory definition of "firearm." As explained, the statutory definition includes inoperable weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Weapon parts kits—which may contain all components necessary to easily assemble a functional weapon and even the templates and tools to allow that assembly—have increasingly been sold not in compliance with the Gun Control Act's

6

licensing, recordkeeping, and background check requirements. App. 651; 87 Fed. Reg. at 24,662. The Rule amends the regulatory definition of "firearm" to clarify that the term includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." App. 651, 716, 724; 87 Fed. Reg. at 24,662, 24,727, 24,735.

Third, the Rule clarifies regulations related to silencers and mufflers. The Rule defines a new term, a "[c]omplete muffler or silencer device," as a "firearm muffler or firearm silencer that contains all component parts necessary to function, whether or not assembled or operable." App. 723; 87 Fed. Reg. at 24,734. The Rule then employs that term to explain when certain obligations attach, providing for example that a frame or receiver part or subpart that is not sold as part of a complete muffler or silencer device must be individually serialized and that a manufacturer must serialize a complete muffler or silencer device by the next business day after the manufacturing process has ended. *See* App. 736-37; 87 Fed. Reg. at 24,747-48. And the Rule identifies a particular part of a muffler or silencer—generally the part "that provides housing or a structure for the primary internal component designed to reduce the sound of a projectile"—as the muffler's or silencer's "frame or receiver" for licensing, background check, and marking requirements. App. 728; 87 Fed. Reg. at 24,739.

Fourth, the Rule makes clear that the statutory definition of "firearm" includes a "[p]rivately made firearm"—that is, one made by a person other than a licensed manufacturer that does not contain a serial number placed by a licensed manufacturer

7

at the time of production. App. 724; 87 Fed. Reg. at 24,735. Consistent with the Gun Control Act's focus on importers, manufacturers, and dealers, the Rule does not affect the private making of firearms by individuals for personal use; however, the Rule requires that licensed dealers imprint a serial number on such firearms if they are taken into inventory. App. 642, 731, 733; 87 Fed. Reg. at 24,653, 24,742, 24,744.

Fifth, the Rule clarifies the process by which individuals may submit requests to ATF to classify a product as a "firearm" (or not) under the statute. As the Rule explains, ATF has long acted on "voluntary requests from persons, particularly manufacturers who are developing new products, by issuing determinations or 'classifications' on whether an item is a 'firearm.'" App. 655; 87 Fed. Reg. at 24,666. The Rule makes that process explicit and provides requirements for those voluntary requests, including that the request be in writing and submitted under penalty of perjury and that the request "include all accessories and attachments relevant" to the classification. App. 655, 732; 87 Fed. Reg. at 24,666, 24,743.

Sixth, the Rule extends the time for which licensees are required to maintain records of firearm production, acquisition, and disposition. Previously, licensees were required to maintain those records for 20 years; under the Rule, licensees must maintain them for the duration of the licensee's business or licensed activity. *See* J.A. 679, 735-36; 87 Fed. Reg. at 24,690, 24,746-47.

Appellate Case: 22-2812    Page: 16    Date Filed: 11/29/2022 Entry ID: 5221982

## B. Procedural Background

Plaintiffs—one firearms owner, one federally licensed firearms dealer, two firearms-related organizations, and 17 States—challenged the Rule in district court and sought a preliminary injunction. The district court denied relief. First, the court held that plaintiffs were unlikely to succeed on the merits. App. 7-24; R. Doc. 85, at 7-24. In so holding, the court examined the "multitude of arguments," App. 17; R. Doc. 85, at 17, advanced by plaintiffs claiming discrete parts of the Rule failed to accord with the APA's notice-and-comment requirements, were contrary to law, or were inadequately explained. The court rejected each of those arguments, concluding that various arguments "contradict[ed] the plain language of the" Gun Control Act, found no support "in the text of the" Rule, relied on "an inaccurate and imprecise view and description" of the Rule, and "strain[ed] credibility." J.A. 11-13, 16; R. Doc. 85, at 11-13, 16.

The court next concluded that plaintiffs had not demonstrated the equitable factors required to support an injunction. The court first held that plaintiffs had failed to demonstrate irreparable harm. The court explained that plaintiffs' allegations of harm primarily rested on assertions that the Rule will require businesses to "revamp" their practices (by, for example, complying with statutory background check and recordkeeping requirements when selling the firearms discussed in the Rule) and that those sort of "ordinary compliance costs are typically insufficient to constitute irreparable harm." App. 24-25; R. Doc. 85, at 24-25 (quotation omitted). The court

9

explained, moreover, that plaintiffs' assertions were "entirely speculative" and undercut by plaintiffs' substantial delay in seeking relief. *Id.* The court then held that the balance of the equities and the public interest weighed against preliminary relief, given both plaintiffs' "speculative" assertions of harm and the substantial "interest in law enforcement and public safety" furthered by the Rule. App. 25; R. Doc. 85, at 25.

Plaintiffs appealed the denial of the preliminary injunction and moved for an injunction pending appeal. This Court denied that motion. *See* Order (Oct. 4, 2022).

## SUMMARY OF ARGUMENT

Congress has required that those who wish to manufacture, import, or deal in firearms must obtain a license, conduct a background check before transferring a firearm, and maintain records of firearms transactions. These requirements are critical components of the Nation's gun-safety scheme because they prevent firearms from being sold to individuals, like felons, who may not lawfully possess them and because they enable law enforcement to trace firearms used in crimes. ATF promulgated the Rule to ensure the continued effective implementation of these requirements in the face of technological advances that have rendered old regulatory definitions obsolete. The Rule does not, however, prohibit any person who may otherwise lawfully possess a firearm from buying, possessing, or making any firearm for personal use. Nor does the Rule prohibit any properly licensed individual from selling firearms. Instead, the Rule simply clarifies that certain products, such as ready-to-assemble weapon and frame or receiver parts kits, must be sold in compliance with the federal firearms laws

and explains which part of a firearm must be marked with a serial number before sale. The Rule also provides that licensed dealers who decide to take an unserialized firearm into their inventory must mark the firearm.

Despite the absence of any substantial harms flowing from the Rule, plaintiffs seek to enjoin the Rule, advancing a mishmash of APA challenges. But to be entitled to the extraordinary remedy of a preliminary injunction, plaintiffs must demonstrate that they are likely to succeed on the merits, that they will suffer irreparable harm absent the injunction, and that the balance of equities favors relief. As the district court correctly concluded, plaintiffs fail at each step.

**I.** Plaintiffs cannot demonstrate that they are likely to succeed on the merits. They claim five provisions of the Rule are contrary to law; that two are arbitrary and capricious; and that three others are invalid for various reasons. As the district court correctly held, those arguments are unavailing.

**A.** The Rule's clarification that a "frame" or "receiver" includes a kit containing parts that may "readily" be converted into a functional frame or receiver reflects the best understanding of the Act. Although plaintiffs point out that the statute does not use the term "readily," any argument on that score proceeds from an incorrect premise. The statute does not itself define the terms "frame" or "receiver." In interpreting those terms to include a collection of parts that may "readily" be converted to a functional frame or receiver, ATF acted consistently with both Congress's approach to other terms in relevant statutes and the reality underlying the

11

statutory scheme that any contrary approach would permit individuals to circumvent important federal gun laws.

The Rule's clarification that a "firearm" includes certain weapon parts kits that may readily be converted into an operational firearm similarly comports with the Gun Control Act. The Act's definition of "firearm" makes clear Congress's intent to include partially complete, or nonoperational, weapons within its scope, and consistent with that intent, courts have long recognized that such weapons constitute "firearms." *See, e.g.*, *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006). A weapon parts kit that includes parts enabling the ready assembly of an operational firearm plainly satisfies the statute's definition, and plaintiffs' contention that the Rule contravenes a requirement that every "firearm" contain a functional "receiver" finds no purchase in the statute.

Equally unpersuasive is plaintiffs' contention that the statute prohibits ATF from requiring licensed dealers to mark privately made firearms with a serial number when they come into the licensee's inventory. The Rule is a lawful exercise of ATF's general authority to implement the statute and specific authority to regulate recordkeeping. *See* 18 U.S.C. §§ 923(g)(1), 926(a). Pursuant to that authority, ATF requires (in regulations unchallenged here) that licensees record each firearm they accept into inventory and include within the record the firearm's serial number. The Rule carries out that requirement by ensuring that a dealer can record a serial number for each firearm it takes into inventory.

12

The Rule's provision defining a "complete muffler or silencer device" also does not conflict with the statute. Plaintiffs' contention otherwise rests on their incorrect belief that ATF eliminated a statutory condition that an object is only a silencer or muffler if it is "designed" and "intended" to be a silencer or muffler. But that statutory condition is incorporated into the Rule's definition. And the Rule's provision requiring that mufflers and silencers be marked on their frame or receiver implements the statutory requirement that each firearm be so marked, 18 U.S.C. § 923(i), and clarifies for manufacturers and makers which part of a complete muffler of silencer device must be marked.

**B.** Plaintiffs' argument that ATF acted arbitrarily and capriciously in promulgating the 98-page rule after reviewing approximately 290,000 comments is similarly unavailing. Review under that "standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, ATF "reasonably considered the relevant issues and reasonably explained the decision." *Id.*

In arguing otherwise, plaintiffs first urge that ATF's explanation of why the Rule does not infringe the Second Amendment is based on a legal framework the Supreme Court has since rejected. But that contention fails on all levels. Plaintiffs never develop an argument that the Rule violates the Second Amendment. And the Rule correctly rejected any such concerns, explaining that the statutory licensing, recordkeeping, and background check requirements implemented by the Rule do not

13

implicate the Second Amendment because they do not infringe "the ability of non-prohibited people to buy, sell, or possess firearms." App. 665; 87 Fed. Reg. at 24,676.

Similarly without merit are plaintiffs' contentions that the Rule fails to explain shifts in policy underlying two provisions: one requiring serialization of each part of a multi-part frame or receiver and one defining "frame" and "receiver" to include nonfunctional frames and receivers that may readily be converted to functional ones. Plaintiffs' contentions are underdeveloped and therefore forfeited, and the Rule provides substantial explanation for ATF's choices.

**C.** Plaintiffs' additional arguments fare no better. First, the Rule's definitions of "frame" and "receiver" are a logical outgrowth of the NPRM. The NPRM proposed defining "frame or receiver" to include any part "that provides housing or a structure designed to hold or integrate any fire control component." App. 614; 86 Fed. Reg. 27,720, 27,727 (May 21, 2021). In response to comments suggesting that the definition would create confusion because a weapon might have multiple frames or receivers subject to regulation, the Rule narrowed the proposal to specify that a "frame" (for handguns) or "receiver" (for long guns) is the part that houses a specific fire control component, rather than any part that houses any fire control component. *See* App. 724; 87 Fed. Reg. at 24,735. That definition is closely tied to the definition proposed in the NPRM.

In arguing that the Rule is invalid, plaintiffs do not identify any specific way in which a purported lack of notice prevented them from "offer[ing] informed criticism

14

and comments." *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991, 1005 (8th Cir. 2018) (quotation omitted). Instead, plaintiffs primarily complain generically that the Rule's definition is surprisingly different from the NPRM's. That is plainly incorrect: both definitions focused on the housing for fire control components, and the definition ultimately adopted simply narrowed the NPRM's proposal to identify more specifically the single "frame" or "receiver" of a weapon.

Plaintiffs are similarly incorrect that the Rule's provision extending the time that licensees must retain records violates 18 U.S.C. § 926(a)'s prohibition on any new regulation requiring records to be transferred to a federal facility or establishing a national gun registry. Under the Rule's provision, federal licensees continue to maintain custody of their own records, consistent with statutory requirements and decades of practice.

And plaintiffs' challenges to the Rule's provisions regarding ATF's voluntary classification process are likewise unavailing. The Rule's provisions are aimed at clarifying and improving that process, are reasonably explained, and do not injure plaintiffs.

**II.** Even if plaintiffs could demonstrate a likelihood of success as to one of their claims, they would still be unable to justify a preliminary injunction.

**A.** Plaintiffs cannot establish irreparable harm. The Rule does not forbid the sale (or purchase) of any firearm, weapon kit, or other item; instead, it primarily clarifies that certain items must be sold in accordance with the Gun Control Act's

15

licensing, recordkeeping, and background check requirements. Plaintiffs who wish to purchase or sell the regulated products at issue here may therefore continue to do so if they are not prohibited from possessing firearms and comply with the Act's relatively modest requirements. Such compliance costs do not constitute irreparable harm. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).

In response, the private plaintiffs claim many underdeveloped harms, but none works. Although they claim that interference with Second Amendment rights would be irreparable injury, they never develop an argument that the Rule violates the Second Amendment. Although they argue that the Rule harms them by forcing them to change their behavior, the actual changes—having to, for example, secure a license before dealing in products defined as firearms—do not constitute irreparable injury. And although they claim that the Rule will cause economic harm to industry, they fail to substantiate that claim, which rests on the implausible premise that many industry members or customers will choose to go out of business or stop purchasing regulated products rather than comply with the Rule's modest requirements.

The harms claimed by the State plaintiffs are no more successful. Although the States complain that the Rule conflicts with their policy preferences and assert that it will decrease tax revenue, those alleged injuries also rest on unsubstantiated speculation. More fundamentally, the harms claimed by the States do not reflect any judicially cognizable interest sufficient to support Article III standing, much less to justify an injunction.

16

**B.** In any event, plaintiffs cannot demonstrate that the balance of the equities weighs in favor of injunctive relief. As the Rule explains, its provisions serve critical law-enforcement and public-safety interests. In recent years, there has been a substantial increase in the availability of kits, many not sold in compliance with statutory requirements, enabling purchasers to easily construct operational firearms. As a result, prohibited persons have been able to easily acquire firearms, there has been a proliferation of unserialized firearms in circulation, and law enforcement has faced difficulty tracing firearms recovered from crime scenes. *See, e.g.*, App. 643; 87 Fed. Reg. at 24,654. The substantial law enforcement and public safety interests protected by the Rule plainly outweigh any modest financial burdens on plaintiffs.

**C.** As a final matter, even if plaintiffs had demonstrated some entitlement to a preliminary injunction, they could not justify the sweeping injunction they appear to seek. Instead, any injunction "must be narrowly tailored to remedy only the specific harms shown by the plaintiffs." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (alteration and quotation omitted).

That bedrock principle requires limiting any injunctive relief in this case in two ways. First, any injunction must be limited to any provision of the Rule for which the Court finds plaintiffs would likely be entitled to vacatur on final judgment. Second, any injunction must be limited to any specific plaintiffs whom the Court finds have demonstrated substantial irreparable harm.

17

## STANDARD OF REVIEW

This Court reviews "the denial of a preliminary injunction for abuse of discretion." *Padda v. Becerra*, 37 F.4th 1376, 1381 (8th Cir. 2022). "A district court abuses its discretion when it rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (alteration and quotation omitted).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs' attempts to meet that burden fail at each step.

## I.     Plaintiffs Are Unlikely to Succeed on the Merits

In arguing for a preliminary injunction, plaintiffs advance a hodgepodge of grounds upon which they claim discrete portions of the Rule are invalid. First, they claim that five provisions of the Rule are contrary to the Gun Control Act. Second, they assert that ATF's explanation was arbitrary and capricious in two different respects. Finally, they bring a smattering of attacks on various aspects of the Rule. As

18

the district court correctly held in rejecting each of these challenges (along with others not advanced here), plaintiffs are incorrect on every score.

## A. The Rule Is Not Contrary to the Gun Control Act

### 1. A Nonfunctional Frame or Receiver May Constitute a "Frame" or "Receiver" Under the Gun Control Act

In defining the statutory terms "frame" and "receiver" to include a kit containing parts that may "readily" be converted into a functional frame or receiver, ATF acted in accordance with the Gun Control Act. When defining weapons throughout the firearms laws, Congress has repeatedly made clear that non-operational weapons that are "designed to" or may "readily" be converted to operational weapons are included. *See, e.g.*, 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b) (defining "machinegun" to include a weapon that "can be readily restored to shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger"). These provisions reflect the reality that any other approach would permit persons to easily circumvent statutory requirements by producing or purchasing nearly complete weapons readily converted into operational ones. As the district court held, *see* App. 11-12; R. Doc. 85, at 11-12, in including a similar provision in the regulatory definitions of "frame" and "receiver," ATF acted in conformity with those congressional determinations and with the statutory scheme.

Nevertheless, plaintiffs unpersuasively contend (Morehouse Br. 15-20) that the Rule contradicts the Act. In making that argument, plaintiffs rely primarily on the

19

assertion (Morehouse Br. 15-16 & n.3) that because Congress included language in § 921(a)(3)(A) defining a "firearm" to include weapons that "may readily be converted" to be operational firearms but did not include a similar clause in § 921(a)(3)(B), ATF acted improperly in using the concept to define the terms "frame" and "receiver."

But that argument proceeds from the incorrect premise that § 921(a)(3)(B) defines "frame or receiver" and so some inference may be drawn from the nonexistence of "readily" language in that provision. In fact, that provision states only that the term "firearm" includes "the frame or receiver" of a weapon. It does not then go on to provide any definition of "frame" or "receiver," leaving the door open for ATF to do so. And it is implausible to think that Congress precluded ATF from using the term "readily" in defining "frame" and "receiver"—thereby allowing (for example) violent felons to purchase online ready-to-assemble, untraceable firearms just because the frame or receiver is not fully completed. That is especially so given that Congress also plainly contemplated that the definition of "firearm" in the statute would encompass nonfunctional firearms.

Moreover, although plaintiffs complain that ATF's definition improperly results in "items that ATF admits are not a 'frame or receiver'" nevertheless counting as a frame or receiver, *see* Morehouse Br. 17-18 (emphasis omitted), that complaint too rests on an incorrect assumption. ATF does not "admit[]" that a collection of parts that is not yet a functional frame or receiver but that may readily be converted to

20

one is "not a frame or receiver"; to the contrary, under the Rule, such a collection of parts is a frame or receiver. Indeed, that result mirrors Congress's approach in related contexts. As with ATF's definitions of "frame" and "receiver," Congress has defined items that may readily be converted into operational firearms or machineguns as "firearms" or "machineguns" themselves.

Finally, failing to identify any specific ambiguity in the term "readily," plaintiffs advance a generalized grievance (Morehouse Br. 16-19) that ATF's explanation of how the term "readily" applies in this context "boggles the mind." But the Rule contains detailed definitions with clarifying examples and an extended discussion of how the term "readily" has been interpreted and applied in analogous contexts, *see* App. 667-68, 728; 87 Fed. Reg. at 24,678-79, 24,739. And because the term "readily" is used in other firearms statutes, ATF's adoption of that term enables ATF to incorporate definitions and understandings based on preexisting case law interpreting it. The Rule thereby "provides manufacturers with fair warning on how the factors in th[e Rule's] definition are evaluated." App. 652, 657; 87 Fed. Reg. at 24,663, 24,668.

And to the extent that plaintiffs remain uncertain how the Rule might apply in a particular circumstance, the Rule provides a mechanism to resolve any uncertainty: parties may submit requests for voluntary classifications as to whether any particular item constitutes a "firearm" within the meaning of the statute and regulations. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (explaining that the ability to receive additional clarity "by resort to an administrative

21

process" ameliorates any harm from claimed vagueness). And indeed, ATF has already issued more than 40 classifications to individual private parties and provided an Open Letter to the public to explain the application of the Rule's definitions of "frame" and "receiver." *See Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-partially-complete-ar/download.

Any claim that the Rule's provision is unconstitutionally vague would in any event be forfeited. Indeed, plaintiffs' only attempt to support their assertion with legal authority (Morehouse Br. 19) is to incorporate by reference a portion of their complaint citing a decision of the Third Judicial District Court for the State of Nevada declaring a Nevada statute unconstitutional under the Nevada Constitution. *See* App. 401-17; R. Doc. 1-51, at 1-17. In the absence of "convincing argument" and "citations to legal authorities," plaintiffs have forfeited any such argument. *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1023 (8th Cir. 2019) (quotation omitted).

### 2. Weapon Parts Kits May Constitute Firearms Under the Gun Control Act

As the district court also correctly concluded, *see* App. 10-11; R. Doc. 85, at 10-11, the Rule's definition of a "firearm" as including certain weapon parts kits that may readily be converted into an operational firearm—even if the kit does not include a completed frame or receiver—comports with the Gun Control Act. Congress defined a firearm to include any weapon that "is designed to" or "may readily be converted to

22

expel a projectile," 18 U.S.C. § 921(a)(3)(A). That definition makes clear that Congress included unfinished, or nonoperational, weapons. And a weapon parts kit that includes parts enabling a purchaser to readily assemble an operational firearm plainly satisfies the statute's definition: such an assemblage of parts is both "designed to" and "may readily be converted to" function as a firearm.

Courts have thus long recognized that such weapons constitute "firearms" for Gun Control Act purposes. For example, in *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006), this Court held that a rifle with the clip and bolt removed constituted a "firearm" under a provision of the Sentencing Guidelines reflecting the Act's definition. As the Court explained, although the rifle was "partially disassembled" and not operational, the defendant "could easily make the rifle operational" by reinserting the bolt and clip. *Id.* (quotation omitted). Thus, because the "definition turns on what the weapon is designed to do, not on whether it is capable of doing its job at" any "particular moment," the Court concluded that the nonoperational rifle constituted a firearm. *Id.* (quotation omitted). *See also, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (both similar).

Despite the clear statutory language and precedent, plaintiffs argue (Morehouse Br. 20-23) that the Rule's definition is contrary to the Act. That argument is primarily based on the assertion that the Gun Control Act defines a "firearm" to include only "weapon[s]" and that, "by definition, a 'weapon' must have a 'frame or receiver.'"

23

That is incorrect. As the Rule explains, dictionaries define a "weapon" simply as an "instrument of offensive or defensive combat." App. 673; 87 Fed. Reg. at 24,684 (quotation omitted). Nowhere does the Act or that commonsense definition of "weapon" suggest any requirement that a weapon include a frame or receiver—much less that it include a completed, or fully operational, one. Reading such a requirement into the statute would undermine Congress's intent to cover non-operational, but readily convertible, weapons and would impermissibly render superfluous the Gun Control Act's primary definition of "firearm" ("any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A)), as the categorization of an object as a "firearm" would rise or fall on whether the object meets the second definition, that is, whether it is a "frame or receiver," *id.* § 921(a)(3)(B).

Plaintiffs' attempts to distinguish precedent making this clear fare no better than their attempts to construe the statute's text. For example, in resisting the applicability of *Annis*, plaintiffs argue (Morehouse Br. 23 n.10) that the rifle in that case had a functional frame or receiver, even if the firearm itself was not operable. But as explained, the presence of a functional frame or receiver is not the *sine qua non* of a firearm. And the recognition by this Court and other courts that a nonoperational firearm that is readily convertible to an operational one fits within the statute's definition of a firearm accords with the Rule's treatment of weapon parts kits. Thus, as the district court correctly held, the Rule's provision "fit[s] squarely within the

24

GCA's 'firearm' definition because after delivery, the kits are easily converted from mere parts into a weapon that expels a projectile." App. 10; R. Doc. 85, at 10.

Plaintiffs' suggestion (Morehouse Br. 20-21) that ATF's definition could require hardware stores to obtain a federal firearms license likewise does not persuade. Unlike a weapon parts kit regulated by the Rule, the collection of wood and metal pipes sold by a hardware store is not an "aggregation of parts" that "is clearly identifiable as an instrument to expel live ammunition." App. 673; 87 Fed. Reg. at 24,684.

Finally, although plaintiffs briefly contend (Morehouse Br. 20 n.5) that ATF previously approved the sale of weapon parts kits and has failed to acknowledge or explain a shift in position reflected in the Rule, that argument is unavailing. For one, the argument is barely developed and is made "only by way of a footnote," which means it is forfeited and this Court should not address it. *Heuton*, 930 F.3d at 1023 (quotation omitted). In any event, by amending the regulatory definition of "firearm" to clarify that weapon parts kits may be covered, the Rule acknowledges that ATF's previous regulation had not sufficiently captured that aspect of the statutory definition, and the Rule contains substantial discussion explaining ATF's view that this new definition represents the best interpretation of the statute. *See* App. 673-74; 87 Fed. Reg. at 24,684-85.

Appellate Case: 22-2812     Page: 33     Date Filed: 11/29/2022 Entry ID: 5221982

### 3. The Rule's Requirement that Licensed Dealers Mark Unserialized Firearms Comports with the Gun Control Act

The Gun Control Act grants ATF both general "authority to take actions 'necessary to carry out the provisions'" of the statute and also specific authority to "regulate [a licensee's] 'records of importation, production, shipment, receipt, sale or other disposition of firearms.'" App. 14; R. Doc. 85, at 14 (first quoting 18 U.S.C. § 926(a); then quoting *id.* § 923(g)(1)). Under longstanding ATF regulations implementing those provisions, dealers must "enter into a record each receipt and disposition of firearms" and include within the record the firearm's "serial number." *See* 27 C.F.R. § 478.125 (2021). To enable those requirements to serve their intended purpose—ensuring that law enforcement may trace firearms that are used in crimes—a licensed dealer must be able to record a serial number for each firearm that it receives or disposes of. And for privately made firearms that contain no serial number at the time of receipt, the dealer thus must mark the firearm upon taking it into inventory. *See* App. 658-69; 87 Fed. Reg. at 24,669-70. The Rule's requirement therefore fits well within the statute's express delegation of authority to ATF to enact regulatory recordkeeping requirements that depend on firearms' serial numbers.

In nevertheless arguing that the Rule is unlawful, plaintiffs initially urge (Morehouse Br. 32-35) that ATF's policy concerns about untraceable privately made firearms cannot supply the requisite statutory authority. But ATF does not claim authority based on policy concerns. Instead, as explained, ATF's authority flows

26

directly from statutory provisions authorizing the agency to prescribe regulations related to recordkeeping—regulations that ATF could not properly implement if dealers were not required to serialize unmarked firearms that they take into inventory.

Similarly, plaintiffs are wrong to suggest (Morehouse Br. 35-36) that the Rule cannot be supported by ATF's authority to promulgate regulations necessary to carry out the statute because the statute does not itself require dealers to serialize unmarked firearms. If that were true, the agency could do no more than parrot requirements already in the statute. That result would be inconsistent with the statute's repeated delegation of regulatory authority to flesh out and implement statutory provisions, as well as with decades of regulatory practice.

Plaintiffs further miss the mark in urging (Morehouse Br. 38) that Congress's failure to enact proposed legislation that would have required privately made firearms to be serialized supports their argument. No implication from legislative history could overcome the statute's plain grant of authority. Congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *PBGC v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation omitted). That is especially true here, where the proposed legislation cited by plaintiffs would have gone much further than the Rule, requiring any person who makes a firearm to serialize it rather than requiring only licensed dealers who take unserialized firearms into inventory to do so. *See* H.R. 377, 114th Cong. (2015).

Appellate Case: 22-2812    Page: 35    Date Filed: 11/29/2022 Entry ID: 5221982

Finally, plaintiffs briefly suggest in a footnote (Morehouse Br. 38-39 n.22) that the Rule's provision creates a new crime of obliterating a serial number on a privately made firearm. That argument, made "only by way of a footnote," is forfeited, and this Court should decline to address it. *Heuton*, 930 F.3d at 1023 (quotation omitted). In any event, the contention misunderstands federal law. Congress prohibited the possession of a firearm with an obliterated serial number as part of the Gun Control Act. *See* 18 U.S.C. § 922(k). The Rule does not purport to alter that longstanding criminal prohibition. And although plaintiffs are correct that there will be more firearms with serial numbers because of the Rule (indeed, that is the point), plaintiffs identify nothing impermissible or unexpected about that result.

### 4. The Rule's Definition of a Complete Muffler or Silencer Device Is Not Contrary to Law

Plaintiffs are equally unsuccessful in arguing (Morehouse Br. 24-28) that the Rule's definition of a "complete muffler or silencer device" as a "firearm muffler or firearm silencer that contains all component parts necessary to function, whether or not assembled or operable," App. 723; 87 Fed. Reg. at 24,734, conflicts with the Gun Control Act.

The Gun Control Act defines a "firearm silencer" or "firearm muffler" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or muffler, and any part intended only for

28

use in such assembly or fabrication." 18 U.S.C. § 921(a)(25). A purported conflict arises, plaintiffs claim, because in defining a complete muffler or silencer device, the Rule omits the condition that the assemblage of parts be "designed" and "intended" for use as a silencer or muffler.

But as the district court recognized, *see* App. 14-15; R. Doc. 85, at 14-15, plaintiffs misunderstand the Rule's definition. In defining a "complete muffler or silencer device," the Rule states that such a device must meet two requirements: first, the device must be a "firearm muffler or firearm silencer" and, second, the device must "contain[] all component parts necessary to function." Thus, any complete muffler or silencer device must itself be a muffler or silencer as defined in the statute. In other words, "the 'designed' and 'intended' statutory language from the GCA was simply incorporated into the [Rule's] definition," and there is no conflict with the statute. *Id.* For the same reason, plaintiffs' concerns (Morehouse Br. 25) that the Rule's definition might sweep in collections of innocuous household items are misplaced. Unless such a collection of items is "designed" and "intended" to be used as a muffler or silencer, it is not a complete muffler or silencer device.

Nowhere do plaintiffs contend that the Rule as correctly understood violates the statute. Plaintiffs instead primarily contend (Morehouse Br. 26-27) that ATF's understanding renders the definition unnecessary and conflicts with ATF's decision to remove "as designed" from the proposed definition. But plaintiffs again misunderstand the Rule: ATF used the concept of a "complete" silencer or muffler

29

device to explain to licensees the moment when particular obligations, such as the requirement to mark a device, attach. *See supra* p. 7. And the Rule explains that ATF eliminated the "as designed" language not to sweep in any complete assemblage of parts that could theoretically function as a silencer—as plaintiffs urge—but instead to ensure that manufacturers cannot use creative design to circumvent the requirement that a complete silencer or muffler device be serialized by the business day after it is completed. *See* App. 717; 87 Fed. Reg. at 24,728.

### 5. The Rule's Requirement that Mufflers and Silencers Be Marked on Their Frame or Receiver Does Not Conflict with the Gun Control Act

Because ATF had not previously defined any particular part of a silencer or muffler to be the frame or receiver, the statutory marking requirements—which include a requirement that a firearm (including a silencer) be marked on its frame or receiver, *see* 18 U.S.C. § 923(i)—"have caused confusion and concern among many silencer manufacturers over the years." App. 651; 87 Fed. Reg. at 24,662. As the Rule explains, absent clarification, manufacturers might "mark all silencer parts for tracing purposes," even though such a result would "make[] little sense." *Id.* ATF therefore adopted in the Rule a definition of a "firearm muffler or silencer frame or receiver" to "clarify for manufacturers and makers" which part of a complete muffler of silencer device they must serialize. *Id.*

In nevertheless contending that ATF does not have statutory authority to identify the silencer part that must be marked, plaintiffs acknowledge (Morehouse Br.

30

29-30) that the Attorney General has authority to promulgate regulations regarding which information must be marked on a silencer but urge that the Attorney General has no authority to promulgate regulations regarding *where* the information be marked.

This argument fails twice over. It is the Gun Control Act, and not any regulation, that requires that all firearms, including silencers, be marked on the frame or receiver. *See* 18 U.S.C. § 923(i). Because "frame" and "receiver" are undefined, the Attorney General's authority to promulgate "such rules and regulations as are necessary to carry out the provisions" of the statute provides ample foundation for the regulation here. *Id.* § 926(a). And the federal firearms laws assign throughout express authority to the Attorney General to promulgate regulations specifically related to serialization requirements. *See, e.g.*, *id.* § 923(i) (requiring importers and manufacturers to identify firearms "by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe"); 26 U.S.C. § 5842(a) (provision of the National Firearms Act applicable to silencers and mufflers) (requiring manufacturers and importers to mark firearms with a serial number, the name of the manufacturer or importer, and "such other identification as the [Attorney General] may by regulations prescribe").

No more successful is plaintiffs' contention (Morehouse Br. 28-30) that ATF provided no sound reason for its decision to identify which part of a silencer must be marked. ATF explained in the Rule that the lack of such an identification had led to confusion among regulated entities and that the Rule's provision is necessary to

31

ensure a clear and sensible application of the statutory marking requirement. Similarly, plaintiffs' argument (Morehouse Br. 28) that the Rule improperly contradicts a previous ATF statement that a silencer does not have a specific frame or receiver fails in the face of the Rule's acknowledgement that no previous definition existed.

## B. The Rule Is Not Arbitrary and Capricious

Having failed to demonstrate any conflict with the statute, plaintiffs next mount a fruitless attempt (States' Br. 24-34; Morehouse Br. 39-43) to demonstrate that the Rule is arbitrary and capricious. Review of such claims "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, ATF reviewed over 290,000 comments, examined the relevant data, and articulated an explanation for its decisionmaking in detail with respect to each provision of the Rule. In short, the agency "reasonably considered the relevant issues and reasonably explained the decision." *Id.* That is all the APA requires.

### 1. The Rule's Discussion of the Second Amendment Is Not Arbitrary and Capricious

Plaintiffs first contend (States' Br. 24-31) that the Rule's discussion of the Second Amendment is arbitrary and capricious because, in their view, the Rule does not follow the analysis required by *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). That contention is unavailing on all levels.

32

As an initial matter, to the extent any aspects of the agency's discussion could be understood as reflecting a now-outdated legal test, *see Bruen*, 142 S. Ct. at 2125-31, that would not entitle plaintiffs to relief because they have not actually argued that the Rule violates the Second Amendment. The APA requires courts to take account of the "rule of prejudicial error." 5 U.S.C. § 706. Under that rule, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009); *see also Panhandle Co-op. Ass'n v. EPA*, 771 F.2d 1149, 1152-53 (8th Cir. 1985) (rejecting challenge to administrative action because "[o]n the record before" the court, the challenger had failed to "show that it was prejudiced" by the claimed error). Here, however, plaintiffs fail to develop any argument that the Rule violates the Second Amendment. And because plaintiffs have not even sought to demonstrate that the Rule violates the Second Amendment, they have failed to meet their burden of showing that any flaw in the agency's explanation related to this issue has prejudiced them. That alone is sufficient to reject their claim.

In any event, contrary to plaintiffs' protestations (States' Br. 24-25), ATF correctly concluded that the Rule does not violate the Second Amendment. The Supreme Court has confirmed that nothing in its decisions interpreting the Second Amendment "cast[s] doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring)

33

(same); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (same). As ATF explained, the statutory licensing, recordkeeping, and background check requirements implicated by the Rule are such commercial restrictions; they "do not prohibit individuals from assembling or otherwise making their own firearms." App. 665; 87 Fed. Reg. at 24,676. Nor do those requirements "burden the ability of non-prohibited people to buy, sell, or possess firearms." *Id.* Thus, as the Rule properly explains, nothing in the Rule or the underlying statute "prevents law-abiding citizens" from exercising the Second Amendment "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156. The Rule therefore does not infringe the protected right, and there is no need for further analysis. *See id.* at 2126 (holding that the threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct").

In rejecting this conclusion, plaintiffs make two arguments. They argue first (States' Br. 28-29) that the district court improperly concocted a post hoc justification for the Rule. But that is incorrect. The Rule contains the analysis explaining why it does not implicate the Second Amendment. And given that the Second Amendment question is a legal one, its resolution does not implicate the sort of policy considerations and agency discretion that might require the agency to resolve in the first instance. *See, e.g., DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908-09 (2020) (cited at States' Br. 29) (rejecting reliance on post hoc "policy reasons" offered

34

by agency). Plaintiffs' attempt to morph incorrect, and wholly undeveloped, legal arguments into attacks on the agency's explanation requiring relief should be rejected.

Plaintiffs find no more success in attacking (States' Br. 29-31) ATF's reliance on the Supreme Court's discussion of the validity of commercial restrictions on firearm sales. *See* App. 665; 87 Fed. Reg. at 24,676 (citing *Heller*, 554 U.S. at 626-27). As the text of the Second Amendment makes plain, only a restriction that infringes the right implicates the Amendment at all. U.S. Const. amend. II; *see also Bruen*, 142 S. Ct. at 2126. As the Supreme Court has repeatedly made clear, the "right" protected in the Second Amendment's text is the right "to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125. Because, like many other commercial regulations, the Rule does not prevent any qualified individual from making, buying, or possessing firearms, it does not infringe that right and it need not be justified by historical analogy. And the Rule's requirements related to privately made firearms are, like the other requirements, commercial restrictions: they attach only to federal firearms licensees (who are necessarily engaged in commerce), not to private persons, and they attach only when the licensee takes the firearm into its inventory.

Finally, to the extent plaintiffs urge that the Rule is invalid because it cites and applies case law from federal courts employing a means-end scrutiny analysis that *Bruen* rejected, that argument is unavailing. Because ATF correctly explained that the Rule does not infringe Second Amendment rights, the inclusion of additional analysis coming to the same result under a different test cannot be prejudicial. In addition,

35

*Bruen* was issued after the Rule's promulgation, and arbitrary-and-capricious review does not permit courts to apply "hindsight derived from matters occurring after the[] adoption" of the challenged action. *SIH Partners LLLP v. Commissioner*, 923 F.3d 296, 301 (3d Cir. 2019).

### 2.    The Rule Properly Explains Any Changes in ATF's Interpretation of the Relevant Statutory Provisions

Plaintiffs next contend (States' Br. 32-34) that the Rule fails to properly explain two alleged policy shifts. As an initial matter, plaintiffs do not develop either argument. Their brief includes only conclusory statements that fail to detail the specific deficiencies plaintiffs perceive in ATF's lengthy explanation of the Rule's requirements. Nor do plaintiffs identify any particular ATF regulations or classifications that assertedly conflict with the Rule's approach. Because plaintiffs "do[] not develop th[ese] argument[s]," they have been forfeited. *United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018).

Plaintiffs' arguments are, in any event, unavailing, as the district court recognized. First, the Rule requires that if a multi-piece frame or receiver is being sold together and "more than one modular subpart is similarly designed to house, hold, or contain" the primary fire control component "(*e.g.*, left and right halves), each of those subparts must be identified with the same serial number." App. 660; 87 Fed. Reg. at 24,671. And if "a modular subpart" is being "sold separately," then the subpart must "be identified with an individual serial number." App. 661; 87 Fed. Reg. at 24,672.

36

The Rule explains that these requirements are necessary to enable effective tracing of firearms—that is, to allow the statute to function as designed—because "otherwise, multi-piece frames or receivers could be sold or distributed piecemeal in individual subparts and replaced by the end user without any traceable marks of identification." *Id.* As the district court held, *see* App. 21; R. Doc. 85, at 21, that justification more than suffices to carry ATF's burden of reasonable explanation.

Second, plaintiffs appear to contend that ATF had never previously used the specific term "readily" (as in "readily converted") to describe when an unfinished frame or receiver falls within the statutory definition of "firearm." That ATF has never used the term in this context is of no moment. As ATF explained in the Rule, although ATF had previously classified unfinished frames and receivers based on the extent to which converting the unfinished item into a functional one would require certain difficult machining operations, that analysis largely parallels the "readily" convertible test adopted in the Rule. *See* App. 657; 87 Fed. Reg. at 24,668 ("Rather than a new or different test, how quickly and easily [*i.e.*, readily] an item could be made functional is largely determined by which machining operations still needed to be performed."). And ATF reasonably explained that adopting the term "readily" allowed ATF to incorporate definitions and factors based on preexisting case law interpreting the term in other firearms statutes and thereby "provide[] manufacturers with fair warning on how the factors in that definition are evaluated." App. 652, 657; 87 Fed. Reg. at 24,663, 24,668.

37

ATF also acknowledged that it previously "did not examine templates, jigs, or other items and materials" included in frame and receiver kits but that it now recognized that "aggregation of a template or jig with a partially complete frame or receiver" can enable a purchaser to construct a functional frame or receiver "efficiently, quickly, and easily (*i.e.*, 'readily')." App. 657; 87 Fed. Reg. at 24,668. Thus, insofar as some of ATF's previous classifications are not consistent with the approach required by the Rule, ATF acknowledged that fact. *Id.* ATF therefore demonstrated awareness of, and provided ample justification for, any changes in the Rule. *See Northport Health Servs. v. U.S. Dep't of Health & Human Servs.*, 14 F.4th 856, 875 (8th Cir. 2021).

## C. Plaintiffs' Additional Arguments Are Unpersuasive

Plaintiffs advance a handful of additional attacks on various provisions of the Rule. First, plaintiffs argue that the Rule's provisions defining "frame" and "receiver" are not a logical outgrowth of the proposed definition. Second, plaintiffs contend that the Rule impermissibly creates a national gun registry. Third, plaintiffs attack the Rule's provisions relating to ATF's practice of acting on voluntary requests for classification of products. None of these arguments has merit.

### 1. The Rule's Definitions of "Frame" and "Receiver" Are a Logical Outgrowth of the NPRM

Unable to identify any error in the Rule's definitions of "frame" and "receiver," plaintiffs contend that the definitions adopted in the Rule are invalid because they are

Appellate Case: 22-2812     Page: 46     Date Filed: 11/29/2022 Entry ID: 5221982

more limited than the approach proposed in the NPRM. But as the district court correctly held, the Rule's definitions of "frame" and "receiver" are a logical outgrowth of the NPRM. And in any event, plaintiffs cannot demonstrate any prejudice from the Rule's narrowing of the NPRM's proposal.

**a.** The NPRM announced ATF's intent to update the definition of "frame or receiver" to address the problem of most modern firearms not having "a specific part that expressly falls within the" old definition and proposed defining the term to include any part "that provides housing or a structure designed to hold or integrate any fire control component." App. 614; 86 Fed. Reg. at 27,727. And the NPRM described in significant detail the factors—including feasibility, flexibility to encompass technology changes, and ensuring each firearm has a frame or receiver— that would animate its decision to adopt a new definition.

That description provided sufficient notice to permit parties to offer informed comments. Indeed, ATF received 290,000 comments from interested parties. Some of those comments, including from some plaintiffs, explained that the proposed definition would create confusion because a weapon might have multiple frames or receivers subject to regulation. *See, e.g.*, App. 681; 87 Fed. Reg. at 24,692.

Heeding those comments, the Rule narrowed the proposed definition to specify that a "frame" (for handguns) or "receiver" (for long guns) is the part that houses a specific fire control component (for handguns, the "sear"; for long guns, the "bolt" or "breechblock"), rather than any part that houses any fire control

39

component. *See* App. 724; 87 Fed. Reg. at 24,735. That definition is closely tied to the more expansive definition contained in the NPRM. And in light of the factors ATF explained that it would consider in defining "frame" and "receiver," the "possibility" that ATF might narrow the proposed definition for feasibility or other reasons was more than "reasonably foreseeable." *Long Island Care at Home v. Coke*, 551 U.S. 158, 175 (2007).

**b.** Plaintiffs nevertheless contend that the Rule's definitions of "frame" and "receiver" are not a logical outgrowth because they differ from the proposed definition. States' Br. 11-17. That contention runs headlong into this Court's precedent governing such challenges. As this Court has explained, an NPRM "need not contain every precise proposal which the agency may ultimately adopt as a rule," *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1319 (8th Cir. 1981) (quotation and alteration omitted); instead, a notice need only be "sufficiently descriptive of the subjects and issues involved so that interested parties may offer informed criticism and comments," *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991, 1005 (8th Cir. 2018) (quotation omitted).

Rather than identify any way in which a lack of notice prevented them from "offer[ing] informed criticism and comments," *Citizens Telecomms.*, 901 F.3d at 1005 (quotation omitted), plaintiffs primarily argue (States' Br. 11, 13, 16-17) that the Rule's provision is a "brand new rule" that is not of the same "character" as, and is "surprisingly distant" from, the NPRM's proposal. That contention cannot be squared

40

with the NPRM and the Rule. As explained, the definitions of "frame" and "receiver" contained in the Rule hew closely to the definition of "frame or receiver" proposed in the NPRM. Both sets of definitions focus on the housing for fire control components, with the primary difference being only that the Rule—directly heeding comments, including from many plaintiffs, raising concerns about the expansiveness of the NPRM's definition—identifies the housing for a specific fire control component as the "frame" or "receiver" rather than identifying the housing for any such component as a frame or receiver.

Similarly, plaintiffs' argument (States' Br. 16) that ATF improperly bootstrapped notice from a comment is unpersuasive. Although ATF relied in part on submitted comments in formulating the Rule's definitions, the NPRM itself provided reasonable notice of the provisions ATF ultimately adopted. Because the NPRM contained all the information that an interested party would need "to comment on the agency's proposals," plaintiffs' contention that ATF improperly relied on comments to "cure inadequate notice" lacks force. *Citizens Telecomms.*, 901 F.3d at 1006. And the fact that ATF listened to comments in revising the NPRM's proposal does not give rise to a logical outgrowth problem. Were it otherwise, agencies would be unable to properly take account of the concerns raised by commenters and notice-and-comment procedures would lose their valuable role in agency decisionmaking.

Finally, plaintiffs devote substantial space (States' Br. 13-14, 17) to refuting strawman arguments that adopting a narrower regulation than proposed or

41

modernizing a definition must always be a logical outgrowth. The government's position is not that the Rule is a logical outgrowth simply because its definitions are narrower than the NPRM's or because any change to the definitions of "frame" and "receiver" would have been foreseeable. Instead, as explained, the NPRM proposed to update the regulatory definitions and identified factors that would guide ATF's adoption of particular definitions; the final Rule properly applied those factors, responded to comments through that lens, and arrived at definitions closely tied to the proposal.

      **c.** In any event, even if the Rule's definitions of "frame" and "receiver" were not a logical outgrowth of the NPRM, any error would be harmless. Under the APA, plaintiffs "must demonstrate that the agency's violation" has "resulted in 'prejudice.'" *American Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (quoting 5 U.S.C. § 706(2)); *cf. Citizens Telecomms.*, 901 F.3d at 1005-06 (considering whether petitioners had demonstrated prejudice before vacating portions of a rule based on inadequate notice). In this context, where the agency has conducted notice and comment, plaintiffs claiming that notice was inadequate must show that "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the [agency's] rationale." *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003).

      In attempting to demonstrate this required prejudice, plaintiffs run through a scattershot of benefits they claim would accrue from an additional round of

Appellate Case: 22-2812    Page: 50    Date Filed: 11/29/2022    Entry ID: 5221982

comments. States' Br. 18-20. But none of their arguments identifies any specific comment they would have submitted had the NPRM proposed the Rule's definition.

As an initial matter, plaintiffs argue (States' Br. 18, 19-20) that an additional round of commenting would have required ATF to address what they perceive as a "conflict" between the Rule's definitions and the statute. Specifically, plaintiffs contend that because the statute refers to "the" frame or receiver of a weapon, any firearm must have only a single frame or receiver subject to marking requirements, while under the Rule, certain firearms might have more than one (if, for example, a particular firearm has a multi-piece receiver with right and left halves). But that perceived conflict does not arise from the narrowing of the NPRM's definitions of "frame" and "receiver"; to the contrary, many fewer firearms will have more than one frame or receiver under the Rule than would have under the NPRM. Thus, commenters (including many plaintiffs) raised similar concerns in the notice-and-comment process, and ATF explicitly relied on those comments in explaining its decision to adopt the Rule. *See, e.g.*, App. 681-82; 87 Fed. Reg. at 24,692-93.

Neither of plaintiffs' additional points persuades. Plaintiffs contend (States' Br. 19) that ATF failed to respond to unspecified issues raised by comments from Gun Owners of America and might have done so with an additional round of notice and comment. But that is not an argument about a purported lack of notice. If anything, the failure to respond to comments would support an argument that the Rule is arbitrary and capricious, though, tellingly, plaintiffs do not actually develop such an

43

argument. Equally unpersuasive is plaintiffs' brief suggestion (States' Br. 19) that any loss of an opportunity to dissuade ATF from adopting the Rule is prejudicial. Plaintiffs had that opportunity—and indeed many plaintiffs submitted comments—and without identifying some specific additional comments they would have submitted on a second round of commenting, plaintiffs cannot reasonably claim any prejudice from the loss of an ability to comment.

### 2. The Rule Does Not Create a National Gun Registry

Plaintiffs next briefly contend (States' Br. 20-23) that the Rule's provision extending the time that licensees must retain records from 20 years to the duration of the licensee's business violates 18 U.S.C. § 926(a). That provision states that no new regulation "may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States" nor may any new regulation establish a "system of registration of firearms, firearm owners, or firearms transactions or dispositions." 18 U.S.C. § 926(a). As the district court correctly held, this argument "strains credibility." App. 15-16; R. Doc. 85, at 15-16.

By its plain terms, the Rule does not "require that" any records "be recorded at or transferred to" any facility owned by the United States. Instead, pursuant to express statutory authority, the Rule simply extends the time that licensees are required to maintain records to ensure law enforcement's ability to effectively trace firearms that were manufactured or sold more than 20 years ago. *Cf.* 18 U.S.C.

44

§ 923(g)(1)(A) (providing that licensees shall maintain records "for such period . . . as the Attorney General may be regulations prescribe").

Although plaintiffs suggest (States' Br. 21-22) that the Rule violates § 926(a)'s prohibition when it is read in combination with a separate statutory provision requiring licensees that dissolve their business to transfer records to the Attorney General, *see* 18 U.S.C. § 923(g)(4), that contention is unavailing. The requirement that licensees transfer records when discontinuing their business is a statutory requirement unchanged by the Rule, which merely extended the period that licensees must retain documents. Congress moreover enacted both § 923(g)(4)'s transfer requirement and § 926(a)'s prohibition at the same time. *See* Pub. L. No. 99-308, §§ 103, 106, 100 Stat. 449, 455, 459-60 (1986). It therefore indeed "strains credibility" to think that the Congress that enacted both of those provisions believed that implementation of the one would violate the other.

Plaintiffs also appear (States' Br. 20-21) to take issue with a recent ATF Ruling giving licensees the option to maintain certain records in electronic form, but that argument fails to advance their challenge to the Rule. The Ruling, which came in response to numerous requests from regulated entities seeking an electronic storage option, does not require any licensee to store records electronically (or to comply with the conditions articulated in the Ruling); instead, it only provides licensees who wish to do so with that option. *See* ATF Ruling 2022-01, *Electronic Storage of Forms 4473*

45

(Aug. 17, 2022), https://www.atf.gov/file/170116/download. The provision of the Rule at issue here merely alters the length of time a licensee must keep records.

### 3. Plaintiffs' Attack on the Provisions Relating to ATF's Classification Process Fails

Plaintiffs fare no better in attacking the Rule's provisions related to ATF's classification process, which codified a longstanding practice and clarified for the regulated community how to properly submit such a request.

First, plaintiffs lob a generalized critique at ATF's process for issuing classification letters, Morehouse Br. 39-41, maintaining that ATF provides preferential treatment to favored requesters and issues conflicting results. But plaintiffs fail to support this contention with anything in the administrative record—or indeed elsewhere—and even if true, that criticism is not based in anything in the Rule.

As the Rule explains, ATF has long acted on voluntary requests from persons to issue classifications regarding whether a particular item constitutes a firearm, and the goal of the Rule's provisions relating to that process is to "clarify the existing process" and provide clear instructions to industry regarding what a submission must contain. App. 655; 87 Fed. Reg. at 24,666. The Rule is explicitly aimed at correcting perceived shortfalls in ATF's process, and plaintiffs' attacks on the preexisting, uncodified process shed no light on the Rule's provisions. Similarly, plaintiffs fail to explain how they are injured by the Rule's provisions, rather than by some hypothetical action they think ATF might take with respect to a future classification

Appellate Case: 22-2812    Page: 54    Date Filed: 11/29/2022 Entry ID: 5221982

request. And to the extent that plaintiffs believe that ATF has acted, or will act, improperly with respect to any specific classification request, any recourse would come from a challenge tied to that specific request and not from this challenge to the Rule.

Nor can plaintiffs prevail on their more specific challenge (Morehouse Br. 42-43) to the Rule's requirement that future classification requests be submitted under penalty of perjury. ATF's objective in including that requirement is clear: the Rule requires that all classification requests include "a complete and accurate description of the item" to be classified and all "instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." App. 655; 87 Fed. Reg. at 24,666. Because correctly classifying an item may require that the description and additional submitted materials are complete and accurate, ATF has a substantial interest in ensuring the completeness and accuracy of requests that reasonably justifies requiring they be submitted under penalty of perjury.

Nor have plaintiffs shown how the penalty-of-perjury requirement materially alters the landscape in a way that harms them. Federal criminal law already prohibits individuals from "mak[ing] any materially false, fictitious, or fraudulent statement or representation" in a matter "within the jurisdiction of the executive[] . . . branch." 18 U.S.C. § 1001(a). Thus, even without the perjury requirement, requesters would be subject to similar potential criminal penalties for making any false statements in a classification request. And as explained, the classification system is voluntary. Thus, to

47

the extent that plaintiffs do not want to submit a statement under the penalty of perjury (or under risk of a § 1001 violation), they are, of course, free to choose not to avail themselves of the voluntary classification system in the first place.

## II.   Plaintiffs Are Not Entitled to the Extraordinary Remedy of a Preliminary Injunction

Even setting aside the merits, plaintiffs have failed to justify the sweeping preliminary injunction they request. Neither the private parties nor the States have demonstrated any irreparable harm flowing from the Rule. Even if they had, their minimal asserted harms could not outweigh the countervailing interests in law enforcement and public safety. And in arguing for a nationwide injunction of the entire Rule, plaintiffs ignore binding precedent that limits relief to remedying plaintiffs' substantiated injuries.

### A.     The Rule Does Not Irreparably Harm Plaintiffs

As the district court correctly held, *see* App. 24-25; R. Doc. 85, at 24-25, plaintiffs have failed to demonstrate that the Rule causes them any irreparable harm. As an initial matter, neither the private nor the State plaintiffs have attempted to make a showing of irreparable harm (or demonstrated they have Article III standing) with respect to all of the challenged provisions: nowhere does any plaintiff develop an argument that the Rule's provisions regulating silencers and mufflers, extending the record retention requirement, or codifying the classification process will injure them. And even as to the provisions that plaintiffs' harm analysis focuses on, the Rule does

48

not alter preexisting statutory requirements for commercial sale of firearms and will lead to, at most, relatively small compliance costs on some of the plaintiffs. Such costs do not constitute irreparable harm, a conclusion that is further buttressed by plaintiffs' delay in challenging the Rule.

**1.** The Rule does not forbid the sale (or purchase) of any firearm, weapon kit, or other item; instead, the Rule clarifies that certain items, like ready-to-assemble kits, are "firearms" and so must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Thus, plaintiffs who wish to purchase or sell the regulated products may do so if they comply with the Act. And these requirements are not especially onerous: a federal firearms dealer's license costs $200 for the first three years (and $90 to renew for further three-year terms), *see* 27 C.F.R. § 478.42(c)(2), and there are tens of thousands of federally licensed firearms dealers around the country, all of whom bear the costs of background checks and recordkeeping. These "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).

The conclusion that plaintiffs are not irreparably harmed by the Rule is confirmed by their delay in challenging it. Although the Rule was promulgated in April, plaintiffs waited until July—a month before the Rule's effective date—to move for a preliminary injunction. That "delay in seeking relief vitiates much of the force"

49

of plaintiffs' "allegations of irreparable harm." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013) (quotation omitted).

**2.** In response, the private plaintiffs (Morehouse Br. 44-50) reference a scattershot of underdeveloped alleged harms, but none is persuasive.

Plaintiffs first contend (Morehouse Br. 44-45) that the Rule causes irreparable harm by interfering with their Second Amendment rights. But plaintiffs have developed no argument that the Rule violates the Second Amendment and so have forfeited any ability to claim irreparable harm on that basis. And in any event, as explained above, *see supra* pp. 33-35, the Rule does not infringe the Second Amendment right.

Plaintiffs next erroneously urge (Morehouse Br. 46-48) that the Rule irreparably harms them by purportedly creating new federal crimes and forcing them to change their behavior to avoid criminal liability. As an initial matter, the Rule does not create any criminal liability; the Rule merely explains, for example, that certain nonfunctional frames and receivers or kits for assembling frames and receivers are "firearms" and subject to the Gun Control Act. In any event, the mere fact of having to change behavior does not constitute irreparable harm. Instead, the relevant question is whether plaintiffs face harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). As explained above, complying with the Rule by, for example, obtaining a federal firearms license, adhering to the Gun Control Act's

50

serialization, background check, and recordkeeping requirements, or purchasing nonfunctional frames and receivers through a licensed dealer rather than directly from an unlicensed manufacturer online, does not meet that exacting standard.

To the extent that plaintiffs intend to additionally argue (Morehouse Br. 47) that the uncertainty generated by the Rule constitutes irreparable harm, that argument is both forfeited as undeveloped and is unsupported by any specific explanation of the alleged uncertainty or vagueness that plaintiffs claim. In addition, as explained, *see supra* pp. 21-22, to the extent that application of the Rule to any specific item is unclear, ATF has issued an Open Letter providing additional guidance on whether particular products are "firearms" under the Gun Control Act and maintains a process where any individual can submit a request that ATF classify a specific item.

Similarly unavailing is plaintiffs' undeveloped claim in a footnote (Morehouse Br. 47 n.25) that the Rule makes it illegal for an individual to purchase a combination of legal parts. Not only is that argument forfeited, *Heaton*, 930 F.3d at 1023, but as the district court explained, "nothing in the text of the [Rule] creates any new federal crimes," App. 12; R. Doc. 85, at 12. To the extent plaintiffs mean to refer to the portion of the Rule explaining that it would be impermissible under preexisting federal statutes for entities to "structur[e] transactions to avoid" the Gun Control Act's requirements, that portion of the Rule is specifically referring to requirements placed on "persons who manufacture and sell unassembled weapons or weapon parts kits." App. 702; 87 Fed. Reg. at 24,713. It does not restrict individuals not otherwise

51

prohibited from possessing firearms from buying the various component parts needed to make their own firearm or suggest any criminal consequences for doing so.

Finally, plaintiffs contend (Morehouse Br. 49-50) that the Rule will irreparably harm the firearms industry by causing substantial economic harm to manufacturers and dealers. But plaintiffs fail to provide any evidence substantiating those assertions, which are impossible to square with the relatively minor steps necessary for manufacturers and dealers to comply with the Rule. And although plaintiffs cite (Morehouse Br. 49-50) ATF's Regulatory Impact Analysis, which stated that some non-licensed dealers may choose to go out of business rather than obtain a license, wholly absent from plaintiffs' brief is any claim that *they* will make such a choice. Nor, even assuming the Court were to consider potential harm to other business, could such self-inflicted harm provide the irreparable harm necessary to support an injunction. *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).

**3.** The State plaintiffs advance a different but similarly inadequate set of alleged irreparable injuries, claiming (States' Br. 35-40) that the Rule conflicts with their policy preferences and will harm their economies and tax revenue. Not only do these claimed harms rest on unsubstantiated speculation about the Rule's effects, but they also embody intangible and derivative harms that are insufficient to support even Article III standing, much less to justify a preliminary injunction.

Appellate Case: 22-2812     Page: 60     Date Filed: 11/29/2022 Entry ID: 5221982

The States' argument regarding their alleged harms reflects a fundamental misunderstanding of the Rule. As explained, the Rule does not prevent any manufacturer or dealer from selling any item; nor does the Rule prevent any individual from purchasing any item. Instead, the Rule only clarifies that sales of certain firearms must take place in accordance with federal statutory licensing, background check, and recordkeeping requirements. The States' claim that the Rule will materially deter individuals from obtaining firearms and will have some economic harm on manufacturers and dealers rests on impermissible speculation regarding how third parties will respond to the clarification that they must be licensed to engage in the business of selling certain weapons parts kits and nonfunctional frames and receivers. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). For the same reasons, the States' reliance on a purported decrease in tax revenue cannot constitute irreparable harm.

Not only have the States failed to demonstrate irreparable harm necessary to entitle them to an injunction, but they have also failed to satisfy even the minimal requirements of Article III standing. To the extent that the States contend that the Rule conflicts with their own policy preferences, their disagreement with the Rule does not give rise to a cognizable injury. Adopting the contrary view would draw the federal courts into all manner of generalized grievances at the behest of States seeking to secure by court order what they were unable to obtain through the political process. That result cannot be squared with Article III, which "serves to prevent the

53

judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), by preserving the "proper— and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The proper channel for seeking a change in a federal policy directly regulating individuals, but incidentally affecting a State, is for the State's citizens to advocate that change to their representatives in Congress or to the federal agency concerned.

The States cannot rescue their lack of standing by asserting a loss of tax revenue. The Supreme Court has emphasized that standing is more difficult to establish where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (emphasis omitted); *see, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Indeed, nearly a century ago, the Supreme Court rejected a State's standing to challenge a federal tax law that would assertedly cause "taxpayers to withdraw property from the state," thereby diminishing its tax revenues. *Florida v. Mellon*, 273 U.S. 12, 17 (1927). The Court explained that the State's asserted injury was, "at most, only remote and indirect" and that the State had failed to establish "any direct injury" attributable to the federal law. *Id.* at 18.

54

## B. The Balance of the Equities and the Public Interest Strongly Favor Denying Injunctive Relief

Even if plaintiffs could demonstrate some irreparable harm, any such harm could not outweigh the significant public interest in enforcement of the Rule.

As ATF explained in the Rule, unserialized firearms have proliferated in recent years; in 2021, nearly 20,000 such firearms were reported to ATF as having been recovered by law enforcement from potential crime scenes, and the United States has recently brought many criminal cases "to counter the illegal trafficking of unserialized privately completed and assembled weapons, the possession of such weapons by prohibited persons, and other related Federal crimes." App. 645-46; 87 Fed. Reg. at 24,656-57. This "proliferation of untraceable firearms severely undermines" law enforcement's ability to engage in the "integral" process of "determin[ing] where, by whom, or when" a firearm used in a crime was manufactured, and "to whom [it was] sold or otherwise disposed." App. 645, 648; 87 Fed. Reg. at 24,656, 24,659.

And not only does the Rule enable law enforcement officials to better trace firearms used in crimes, but it also ensures that those firearms do not end up in the hands of individuals prohibited from possessing firearms—such as felons—in the first place. One of the Gun Control Act's requirements is that a dealer conduct a background check before selling a firearm to an unlicensed person. The Rule clarifies that products like weapon parts kits and partially complete frames or receivers must be sold in compliance with the statute, preventing (for example) violent felons from

purchasing firearms over the Internet. The Rule therefore, as ATF recognized, "increase[s] public safety by, among other things, preventing prohibited persons from acquiring firearms." App. 643; 87 Fed. Reg. at 24,654.

Plaintiffs have no answer to the substantial law enforcement and public safety interests advanced by the Rule, instead resting primarily on the unexplained assertion that "ATF will not be harmed" by an injunction. States' Br. 41; Morehouse Br. 55. That assertion is, as ATF explained in the Rule, incorrect. Nor can plaintiffs advance their case by attempting to portray the interest as simply belonging to ATF; the Rule supports public safety and the personal safety of all in our country by ensuring both that fewer firearms make it into the hands of criminals in the first place and that law enforcement officials are able to solve crimes and stop those who use firearms to commit crimes and perpetrate violence. In the face of such weighty interests, it is difficult to conceive how the requirement to obtain a $200 license or purchase a firearm parts kit from a licensed dealer could justify a preliminary injunction.

Plaintiffs' brief suggestion (States' Br. 41; Morehouse Br. 55) that the government's interests in the Rule should be discounted because (in their view) the Rule is illegal disregards the preliminary injunction framework. To succeed in their request for a preliminary injunction, plaintiffs must demonstrate not only that they are "likely to succeed on the merits," but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. If plaintiffs' argument were correct, those three factors would collapse into one: any

56

plaintiff who could establish a likelihood of success on the merits would also establish that the balance of equities and the public interest tipped in his favor. That is not the law. *See id.* at 31-32 (declining to "address the underlying merits" but holding plaintiffs had failed to meet the equitable factors).

### C. Any Injunction Must Be Narrowly Tailored

In all events, plaintiffs cannot justify the sweeping injunction against the Rule that they appear to seek. To the contrary, any injunction "must be narrowly tailored to remedy only the specific harms shown by the plaintiffs." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (quotation and alteration omitted). That principle requires limiting any injunction here in two ways.

First, any injunction must be limited to any specific provisions of the Rule for which the Court finds plaintiffs would likely be entitled to vacatur on final judgment. *Cf.* App. 719; 87 Fed. Reg. at 24,730 (severability clause in the Rule). Similarly, even if the Court were to determine plaintiffs were likely to succeed on their policy shit, Second Amendment-related, or logical outgrowth arguments, that would not justify a preliminary injunction. Remand, not vacatur, is generally appropriate relief in an APA suit where it "is conceivable that [the agency] may be able" to correct the identified deficiencies on remand and vacatur would be "disruptive." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993); *see also U.S. Steel Corp. v. EPA*, 649 F.2d 572, 576-77 (8th Cir. 1981) (remanding to EPA but leaving rule "in effect pending completion of further administrative proceedings"). The defects

57

plaintiffs purport to locate in the Rule are precisely those amenable to correction on remand: the failure to fully articulate the agency's reasons for acting and to conduct an additional round of notice and comments. *Cf. Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021) (remanding without vacatur where the agency had not properly employed notice-and-comment procedures and had failed to consider relevant factors). And as explained in detail above, *see supra* pp. 55-56, the disruptive consequences of setting aside the Rule in this case would be immense.

Second, any injunction must run only to any specific plaintiffs whom the Court finds have demonstrated some harm from the Rule.

Article III "limits the exercise of the judicial power to 'Cases' and 'Controversies,'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and consistent with that limitation, a court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (quotation omitted). Those constitutional limitations are reinforced by principles of equity. A court's authority to award equitable relief is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And it is a longstanding principle of equity that injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

58

Here, as explained above, no plaintiff has demonstrated the sort of injury that would support preliminary injunctive relief; nor have the State plaintiffs even demonstrated standing to proceed. But even if some plaintiff had established an injury, "complete relief" to that plaintiff could be accomplished through a preliminary injunction limited only to that plaintiff. Thus, before determining that any particular plaintiff is entitled to a preliminary injunction, the Court must ensure that that specific plaintiff has demonstrated an irreparable injury that outweighs the public interest in enforcing the Rule.

To the extent that plaintiffs seek a nationwide preliminary injunction, such relief is particularly unwarranted. For the reasons explained, relief that goes beyond the plaintiffs to the case contravenes Article III and principles of equity. And nationwide injunctions create additional legal and practical problems. They circumvent the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied. Fed. R. Civ. P. 23. They enable forum shopping and empower a single district judge to effectively nullify the decisions of all other lower courts by barring application of a challenged policy in any district nationwide. *DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring). And they operate asymmetrically. A nationwide injunction anywhere freezes the challenged action everywhere, such that the government must prevail in every suit while any plaintiff can derail a federal regulation nationwide with a single district-court victory. *See id.* And the prospect of a single district court decision blocking

59

government policy nationwide while the ordinary appellate process unfolds often leaves the Executive Branch with little choice but to seek emergency relief, which deprives the judicial system of the benefits that accrue when multiple courts grapple with complex legal questions. *See id.* at 600-01.

## CONCLUSION

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JENNIFER KLEMETSRUD PUHL
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 *s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-33388*
*sean.r.janda@usdoj.gov*

November 2022

60

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of November 16, 2022 because it contains 14,881 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Sean R. Janda*

Sean R. Janda

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda